**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
09/28/2018

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 16-35021-H4-7** |
| **OLUYEMISI OMOKAFE** | § | |
| **OKEDOKUN,** | § | **Chapter 7** |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| **ELBAR INVESTMENTS, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Adversary No. 17-03001** |
| **v.** | § | |
| | § | |
| **OLUYEMISI OMOKAFE** | § | |
| **OKEDOKUN, FELIX AMOS, EVA S.** | § | |
| **ENGELHART, CHAPTER 7** | § | |
| **TRUSTEE, TODD A. PRINS, UNITED** | § | |
| **SENTRY MORTGAGE** | § | |
| **INVESTMENT FUND #1, LLC,** | § | |
| **DONALD ANTHONY MACKENZIE,** | § | |
| **TRANSWORLD LEASING** | § | |
| **CORPORATION, and INDUSTRY** | § | |
| **DRIVE PARTNERS, LTD.** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION**
**[This Order Relates to Adv. Doc. No. 68]**

### I.   INTRODUCTION

The adversary proceeding pending before this Court was filed due to an unscrupulous attorney's theft of $2.4 million. This attorney has no moral compass whatsoever, and his perfidy has resulted in litigation among his former clients, friends, and various third parties who did not have the displeasure of knowing him. While he deservedly spends time behind bars—he has recently been sentenced to six years in prison for his illegal greed—the individuals and entities

he deceived and cheated are left duking it out over who has a superior claim to the remaining proceeds that he stole but was prevented from spending.

This Court conducted a multi-day trial in this adversary proceeding, and then took the matter under advisement.  The Court now issues this Memorandum Opinion explaining why it has decided to deny all relief requested by the plaintiff except for one of its claims against the dishonest attorney.  Set forth below are this Court's Findings of Fact and Conclusions of Law, which this Court makes pursuant to Federal Bankruptcy Rule 7052.  To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such; and to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such.  The Court reserves the right to make additional findings and conclusions as it deems appropriate or as any of the parties may request.

## II.    FINDINGS OF FACT

### A.  The Parties

1.  Elbar Investments, Inc.

Elbar Investments, Inc. ("Elbar"), the sole plaintiff in this adversary proceeding, is a privately-held company based in Houston, Texas, that buys properties at public foreclosure sales in Harris County, Texas and resells them for a profit.  [*See* Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 53:9-11; TransWorld's Ex. JJ, Klaimy Dep. 5:20–6:5].

2.  Oluyemisi Omokafe Okedokun

Oluyemisi Omokafe Okedokun is the debtor in the main Chapter 7 case (the "Debtor"). [*See* Main Case Doc. No. 1].

3.  Felix Amos

Felix Amos ("Amos") is the Debtor's husband.  [*See* Main Case Doc. No. 197 at 1–2 of

20, ¶ 2[1]].

4.  United Sentry Mortgage Investment #1, LLC

United Sentry Mortgage Investment #1, LLC ("United Sentry") is a private lender based

in Spring, Texas, that provided financing to an entity owned by the Debtor and Amos—namely,

Triple Gate Investment LLC ("Triple Gate").  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 44:21-

22, 46:10-13, 47:2-8; Pl.'s Ex. 13].

5.  Donald Anthony MacKenzie

Donald Anthony MacKenzie ("MacKenzie") is the president and owner of United Sentry.

[Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 44:10-20].

6.  TransWorld Leasing Corporation

Transworld Leasing Corporation ("Transworld") is a privately-held leasing company

based in San Antonio, Texas.  [*Id.* at 28:23–30:6].

7.  Industry Drive Partners, Ltd.

Industry Drive Partners, Ltd. ("Industry Drive") is a privately-held entity headquartered

in San Antonio, Texas.  [*Id.* at 111:7-10, 112:6-14].

---

[1] On March 27, 2017, this Court issued its Findings of Fact and Conclusions of Law Regarding Order (1) Requiring Todd Prins to Wire Transfer $2.4 Million to the Chapter 7 Trustee by No Later Than 5:00 P.M. on December 12, 2016; and (2) Requiring Todd Prins to Personally Appear in Court and Show Cause Why He Should Not Be Sanctioned.  [Main Case Doc. No. 197].  The instant Memorandum Opinion adopts certain findings of the March 27, 2017, Findings of Fact and Conclusions of Law that this Court made in the Main Case with respect to the show cause order and cites to them throughout this Memorandum Opinion.

3

8.  <u>Todd A. Prins</u>

Todd A. Prins ("<u>Prins</u>") is a San Antonio-based attorney—now no longer licensed to practice law and, instead, confined in a federal prison—who was the principal of the Prins Law Firm (the "<u>Prins Law Firm</u>").  [*See* Main Case Doc. No. 197 at 2 of 20, ¶ 3].

9.  <u>Eva S. Engelhart, Chapter 7 Trustee</u>

Eva S. Engelhart is the Chapter 7 Trustee in the Debtor's main Chapter 7 case (the "<u>Trustee</u>").

**B.  Relevant Pre-Bankruptcy Events Concerning TransWorld and Prins**

1.  Transworld is a leasing company headquartered in San Antonio, Texas, that leases a myriad of items, including automobiles, medical equipment, airplanes, bulldozers, and even a brewery.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 28:23–29:8].  Lenny Cash ("<u>Mr. Cash</u>") founded TransWorld in 1979.  [*Id.* at 28:25–29:10].  Mr. Cash and Peggy Cash ("<u>Ms. Cash</u>") (collectively, the "<u>Cashes</u>") were married in 1996; shortly thereafter, Ms. Cash became the 100% shareholder of TransWorld.  [*Id.* at 29:11–30:3].  Ms. Cash is presently the president of TransWorld.  [*Id.* at 30:7-9].  TransWorld currently has 12 full-time employees, [*id.* at 30:10-14]; at one point, TransWorld had as many as 30 employees, as well as an office in Dallas, Texas, [*id.* at 30:15-18].

2.  Prins, who was licensed to practice law in 1991,[2] was referred to the Cashes by a friend and client of the Cashes.  [*Id.* at 33:8-12].  Prins began providing legal services to the Cashes and to TransWorld in approximately 1999.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 17:14-18, 33:16-23; TransWorld's Ex. HH, Prins Dep. 93:5-13].  Aside from Prins representing

---

[2]  *See State Bar of Texas – Find a Lawyer – Todd A. Prins*, State Bar of Texas, https://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&template=/Customsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=183309 (last visited September 28, 2018).

the Cashes and TransWorld, Prins and his wife, Paula Prins ("Ms. Prins"), were personal friends of the Cashes.  [TransWorld's Ex. HH, Prins Dep. 225:17-22].

      3.      In 2005 or 2006, a tax issue arose with certain of TransWorld's taxes due to the misdeeds of a TransWorld employee.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 31:8–32:16]. Eventually, a tax suit was commenced by the Bexar County Tax Assessor-Collector in Bexar County, Texas (the "Tax Assessor") and a default judgment against TransWorld was entered on December 21, 2006, in the amount of $230,853.66.  [TransWorld's Ex. K; TransWorld's Ex. HH, Prins Dep. 98:2-9].  On February 4, 2008, TransWorld wrote a check in the amount of $230,853.66 payable to the order of the IOLTA account of the Prins Law Firm (the "IOLTA")[3] at BBVA Compass Bank ("BBVA") for the past due taxes related to the tax suit commenced by the Tax Assessor.[4]  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 16:25–17:4; Pl.'s Ex. 46, Ex. D; TransWorld's Ex. D].  At this time, Prins told Ms. Cash she needed to make the check payable to the IOLTA, and that he would then write a check to Linebarger,[5] and that Linebarger would then apply the money to the accounts for the county.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 35:16-24].  Ms. Cash initially questioned why she could not make the check directly payable to Sylvia Romo ("Romo")[6] or to Linebarger, instead of to the IOLTA, as it was "kind of, you know, a long chain of everybody,"  [id. at 35:20–36:6], and Prins replied that this was the way things

---

[3] "IOLTA" is an acronym for Interest on Lawyers Trust Accounts.  The last four digits of the IOLTA are 8544. [Pl.'s Ex. 2].

[4] It is not entirely clear what happened after the default judgment was entered against TransWorld.  Prins testified that the judgment was set aside on TransWorld's motion, and that eventually the Tax Assessor was paid the money it was owed related to this lawsuit.  [TransWorld's Ex. D, Prins Dep. 98:20-25, 116:17–117:8].  Ms. Cash, on the other hand, testified that the matter was "settled."  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 19:7-20, 35:1-6, 35:16-18].

[5] Linebarger Goggan Blair & Sampson, LLP, ("Linebarger") is the law firm that has been representing the Tax Assessor in the tax matters related to TransWorld.  [See id. at 35:10-14].

[6] Romo was the Tax Assessor at that time.  [See id. at 35:25–36:3].

were done in order for the Tax Assessor to avoid receiving a bad check from the taxpayer, [*id.* at 36:6-8]. In reliance upon Prins' advice, Ms. Cash thus wrote the check payable to the order of the IOLTA instead of to the Tax Assessor directly because she believed "that's the way things are done." [*Id.* at 36:11-13]. Prins subsequently told the Cashes that TransWorld's debt to the Tax Assessor had been paid and was resolved. [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 16:25–17:8; TransWorld's Ex. D, Prins Dep. 116:17–117:5, 118:2-5]. At his deposition, Prins asserted that he did in fact pay these monies to the Tax Assessor, [TransWorld's Ex. D, Prins Dep. 98:12-19, 99:1-19, 117:1-8], but TransWorld is currently in a half million dollar lawsuit with the Tax Assessor over the payment of these monies, interest, and legal fees,[7] [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 13:23–14:4, 23:20–24:15, 36:14–37:1].

4.     In 2011, Mr. Cash was diagnosed with cancer. [*Id.* at 17:9-13].

5.     Sometime around the beginning of January 2014, Ms. Cash was reviewing TransWorld's 2014 tax statement regarding its 2013 taxes when she learned that TransWorld owed delinquent taxes in the amount of $496,198.52.[8] [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 19:7-12; TransWorld's Ex. U at 2]. Ms. Cash contacted Prins regarding the 2014 tax statement from the Tax Assessor, as she believed that TransWorld did not owe any taxes and had

---

[7] The record is murky as to just exactly how many tax disputes TransWorld had or might have had—or still has—with the Tax Assessor over the many years that Prins represented TransWorld; and the record is equally unclear as to just exactly how many payments, if any, Prins made to the Tax Assessor on behalf of TransWorld. Unfortunately, none of the parties at trial presented the Court with any written accounting or charts to give clarity on this issue. What is unquestionably clear is that TransWorld has paid approximately $15,000 to $18,000 in legal fees to the law firm (a different law firm than the Prins Law Firm) that TransWorld hired to represent it in the current dispute with the Tax Assessor. [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 40:2-14; TransWorld's Ex. EE].

[8] It is not entirely clear whether the $496,198.52 in delinquent taxes arose solely from the judgment that was entered against TransWorld and was subsequently allegedly set aside and then fully paid off according to Prins, [*see* TransWorld's Ex. K; *supra* Finding of Fact No. 3], or whether the $496,198.52 in delinquent taxes was related to one or more of the other tax lawsuits that TransWorld was apparently involved in around approximately 2006 to 2008, [*see* TransWorld's Ex. HH, Prins Dep. 98:1-4, 98:20-25, 114:23–115:3, 115:20-24, 117:9–118:1; *supra* footnote 7 discussing potential tax disputes TransWorld had with the Tax Assessor]. Nonetheless, as discussed in Finding of Fact Nos. 3 and 5–6, Ms. Cash believed that the $496,198.52 in delinquent taxes was related to a matter that had previously been fully paid off and disposed of during Prins' representation of TransWorld.

already settled the matter back in 2008 when it gave Prins $230,853.66 to pay to the Tax Assessor.  [*See* Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 19:7-15].  Prins assured Ms. Cash that TransWorld did not owe any taxes, that everything had been settled and paid previously, and that Prins would "take care of it."  [*Id.* at 19:7-15].  Ms. Cash did not hear anything else about this tax dispute issue until a TransWorld customer called her in 2016 to let her know that TransWorld was on a delinquent tax list in a newspaper article.  [*Id.* at 19:15-17].

6.      At his deposition, Prins testified that in late 2015 or early 2016, he, as the attorney for TransWorld, was negotiating with the Tax Assessor over monies allegedly owed by TransWorld.  [TransWorld's Ex. HH, Prins Dep. 77:2-7].  In addition to the amounts allegedly in dispute, Prins testified that the Tax Assessor stated that there were also monies due that were not in dispute.  [*Id.* at 77:2-7].  Thus, in January 2016—without TransWorld's (i.e., the Cashes') knowledge or permission—Prins claims that he paid the Tax Assessor approximately $143,000.00 for TransWorld's alleged tax obligations that were not in dispute.[9]  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 18:19–19:1; TransWorld's Ex. HH, Prins Dep. 77:17-25, 83:19-23, 223:13-21].

7.      At or around this point in time (i.e., late 2015 to early 2016), Mr. Cash was suffering from terminal cancer.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 11:17-22, 17:9-13].

8.      In January of 2016, Ms. Cash learned from a TransWorld customer that TransWorld was listed on a delinquent tax list for Bexar County, Texas, in a local newspaper article.  [*Id.* at 17:23–18:2, 19:15-17, 38:7-17].  The Cashes contacted Prins about TransWorld's taxes being listed as delinquent, as the Cashes believed that TransWorld had paid all

---

[9] The Court notes that Prins testified that the money he paid the Tax Assessor in January 2016 on TransWorld's behalf actually belonged to Industry Drive.  [TransWorld Ex. HH, Prins Dep. 77:20-23, 78:4-10].  It appears to the Court that Prins did not pay the $143,000.00 because presently the Tax Assessor claims that TransWorld owes half a million dollars in delinquent taxes and fees.  [Finding of Fact No. 5].

delinquencies and the matter had been settled back in 2008.  [*Id.* at 19:18-20].  In response, Prins told the Cashes that the Tax Assessor had likely "misapplied" the $230,853.66 that TransWorld had paid to the IOLTA in 2008 (and that Prins was then to have paid to the Tax Assessor on TransWorld's behalf) and that the Tax Assessor needed to research the issue and straighten out its records.  *[Id.* at 19:21-25, 37:14-25].

9.      Even though Prins allegedly paid approximately $143,000.00 to the Tax Assessor in January 2016 (without the Cashes' knowledge or consent), in approximately April 2016, he told the Cashes that the Tax Assessor wanted TransWorld to deposit into his IOLTA a percentage of the taxes it owed as "good faith" money in the amount of $169,807.29 while he and the Tax Assessor worked out the disputed tax issues.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 19:21–20:1; TransWorld's Ex. HH, Prins Dep. 78:2-10, 78:19-25].   To convince TransWorld to place the $169,807.29 into his IOLTA, Prins created a false letter dated April 6, 2016, from Linebarger (using this law firm's letterhead), stating that TransWorld owed delinquent taxes in the amount of $169,807.29.  [Pl.'s Ex. 46, Ex. A; TransWorld's Ex. A; TransWorld's Ex. HH, Prins Dep. 93:23–95:4, 114:3-13, 223:22–224:5].  Ms. Cash questioned Prins as to why she needed to put the disputed money into the IOLTA, as she did not believe that TransWorld owed any taxes.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 20:2-11].  Prins told Ms. Cash that it was "just a formality," and then Ms. Cash questioned whether she could obtain a bond, instead of placing the alleged disputed money into the IOLTA.  [*Id.* at 20:3-6].  Prins told Ms. Cash that she could procure a bond, but that she would have to put down 125% of the money that was in dispute.  [*Id.* at 20:7-8].

10.      Based on the representations from Prins that TransWorld needed to deposit a percentage of the taxes in dispute as "good faith" money to be held in the IOLTA so that

TransWorld's tax issues could be resolved—and not wanting to post a bond, as Ms. Cash did not want to put down 125% of the disputed amount—on May 17, 2016, TransWorld (i.e., Ms. Cash as its president) "reluctantly" delivered a check in the amount of $169,807.29 to Prins for deposit into the IOLTA.   [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 19:16–20:14; Pl.'s Ex. 12; TransWorld's Ex. G].

**C. Relevant Pre-Bankruptcy Events Concerning United Sentry, MacKenzie, the Debtor, Amos, and Prins**

11.     On June 16, 2015, Triple Gate, in order to obtain financing from United Sentry, executed that one certain promissory note in the original principal amount of $1,537,500.00 (the "Note").   [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 46:10–47:4; Pl.'s Ex. 13].   Triple Gate (through its authorized representatives, the Debtor and Amos) executed the Note to obtain financing for its purchase of certain residential real property—namely, 5506 Holly Springs Drive, Houston, Texas 77056—which is located in the very toney west Houston neighborhood of Tanglewood (the "Property").   [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 46:10-13, 47:2-8; Pl.'s Ex. 13].   Twelve individual investors, including MacKenzie, plus United Sentry, contributed funds to United Sentry in order for this entity to finance the loan to Triple Gate. [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 47:9-19, 49:13-16, 93:21–94:4, 219:12–220:6].   At the time of the filing of the Debtor's Chapter 7 petition, the Debtor and Amos, plus their children, were residing at the Property.

12.     In addition to executing the Note, Triple Gate also executed a deed of trust on June 16, 2015, naming MacKenzie as the trustee on the Property (the "Deed of Trust").   [Adv.

Doc. No. 221, Feb. 7, 2018, Trial Tr. 51:25–52:11; Pl.'s Ex. 14].   The Deed of Trust secures

repayment of the Note and contains the following language:[10]

**Beneficiary's Rights**
. . .
4.  If Grantors default on the note, fails to perform any of Grantors' obligations, or fails on demand to reimburse Beneficiary for the sums advanced, and such failure or default continues after Beneficiary gives Grantors written notice of the failure or default and twenty (20) days to cure in the event of a monetary failure, or thirty (30) days to cure all other matters, the Beneficiary may:
. . .
>    b.    Request Trustee to foreclose this lien, in which case Beneficiary or Beneficiary's agent shall give notice of foreclosure sale as provided by the Texas Property Code as then amended; and
. . .

**Trustee's Duties**

   If requested by Beneficiary to foreclose this lien, Trustee shall:

1.  Either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then amended;

2.  Sell and convey all or part of the Property to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to other exceptions to conveyances and warranty; and

3.  From the proceeds of the sale, pay, in this order:

>    a.   expenses of foreclosure, including a normal hourly fee to the Trustee;
>
>    b.   to Beneficiary, the full amount advanced, or the full amount of the principal, interest, attorney's fees, and other charges due and unpaid;
>
>    c.   any amounts required by law to be paid before payment to Grantor; and to Grantor, any balance.

**General Provisions**
. . .
5.  No sale under this Deed of Trust shall extinguish the lien created by this instrument.

[Pl.'s Ex. 14].

---

[10] Even though the Deed of Trust contains language suggesting that it was executed by more than one grantor, the fact is that only Triple Gate executed the Deed of Trust.  [Pl.'s Ex. 14].

13.     MacKenzie has known Prins since approximately 1998 or 1999, or for approximately 20 years. [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 49:17-18; TransWorld's Ex. HH, Prins Dep. 204:19-22]. Prins has periodically done legal work for MacKenzie since 1999. [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 49:22-24; TransWorld's Ex. HH, Prins Dep. 204:19–205:5].

14.     United Sentry had to make several demands to Triple Gate for late payment of the Note. [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 50:13-16]. MacKenzie made the decision on behalf of United Sentry for Prins to represent it for collection of the Note after Triple Gate fell into default. [*Id.* at 50:15-22]. Prins sent out several demand letters on behalf of United Sentry, demanding payment of the late payments. [*Id.* at 50:17-22]. Triple Gate failed to make payment.

15.     On December 30, 2015—unbeknownst to United Sentry (as the holder of the lien on the Property)—the Debtor, in her capacity as the Manager of Triple Gate, executed a general warranty deed conveying the Property to herself and Amos in their individual capacities. [Pl.'s Ex. 16].

16.     Because Triple Gate had defaulted under the Note, United Sentry, through the Prins Law Firm, posted the Property for a foreclosure sale to be held on October 4, 2016. [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 50:3-5, 56:5-6, 57:13-15]. MacKenzie hired the Prins Law Firm to handle the foreclosure sale on the Property. [*Id.* at 56:5-6].

17.     On October 3, 2016, MacKenzie, as manager for United Sentry, appointed Prins or Victoria Shum ("<u>Shum</u>"), an associate at the Prins Law Firm, as substitute trustee under the Deed of Trust. [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 81:20–82:5; Pl.'s Ex. 17].

**D.  Relevant Pre-Bankruptcy Events Concerning Industry Drive and Prins**

18.     G5 Property Holdings, LLC ("G5") is a San Antonio family-owned business that sells liquor, wine, and beer on a wholesale and retail basis.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 112:6-10].  Industry Drive is the entity that owns G5's corporate office.  [*Id.* at 111:7-10, 112:11-14].  Industry Drive collects rents from G5 and maintains the property on which G5's corporate office is located.  [*Id.* at 112:15-24].

19.     Inez Cindy Gabriel ("Gabriel") is one of the general partners for Industry Drive.  [*Id.* at 110:15-20].  Gabriel and each her siblings, to some degree, help manage and run the family business—i.e., G5.[11]   [*Id.* at 111:9-15, 158:14-19].  James Pfirrmann ("Pfirrmann") is married to one of Gabriel's sisters, Eleanor Gabriel ("Eleanor").  [*Id.* at 111:23–112:2].  In October of 2015, Pfirrmann was a co-managing partner of Industry Drive; Gabriel was the other managing partner.  [*Id.* at 114:13-16].  Both Gabriel and Pfirrmann had signature authority on Industry Drive's bank account.  [*Id.* at 123:16-22].  Disputes arose between Pfirrmann and the Gabriel Family regarding the family's businesses.  [*Id.* at 113:11–114:3].

20.     Prins was Pfirrmann's personal attorney.  [*Id.* at 115:14-15].  Neither Industry Drive nor G5 were clients of Prins, nor was there any business conducted between Industry Drive and Prins.  [*Id.* at 115:10-18].

21.     On October 7, 2015, Pfirrmann withdrew $200,000.00 from Industry Drive's bank account and tendered it to Prins to deposit into the IOLTA.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 114:13–115:3; Industry Drive's Ex. 4; Pl.'s Ex. 47 at Ex. A].  On October 16, 2015, Pfirrmann withdrew $100,000.00 from Industry Drive's bank account and again tendered it to

---

[11] The names of Gabriel's siblings are as follows:  Johnny Gabriel, Ronnie Gabriel, Roslyn Gabriel, Jennifer Barbara Gabriel, and Eleanor Gabriel.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial. Tr. 118:15-18; Pl.'s Ex. 47].  The Court will refer to Inez Cindy Gabriel, Johnny Gabriel, Ronnie Gabriel, Roslyn Gabriel, and Jennifer Barbara Gabriel as the "Gabriel Family."

Prins for deposit into the IOLTA.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 114:13–115:3; Pl.'s Ex. 47 at Ex. B; Industry Drive's Ex. 4].  Prins did, in fact, deposit into the IOLTA the entire $300,000.00 given to him by Pfirrmann.  [Industry Drive's Ex. 4].

22.     Once Gabriel became aware that Pfirrmann had withdrawn the above-referenced $300,000.00 from Industry Drive's account, she made demands on Pfirrmann and Eleanor that the funds be returned.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 123:23–124:3, 159:16–160:13; TransWorld's Ex. HH, Prins Dep. 29:18-23].

23.     On December 16, 2015, the Gabriel Family and Industry Drive filed a lawsuit against Pfirrmann in Bexar County, Texas, seeking return, among other things, of the $300,000.00 Pfirrmann took from the Industry Drive account, and bringing claims for judicial dissolution of Industry Drive under the Texas Business Organization Code, breach of fiduciary duty, conversion, and breach of partnership agreement (the "Pfirrmann Lawsuit").[12]  [Pl.'s Ex. 47; Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 115:19-25].

24.     On or around October 4, 2016, the Gabriel Family, Eleanor, Pfirrmann, and Prins held a meeting in an effort to resolve the Pfirrmann Lawsuit.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 118:3-19, 119:9-11; TransWorld's Ex. HH, Prins Dep. 31:20-24].  There is conflicting testimony regarding whether the issue of Prins personally filing for bankruptcy arose at this meeting on October 4, 2016: Gabriel testified that Prins filing for personal bankruptcy was not raised at the meeting, while Prins testified that the issue did arise.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 119:16-22; TransWorld's Ex. HH, Prins Dep. 31:18-24].  Because—as discussed more in depth *infra* in the Credibility of Witnesses Section—the Court finds Gabriel to be a very credible witness and Prins not to be a credible witness, the Court finds that the issue of Prins'

---

[12] The Gabriel Family and Industry Drive filed a First Amended Petition and Application for Injunctive Relief on September 27, 2016.  [Industry Drive's Ex. 1].

personal bankruptcy was **not** mentioned or discussed at the meeting on October 4, 2016.  As a result of the settlement meeting, the Gabriel Family, Eleanor, and Pfirrmann negotiated an agreement in which the Gabriel Family agreed to buy out Eleanor and Pfirrmann's interest in Industry Drive.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 120:4-9].  The agreement, however, due to the need to obtain financing for the purchase of Eleanor and Pfirrmann's interests, was not completely finalized until approximately September 2017.  [*Id.* at 120:12–121:16].  At the settlement meeting, Prins never gave any indication to Pfirrmann or Gabriel that the $300,000.00 was at risk.  [TransWorld's Ex. HH, Prins Dep. 33:7-12].

**E.  Additional Relevant Pre-Bankruptcy Events Concerning Prins**

25.     In addition to the IOLTA, the Prins Law Firm also had an operating account at BBVA (the "BBVA Operating Account")[13] and another operating account at Wells Fargo (the "Wells Fargo Operating Account").[14]  [Main Case Doc. No. 197 at 3 of 20, ¶ 7].

26.     On or around September 29, 2016, Prins and Ms. Prins personally filed a Chapter 7 petition in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the "Prins' Bankruptcy").  [TransWorld's Ex. HH, Prins Dep. 71:6-7; Pl.'s Ex. 42].  The Prins' Bankruptcy was assigned to Bankruptcy Judge Craig A. Gargotta ("Judge Gargotta").  [*See Todd A. Prins and Paula R. Prins*, Case No. 16-52187-cag, Bankr. W.D. Tex.].

27.     On October 1, 2016, the balance of the IOLTA was $2,041.17.  [Pl.'s Ex. 2].

---

[13] The last four digits of the BBVA Operating Account are 8552.  [Pl.'s Ex. 5].

[14] The last four digits of the Wells Fargo Operating Account are 2166.  [Pl.'s Ex. 7].

**F.  The Debtor's Filing for Bankruptcy and Relevant Post-Bankruptcy Events**

1.  <u>The Filing of the Debtor's Petition</u>

28.     On October 4, 2016 (the "<u>Petition Date</u>"), the Debtor filed a Chapter 7 petition that initiated the Main Chapter 7 case.  [Main Case Doc. No. 1].  The Debtor's petition was filed at approximately 8:20 a.m.  [Main Case Doc. No. 197 at 1 of 20, ¶ 1].

29.     At approximately 8:59 a.m. on October 4, 2016, the Debtor's original bankruptcy counsel, Kyle Payne ("<u>Payne</u>"), faxed a notice of the Debtor's Chapter 7 petition to Prins.  [Main Case Doc. No. 197 at 2 of 20, ¶ 4; TransWorld's Ex. HH, Prins Dep. 145:21-25; Pl.'s Ex. 33]. Despite being on notice of the Debtor's bankruptcy case, Prins made the unilateral decision to proceed with the foreclosure sale because he believed that the Property was owned by Triple Gate and, therefore, was not property of the Debtor's Chapter 7 bankruptcy estate that was protected by the automatic stay.  [Main Case Doc. No. 197 at 2 of 20, ¶ 4].  Prins and the Prins Law Firm undertook no efforts to determine whether the Property was owned by the Debtor or Triple Gate as of October 4, 2016.  [*Id.*].

2.  <u>The Details of the Foreclosure Sale</u>

30.     At Prins' direction, Shum conducted the foreclosure sale, which resulted in a purchase price of $2.4 million.  [*Id.* at 2 of 20, ¶ 5].  The purchasers of the Property were Elbar, Vincent Bustamante ("<u>Bustamante</u>"), Osama Abdullatif ("<u>Abdullatif</u>"), and Jean Jabbour ("<u>Jabbour</u>") (collectively, the "<u>Purchasers</u>").[15]  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 57:17–58:14; Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 166:5-9, 170:20–171:1;TransWorld's

---

[15] In its March 27, 2017, Findings of Fact and Conclusions of Law, [Main Case Doc. No. 197], this Court found that the buyer of the Property was solely Elbar.  The Court did so based upon the evidence before it at that time.  Indeed, the Court made these findings and conclusions long before the trial of this adversary proceeding.  Having heard extensive testimony at trial, and having admitted and reviewed numerous exhibits introduced at the trial, it is more accurate to find that the individuals and entity who provided the funds to purchase the Property were Bustamante, Abdullatif, Jabbour, and Elbar.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 57:17–58:14; Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 166:5-9, 170:20–171:1; TransWorld's Ex. II, Bustamante Dep. 110:3-10, 110:25–111:4].

Ex. II, Bustamante Dep. 105:23–106:1, 110:3-10, 110:25–111:4].   Bustamante testified that Jabbour, Abdullatif, and he purchased the Property as its beneficial owners, and that Elbar acquired legal title to the Property.   [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 91:2-10; TransWorld's Ex. II, Bustamante Dep. 142:5–145:5].   Elbar is a company that buys properties at public foreclosure sales in Harris County, Texas, and thereafter resells them.   [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 53:9-11; TransWorld's Ex. II, Bustamante Dep. 9:16-20].   Elias Klaimy formed Elbar in approximately 1984 and he is the president and owner of Elbar.   [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 52:25–53:1; TransWorld's Ex. JJ, Klaimy Dep. 5:20–6:5]. Bustamante is a vice president of Elbar and has been with the company for approximately 20 to 30 years.   [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 52:24–53:1; TransWorld's Ex. II, Bustamante Dep. 9:10-15].   Bustamante is also an attorney by training, having received his law degree from the University of Houston and an LLM from New York University.   [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 51:12-15].   Bustamante has been a real estate investor since 1975 and attended every foreclosure sale on the first Tuesday in Harris County, Texas, from 1975 to March 2015.   [*Id.* at 52:2-7].   Bustamante has personally purchased in excess of 2,000 properties at foreclosure sales, and on behalf of clients has purchased "thousands" of properties at foreclosure sales.   [*Id.* at 52:13-17].

31.   Abdullatif is an individual who participates with Elbar in buying properties at foreclosure sales.   [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 165:13-16; TransWorld's Ex. II, Bustamante Dep. 105:23–106:1].   Abdullatif, however, has no formal role or title at Elbar.   [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 166:5-9, 168:13-19].   Likewise, Jabbour is an individual who participates with Elbar in buying properties at foreclosure sales, but he also has no formal

role at Elbar.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 170:15-23; TransWorld's Ex. II, Bustamante Dep. 105:23–106:1, 137:17-21].

32.     Jerel Twyman ("Twyman") is an attorney and a vice president of Elbar.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 57:11; TransWorld's Ex. II, Bustamante Dep. 10:25–11:5]. Twyman attended the foreclosure sale on behalf of Elbar.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 114:1-7; TransWorld's Ex. II, Bustamante Dep. 10:25–11:5].  The purchase price for the Property was paid at the foreclosure sale with eleven cashier's checks from Abdullatif, Jabbour, and Bustamante.[16]  [TransWorld's Ex. II, Bustamante Dep. 137:12–138:8; Plaintiff's Ex. 20].  The eleven cashier's checks were drafted payable to the order of the following:  (1) Osama Abdullatif in the amount of $500,000.00; (2) Osama Abdullatif in the amount of $300,000.00; (3) Elbar Investments, Inc. in the amount of $250,000.00; (4) Elbar Investments, Inc. in the amount of $50,000.00; (5) Elbar Investments, Inc. in the amount of $250,000.00; (6) Elbar Investments, Inc. in the amount of $250,000.00; (7) Jean Jabbour in the amount of $100,000.00; (8) Jean Jabbour in the amount of $100,000.00; (9) Jean Jabbour in the amount of $100,000.00; (10) Jean Jabbour in the amount of $400,000.00; and (11) Jean Jabbour in the amount of $100,000.00.  [Pl.'s Ex. 20].  Even though four of the cashier's checks were paid to the order of Elbar, Bustamante clearly testified at his deposition that the $2.4 million paid in cashier's checks was comprised of $800,000.00 each from himself, Abdullatif, and Jabbour. [TransWorld's Ex. II, Bustamante Dep. 137:12–138:8].

---

[16] In its March 27, 2017, Findings of Fact and Conclusions of Law, [Main Case Doc. No. 197], this Court found that three principals of Elbar attempted to pay the purchase price at the foreclosure sale by several cashier's checks. Based upon testimony adduced at trial, the Court has learned that Abdullatif and Jabbour have no formal roles in Elbar, [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 165:13-16; 166:5-9, 168:13-19; TransWorld's Ex. II, Bustamante Dep. 105:23–106:1, 137:17-21]; only Bustamante is an officer (vice president) of Elbar, [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 52:24–53:1, 130:8-20].  Thus, it is more accurate to state that three individuals attempted to pay the purchase price at the foreclosure sale by having Twyman deliver several cashier's checks to Shum.  Moreover, even though Bustamante was personally purchasing an $800,000.00 interest in the Property, he signed his cashier's checks on behalf of Elbar, as one of its vice presidents.  [Pl.'s Ex. 20].

17

33.     Bustamante, Abdullatif, and Jabbour each put up $800,000.00 to purchase the Property, thus giving them each a one-third ownership interest in the Property.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 166:5-9, 170:20–171:1; TransWorld's Ex. II, Bustamante Dep. 110:3-10, 110:25–111:4].  Bustamante testified, however, that he has an agreement with Elbar in which he advances the purchase money and Elbar has a 25% percent cut of Bustamante's portion; Elbar then pays Bustamante back later.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 82:13-23].  Here, Elbar paid Bustamante $200,000.00 for 25% of Bustamante's 1/3 portion of the Property, thus making Elbar's stake in the Property $200,000.00.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 82:24–83:12, 93:24–94:3; TransWorld's Ex. II, Bustamante Dep. 143:8-12; TransWorld's Ex. JJ, Klaimy Dep. 9:12-19, 10:1-3, 10:21-22].  Bustmanate does not know on what date Elbar paid him the $200,000.00 for Elbar's 25% share of Bustamante's one-third interest in the Property.[17]  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 83:2-8].  Thus, according to Bustamante, the ownership interest in the Property was "one-third Osama [Abdullatif], one-third Vincent and Elbar, and one-third Jean Jabbour."[18]  [*Id.* at 57:17–58:14].

---

[17] Bustamante was unable to recall when Elbar purchased 25% of Bustamante's 1/3 portion: ". . . I don't know if [Elbar] gave it to me on the 4th, the 5th, the 6th or after the 6th.  It was never an issue.  Eventually I got it."  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 83:2-8].  Even though Bustamante was unable to recall the precise date Elbar paid him for its 25% share of his 1/3 interest in the Property, the Court emphasizes that it finds Bustamante's testimony credible that Elbar did in fact, at some point close in time to Elbar's wire transfer of the $2.4 million, purchase a portion of Bustamante's interest in the Property, thereby making Elbar a Purchaser of the Property as well.

[18] In fact, Bustamante further testified that Twyman paid him the sum of $24,000.00 so that Twyman himself could participate in acquiring an interest in the Property.  [*Id.* at 83:20-24].  It is not clear at what point in time—either pre or post wire transfer of the Proceeds—that Twyman purchased his interest in the Property.  The Court concludes that Twyman should be included in the definition of "Purchasers" (as defined *supra* by this Court in Finding of Fact No. 30), as Twyman, regardless of whether he purchased Bustamante's share pre or post wire transfer of the Proceeds, became a "Purchaser" with knowledge of the Debtor's bankruptcy and imposition of the automatic stay.

18

34.    Bustamante testified that he hoped for a 20% return on the investment on the Property after all costs were paid, or a $480,000.00 aggregate total return for all parties.[19]  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 135:7-24; TransWorld's Ex. II, Bustamante Dep. 234:14-21].  Bustamante also testified that Elbar has previously purchased properties when it knew the owner was in bankruptcy.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 134:11-14].  Additionally, Elbar has been involved in other lawsuits involving the automatic stay.[20]  [*Id.* at 118:5–120:1].

35.    After the foreclosure sale, Shum returned from Houston (where the foreclosure sale was held) to San Antonio (where the Prins Law Firm was located) with the cashier's checks; however, Prins testified that his bank, BBVA, would not negotiate the cashier's checks.  [Main Case Doc. No. 197 at 2 of 20, ¶ 5].  Shum therefore called Twyman to inform him that the cashier's checks would not suffice as payment.  [*See* Pl.'s Ex. 21].  In response, at 5:43 p.m. on October 4, 2016, Twyman, on behalf of Elbar, emailed Shum, stating that he would be happy to pay the funds for the Property with either one check or by a wire transfer.  [*Id.*].  On October 5, 2016, at 9:03 a.m., Shum replied to Twyman's email, providing wiring instructions for the IOLTA.  [Pl.'s Ex. 22].

3.  Giving Notice to Prins and Elbar of the Debtor's Bankruptcy and Her Claim to the Property

36.    On October 5, 2016, at 10:15 a.m., Payne sent to Prins the following: (a) a copy of the recorded deed from December 30, 2015, evidencing the transfer of the Property from Triple Gate to the Debtor and Amos; and (b) records from the Harris County Appraisal District

---

[19] The Court notes that even though Bustamante testified that Elbar was hoping to make a 20% return on the Property, the actual return on the Property would have been much greater.  In its proof of claim filed in the Main Case, Elbar sets forth that it believes the Property is worth $3,500,000.00.  [Proof of Claim, Case No. 16-35021, Claim 11, at 2].  The Purchasers' bid price on the Property was $2.4 million, which—if the sale had actually been completely consummated—would have resulted in an approximate 45.8% return on the Purchasers' investment and a $1.1 million aggregate total return.

[20] These suits are subsequently discussed in greater detail.

19

showing that the Debtor and Amos claimed the Property as their homestead.  [Main Case Doc. No. 197 at 3 of 20, ¶ 6].  As of the morning of October 5, 2016, Prins admitted to having knowledge that the Property had been transferred to the Debtor.  [*Id.* at 3 of 20, ¶ 6].  Thus, at the moment in time when Prins admittedly was aware that the Property was claimed as property of the bankruptcy estate, he had not received any good funds from Elbar.**21**  [*Id.* at 3 of 20, ¶ 6].

37.     On October 5, 2016, at 2:35 p.m., Shum emailed Twyman, copy to Prins, informing him that the Prins Law Firm had received notice that one of the representatives from Triple Gate had declared personal bankruptcy and was asserting that the Property was deeded in the name of the individual who declared bankruptcy, not Triple Gate.  [Pl.'s Ex. 26; TransWorld Ex.'s HH, Prins Dep. 154:5-17].  Shum also stated that Prins and she believed the warranty deed from Triple Gate to Amos and the Debtor was a fraudulent transfer.  [Pl.'s Ex. 26].  At 2:53 p.m. that same afternoon, Twyman replied to Shum, copy to Prins, thanking her for the information

---

21 Case law is clear that any property in which a debtor has an interest on the date of the filing of the bankruptcy petition constitutes "property of the estate" pursuant to 11 U.S.C. § 541(a).  *Peake v. Ayobami (In re Ayobami)*, 879 F.3d 152, 153–54 (5th Cir. 2018); *TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 (5th Cir. 2014); *Towers v. Wu (In re Wu)*, 173 B.R. 411, 413 (9th Cir. B.A.P. 1994); *U.S. Fid. & Guar. Co. v. Houska*, 184 B.R. 494, 500–01 (Bankr. E.D. Va. 1995).  Here, once Payne provided Prins with a copy of the recorded deed evidencing the pre-petition transfer of the Property to the Debtor and Amos, Prins was on notice, as a matter of law, that the Property was "property of the estate" that was protected by the automatic stay.  *See In re Am. Med. Utilization Mgmt. Corp.*, 494 B.R. 626, 634–35 (Bankr. E.D.N.Y. 2013); *In re Turner*, No. 04-92951-BHL-7, 2009 WL 3013615, at *2 (Bankr. S.D. Ind. Sept. 15, 2009).  Accordingly, as a matter of law, because the Property was property of the estate, neither Prins nor Shum nor anyone else could execute a deed to transfer the Property to any third party, including Elbar.  Such a conveyance would violate 11 U.S.C. § 362(a)(3) because it would constitute "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]"

The Court notes that the Debtor eventually attempted to exempt the Property and therefore remove it from being property of the estate.  However, the Trustee objected to the Debtor's exemption, [Main Case Doc. No. 47], and this Court sustained the objection, [Main Case Doc. No. 96].  Therefore, as a matter of law, the Property was not only property of the estate on the date of the filing of her petition, it remained property of the estate because the Debtor failed in her attempt to remove the Property out of the estate.  Accordingly, title to the Property has always vested in the Trustee, and that is why the Trustee had the right to sell the Property in the Main Chapter 7 case.  *See Studensky v. Morgan (In re Morgan)*, 481 F. App'x 183, 186 (5th Cir. 2012) (per curiam) ("When [the debtor] filed his bankruptcy petition and did not claim an exemption for his Texas homestead, that property passed by operation of law into the bankruptcy estate."); *In re Didelis*, No. 3:14-bk-02966-JAF, 2014 WL 7652894, at *1 (Bankr. M.D. Fla. Jan. 15, 2014) ("If a debtor does not claim the Homestead Exemption, then he or she effectively surrenders the homestead to the trustee for administration.  At that time, the debtor loses the benefits of the Homestead Exemption because the trustee may dispose of it as he sees fit.") (internal citations omitted).

and stating that he would pass along the information to his client—i.e., to Elbar.  [Pl.'s Ex. 27; TransWorld's Ex. HH, Prins Dep. 154:18-25].  Thus—at the latest—as of 2:53 p.m. on October 5, 2016, Elbar was aware (through Twyman, its vice president and attorney) that an individual who claimed to own the Property had filed for bankruptcy.  [*See* Pl.'s Ex. 27].  Bustamante did not remember taking any steps—except to perhaps check PACER[22]—to verify the information about the Debtor's bankruptcy after he learned about her bankruptcy, [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 85:19–86:7, 100:17-21]; Bustamante further testified that learning about the Debtor's bankruptcy did not change his mind about wire-transferring the $2.4 million to the substitute trustee (i.e., to Prins), [*id.* at 87:12-19].

    4.  Elbar's Violation of the Automatic Stay

38.    At some point after learning that the Debtor was claiming that she owned the Property and thus the automatic stay was in effect, Bustamante, on behalf of Elbar and the Purchasers, decided to go forward with the purchase of the Property and to send a wire of $2.4 million to the substitute trustee—i.e., to the Prins Law Firm.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 87:12–88:8; Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 165:8-9, 166:21–167:4, 167:8-15, 170:15-18, 173:19-22].

39.    On October 6, 2016, at 11:53 a.m., Bustamante emailed Abdullatif, requesting that the wire of the $2.4 million (the "Proceeds") show Elbar Investments, Inc. as the sending party.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 63:12-16; Pl.'s Ex. 31].  At 12:53 p.m., Twyman emailed Shum, copy to Prins, requesting that Shum send a copy of the notice confirming the bankruptcy filing.  [Pl.'s Ex. 29].  At 12:58 p.m., Prins sent an email to Twyman, stating that he had received notice from the Debtor's bankruptcy attorney that the Debtor, not

_____

[22] Public Access to Court Electronic Records, or "PACER," provides on-line access to U.S. Appellate, District, and Bankruptcy Court records and documents nationwide.

Triple Gate, had filed for personal bankruptcy; that subsequent to the foreclosure sale, the Debtor's bankruptcy attorney sent a deed that was executed six months after the execution of the Note and the Deed of Trust whereby the Debtor and Amos had transferred the Property from Triple Gate to themselves personally;[23] and that he (i.e., Prins) was going to file a motion for relief from stay since this was a "fraudulent transfer." [Pl.'s Ex. 30].

40.     Despite learning that the Property had been deeded to the Debtor personally and that the Debtor had filed for bankruptcy—and, thus, that the automatic stay was in effect—on October 6, 2016, at approximately 1:13 p.m., at Bustamante's direction,[24] Abdullatif's bank wire-transferred the Proceeds to the IOLTA.[25] [Pl.'s Ex. 31; Pl.'s Ex. 2, at 6]. At 1:13 p.m. on October 6, 2016, Abdullatif received an email from his bank, informing him that the wire of $2.4 million had been sent. [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 63:24–64:8; Pl.'s Ex. 31]. Shortly thereafter, at 1:17 p.m. that same day, Abdullatif forwarded the email from his bank confirming the successful wire to Bustamante. [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 64:10-15; Pl.'s Exs. 31–32]. At trial, Bustamante admitted that Elbar had notice of the Debtor's bankruptcy and of the automatic stay at the time the Proceeds were wire-transferred. [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 64:16-24].

41.     According to Bustamante, Elbar has previously paid a purchase price at a foreclosure sale knowing of a bankruptcy approximately ten (10) times out of thousands of

---

[23] In fact, it was not the Debtor and Amos who executed the deed transferring the Property from Triple Gate to themselves. It was only the Debtor, in her capacity as the Manager of Triple Gate, who executed this deed. [Pl.'s Ex. 16].

[24] After learning about the bankruptcy, Bustamante himself made the decision to wire the Proceeds to Prins. [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 86:23-25; TransWorld's Ex. II, Bustamante Dep. 82:17-20].

[25] The $2.4 million wire-transferred from Abdullatif's bank to the IOLTA was Abdullatif's own funds. [TransWorld's Ex. II, Bustamante Dep. 110:3-15]. At some point post-wire transfer of the Proceeds, Bustamante and Jabbour paid Abdullatif their portion (i.e., $800,000.00 each) of the purchase price. [*See id.* at 106:10-13, 110:19-24].

foreclosure sales—in other words, to pay the purchase price after learning about a bankruptcy is "unusual."[26]   [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 116:14-17; TransWorld's Ex. II, Bustamante Dep. 124:15–125:4].   In Bustamante's own words: "We paid the money knowing about the bankruptcy.   It doesn't get more complicated than that."[27]   [TransWorld's Ex. II, Bustamante Dep. 228:17-20].   Bustamante testified that he instructed that the $2.4 million be wire transferred after learning about the Debtor's bankruptcy because he wanted the replace the cashier's checks that were rejected, that he "committed to send the wire" and he "was just completing what I committed," that if he did not "send the wire, then I have not made my bid good, I have no right to anything," so that the Purchasers "would have standing as the highest bidder of the sale," and that one of his goals was to acquire the Property.   [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 88:19–89:1, 89:17-25, 133:13–134:10].   Bustamante also testified unequivocally that Elbar had previously purchased properties when it knew the owner was in bankruptcy.   [*Id.* at 134:11-14].

  5.   Post-Foreclosure Events

  42.   Upon receipt of the $2.4 million that Elbar wired to the IOLTA, Prins did **not** provide Elbar with title to the Property.   [Main Case Doc. No. 197 at 3 of 20, ¶ 8].

---

[26] Subsequently, at the same deposition, Bustamante testified that it is not "uncommon" to pay with cashier's checks after knowledge of a bankruptcy.   [*Id.* at 182:6–184:20].

[27] During his cross-examination by counsel for Industry Drive, Leslie Hyman ("Hyman"), Bustamante also testified as follows at trial:

> Hyman:          So you made the bid on October 4th hoping to make a 20 percent return on the property, and you authorized wiring the funds to Mr. Prins on October 6th after you were aware of the bankruptcy filing, in order to continue to maintain the hope of making that 20 percent?
>
> Bustamante:     Yes.

[Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 135:19-24].

43.     On October 11, 2016, Prins filed a motion for relief from stay on behalf of United Sentry in order to "allow movant to complete foreclosure of the Property" ("Motion for Relief"). [Main Case Doc. No. 7].   The Motion for Relief was set for hearing on November 8, 2016. Shum, the lawyer who actually conducted the foreclosure sale, drafted the Motion for Relief, but it was signed by Prins.  [Main Case Doc. No. 197 at 3–4 of 20, ¶ 10].

44.     On October 13, 2016, Prins, on behalf of United Sentry, filed an amended motion for relief from stay (the "Amended Motion for Relief").  [Main Case Doc. No. 9].  The Amended Motion for Relief contains additional legal authorities compared to the Motion for Relief, but essentially requests the same relief as the Motion for Relief.

45.     As of October 17, 2016, the closing balance of the Wells Fargo Operating Account was $13,414.57.  [Pl.'s Ex. 7].

46.     On October 18, 2016, Prins transferred $2.0 million from the IOLTA to the Wells Fargo Operating Account.   [Main Case Doc. No. 197 at 4 of 20, ¶ 11; Pl.'s Exs. 2, 7; TransWorld's Ex. HH, Prins Dep. 18:10-15].  Prins was the only person who was authorized to make withdrawals from and charges to the Wells Fargo Operating Account.  [Main Case Doc. No. 121, Jan. 9, 2017, Hrg. 28:11–29:5].  Prins did not advise United Sentry, or anyone else, of the $2.0 million transfer.  [Main Case Doc. No. 197 at 4 of 20, ¶ 11; Main Case Doc. No. 121, Jan. 9, 2017, Hrg. 38:11-19].

47.     Between October 19, 2016, and December 12, 2016,[28] Prins freely spent the Proceeds, which were by that time in the Wells Fargo Operating, for his own personal and business needs.  Prins' expenditures from the Wells Fargo Operating Account, which are directly

---

[28] This is the date, discussed *infra* at Finding of Fact No. 82, on which the U.S. Department of Justice seized the funds that were in the Wells Fargo Operating Account.

traceable to the Proceeds, [*see* TransWorld's Ex. HH, Prins Dep. 125:11-19], include, but are in no way limited to, the following:

A. On October 20, 2016, Prins purchased four plane tickets on United Airlines, each in the amount of $1,868.90. [Pl.'s Ex. 7; Main Case Doc. No. 197 at 4 of 20, ¶ 12]. Prins' testimony regarding the timing of his decision to take a trip overseas has been contradictory. Prins testified that when he transferred the $2.0 million into the Wells Fargo Operating Account on October 18, 2016, he did not yet have the intention to leave for an overseas vacation. [TransWorld's Ex. HH, Prins Dep. 20:11-19]. Prins later testified that as of October 19, 2016, he was contemplating the trip overseas. [*Id.* at 23:14-22, 24:21-25]. Later still, Prins testified that as of October 21, 2016, he had not made the decision to travel overseas but had made the decision to "shut down the practice and leave."[29] [*Id.* at 40:1-4].

B. On October 21, 2016, Prins cut a number of severance checks from the Wells Fargo Operating Account to the employees of the Prins Law Firm because Prins had decided to shut down his law firm. [Pl.'s Ex. 7; TransWorld's Ex. HH, Prins Dep. 39:13-25].

C. On or around October 25, 2016, Prins charged over $5,000 at hotels.com. [Pl.'s Ex. 7; Main Case Doc. No. 197 at 4 of 20, ¶ 14].

D. On October 26, 2016, an automatic payment to the IRS in the amount of $18,411.19 cleared the Wells Fargo Operating Account related to the payroll

---

[29] It strains credulity for Prins to testify that as of October 21, 2016, he had not yet decided to travel overseas, as the prior day (i.e., October 20, 2016) he had actually purchased four plane tickets (for his wife, his two children, and himself) for a family trip to Europe. This testimony further underscores that Prins is not a credible witness on most issues. (*See* Credibility of Witnesses Section *infra*).

taxes for the severance checks Prins had paid his employees on October 21, 2016. [Pl.'s Ex. 7; TransWorld's Ex. HH, Prins Dep. 41:3-11].

E.   On October 27, 2016, Prins made a charge to the Wells Fargo Operating Account in London, England.  [Pl.'s Ex. 7; Main Case Doc. No. 197 at 4 of 20, ¶ 15].   In subsequent weeks, Prins continued to charge tens of thousands of dollars to the Wells Fargo Operating Account for recreational purchases in (i) London, England, (ii) Edinburgh, Scotland, and (iii) Copenhagen, Denmark, with the last of the international charges occurring on November 28, 2016.  [Pl.'s Exs. 7–8; Main Case Doc. No. 197 at 4 of 20, ¶ 15].   Upon returning from his month-long trip to Europe, Prins immediately traveled to Portland, Oregon, based on further recreational charges on the Wells Fargo Operating Account in Portland between November 29, 2016, and December 5, 2016.  [Pl.'s Exs. 8–9; Main Case Doc. No. 197 at 4 of 20, ¶ 15].

F.   On November 17, 2016, Prins paid Martin Seidler ("Seidler")—the attorney representing Prins in the Prins' Bankruptcy—$10,000.00 from the Wells Fargo Operating Account for Seidler's representation of Prins.   [Pl.'s Ex. 8; TransWorld's Ex. HH, Prins Dep. 43:1-22].   At Prins' deposition (taken approximately one year later on November 15, 2017), he testified that this $10,000.00 was "Elbar's money."  [TransWorld's, Ex. HH, Prins Dep. 44:4-6].

G.   On November 21, 2016, Prins paid Hilley & Solis—the law firm representing Prins in his criminal matters[30]—$10,000.00, which represented a portion of the

---

[30] As of this date, Prins had not yet been indicted for theft of the Proceeds, among other crimes.  However, he clearly knew that he had criminal problems due his theft of the Proceeds, and he therefore decided to retain criminal counsel.  Eventually, he was indicted, and thereafter entered into a plea agreement with the United States Attorney

retainer Prins was to pay Hilley & Solis, from the Wells Fargo Operating Account.  [Pl.'s Ex. 8; TransWorld's Ex. HH, Prins Dep. 44:10-16].

H.   On November 23, 2016, a check cleared the Wells Fargo Operating Account to Carlos Pumarejo in the amount of $66,000.00.  [TransWorld's Ex. HH, Prins Dep. 46:15-21; *see* Pl.'s Ex. 8].  Pumarejo was a client of Prins and had previously given $66,000.00 to Prins to hold, [TransWorld's Ex. HH, Prins Dep. 46:15-25], but Prins spent these funds and therefore used a portion of the Proceeds to return the funds to this client that the client had previously given Prins to hold.

I.   On November 30, 2016, Prins paid Hilley & Solis another $5,000.00 from the Wells Fargo Operating Account, representing the remainder of the retainer Prins was required to pay Hilley & Solis for that law firm to represent him in the criminal prosecution that was inevitably going to be brought against him.  [Pl.'s Ex. 8; TransWorld's Ex. HH, Prins Dep. 49:21–50:3].

J.   In addition to the large expenditures of funds Prins made from the Wells Fargo Operating Account detailed above, Prins also made a number of smaller purchases, the funds of which are all directly traceable to the Proceeds:  (1) multiple purchases from the iTunes store; (2) parking fees, Uber rides, and charges for executive car service; (3) charges to efile TX.gov, which are ostensibly related to the Prins Law Firm; (4) purchases from Office Depot, Brookstone, Central Market grocery store, and Gamestop; (5) Humana insurance payments related to the Prins Law Firm; and (6) payments to AT&T, CPS Energy, Time Warner Cable, and Godaddy.com.  [*See* Pl's Exs. 7–9].

---

for the Western District of Texas, and the U.S. District Court approved this agreement.  [*See* Finding of Fact No. 101].

48.     On October 19, 2016, Prins made four wire transfers out of the IOLTA totaling $82,373.28 to the Internal Revenue Service to pay his own personal taxes.  [Pl.'s Ex. 2; TransWorld's Ex. HH, Prins Dep. 17:3-5, 23:8-17].

49.     Mr. Cash was keen to resolve all outstanding disputes regarding TransWorld—including the tax issue with the Tax Assessor—because of his extremely poor health.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 20:22–21:13; TransWorld's Ex. HH, Prins Dep. 238:24–239:1]. Mr. Cash did not want to leave Ms. Cash saddled with a major tax problem for TransWorld upon his death.  Hence, between May 2016 and October 2016, Mr. Cash followed up with Prins regarding the tax issue.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 20:15–21:14].

50.     On October 20, 2016—due to increasing pressure from Mr. Cash and because of a sense of duty to "do right" by the Cashes[31]—Prins issued a check to TransWorld in the amount of $164,807.29, which cleared the Wells Fargo Operating Account on October 21, 2016.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 27:19–28:4; Main Case Doc. No. 197 at 4 of 20, ¶ 13; Pl.'s Exs. 7, 11; TransWorld's Ex. HH, Prins Dep. 37:9-25, 38:18-25, 83:24–84:8, 231:17-20, 239:2-13].   Prins told the Cashes that he had settled the tax dispute with the Tax Assessor for $5,000.00.  [TransWorld's Ex. HH, Prins Dep. 96:2–97:3].   The Cashes believed that the $164,807.29 check the Prins Law Firm issued to TransWorld represented TransWorld recovering the "good faith" money of $169,807.29 it had given Prins to deposit into the IOLTA, less the $5,000.00 settlement amount.[32]   [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 22:2-12; Pl.'s Ex. 46].   Prins, however, lied to the Cashes about the $5,000.00 settlement with the Tax Assessor:

---

[31] Prins was well aware that Mr. Cash was dying of cancer.  [*See* TransWorld's Ex. HH, Prins Dep. 80:7-13].

[32] See Finding of Fact Nos. 9–10 as to why and when Ms. Cash (on behalf of TransWorld) had given Prins a check for $169,807.29.

he did not, in fact, negotiate any $5,000.00 settlement with the Tax Assessor.  [TransWorld's Ex. HH, Prins Dep. 79:19–80:3, 99:20-25, 109:24-25].

51.     On or around October 24, 2016, MacKenzie, on behalf of United Sentry, requested proof of funds in the IOLTA and Prins therefore sent MacKenzie a screenshot of the IOLTA, showing a balance of $3,787,183.01.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 239:20–240:20; United Sentry's Ex. 9; TransWorld's Ex. HH, Prins Dep. 184:15–185:6].  The screenshot Prins sent to MackKenzie was not an accurate screenshot of the funds in the IOLTA on October 24, 2016; instead, Prins used editing software on his computer to create a screenshot that would appear to show that the IOLTA still held all of the Proceeds.  [TransWorld's Ex. HH, Prins Dep. 184:15–185:6, 173:20-23].

52.     On October 28, 2016, this Court held an emergency status conference in the Main Chapter 7 case at the request of the Chapter 7 Trustee regarding the Debtor's failure to timely file schedules and a statement of financial affairs.  The Court entered its Order Requiring Debtor to Personally Appear and Show Cause Why She Should not be Sanctioned for Failing to Timely File Schedules of Assets and Liability and Statement of Financial Affairs ("Debtor Show Cause Order").  [Main Case Doc. No. 22].  The Debtor Show Cause Order was set for hearing at the same time as the Amended Motion for Relief—i.e., for November 8, 2016.[33]

53.     Also on October 28, 2016, the Estate of Jose Oleszcovski Wasserteil (the "Wasserteil Estate") filed a motion for relief from stay pursuant to 11 U.S.C. § 362(d) in the Prins' Bankruptcy, alleging that the IOLTA held funds belonging to the Wasserteil Estate and that Prins had refused to release those funds.  [Pl.'s Ex. 37].

---

[33] *See* Finding of Fact Nos. 43–44.  Prins, in his capacity as counsel of record for United Sentry, in the Main Chapter 7 case, had filed the Amended Motion for Relief on October 13, 2016, to obtain this Court's approval for United Sentry to "to complete foreclosure on the Property."

54.     As of October 31, 2016, the balance of the IOLTA was $295,167.89.  [Pl.'s Ex. 2].  Thus, from October 6, 2016, when the IOLTA's balance was $2,402,041.17, the balance had declined by $2,106,873.28.  [*See id.*].  This decline was due entirely to Prins' transfer of the funds in the IOLTA—virtually all of which were comprised of the Proceeds—to the Wells Fargo Operating Account and to the Internal Revenue Service.

55.     As of November 3, 2016, the closing balance of the BBVA Operating Account was $30.34.  [Pl.'s Ex. 5].  Thus, as of this date, this particular account had virtually no funds on hand.

56.     On or about November 4, 2016, William and Karen Ozer (the "Ozers"), former clients of Prins, filed an original complaint to determine dischargeability objection to discharge in the Prins' Bankruptcy.  [Pl.'s Ex. 38].  In their complaint, the Ozers alleged that when Prins was representing them in a lawsuit, Prins repeatedly lied to them about and misrepresented the status of their lawsuit.  [*Id.*].  The Ozers also alleged that Prins forged judges' orders on court documents and fabricated numerous communications from various elected and appointed officials.  [*Id.*].

57.     On November 4, 2016, Gabriel learned from one of the partners at the law firm utilized by the family's businesses—Pulman, Cappuccio, Pullen, Benson & Jones (the "Pulman Law Firm")—that Prins had "an issue."  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 126:2-4, 126:13-25].  Once Gabriel learned about Prins' "issue,"[34] she again demanded that Pfirrmann

---

[34] At trial, Gabriel indicated that one of the attorneys at the Pulman Law Firm sent her a document indicating that "something was up with Mr. Prins," but Gabriel was unable to remember the name of the individual or parties who were referenced in the document showing that Prins had "an issue."  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 126:6–128:7].  Gabriel further testified that she never actually read the contents of the email that detailed the "issue" Prins was having and instead she just reacted to the comments of the attorney from the Pulman Law Firm that Prins was experiencing some issues that were disconcerting.  [*Id.* at 128:11-22].  Relying on the advice of the attorney from the Pulman Law Firm that Gabriel should be concerned about Prins' issues, Gabriel immediately called Pfirrmann and told him to contact Prins and insist that he immediately transfer the $300,000.00 out of the IOLTA and into the Industry Drive bank account.  [*Id.* at 128:11-22].

return the $300,000.00 that he had placed into the IOLTA. [*Id.* at 126:5-12, 130:5-11]. After receiving pressure from Gabriel, Pfirrmann contacted Prins to request the transfer of the $300,000.000 back to Industry Drive. [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 130:9-16; TransWorld's Ex. HH, Prins Dep. 28:24–29:12]. On November 4, 2016, Prins transferred $300,000.00 from the IOLTA to the BBVA Operating Account.**35** [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 130:15-16; Pl.'s Ex. 3, 5; TransWorld's Ex. HH, Prins Dep. 27:25–28:8]. On that same day, Prins delivered a check to Industry Drive in the amount of $300,000.00 from the Prins Law Firm, i.e., from the BBVA Operating Account. [*See* Pl.'s Exs. 5, 10].

58.    On November 8, 2016, at approximately 10:20 a.m., the Court held a hearing on the Motion for Relief and the Debtor Show Cause Order. Prins did not personally appear at the hearing. An associate attorney from the Prins Law Firm named Travis Parks ("Parks") made a telephonic appearance on behalf of United Sentry. [Main Case Doc. No. 197 at 5 of 20, ¶ 18]. Parks stated that United Sentry desired to move forward on the Motion for Relief. [*Id.* at 5 of 20, ¶ 19]. However, Prins had sent an email to the Court's case manager in the early hours of November 8, 2016, stating:

> Along with the Show Cause Hearing and the Continued Status Conference, I have filed and sent an Amended Motion for Relief from Stay on behalf of United Sentry Mortgage that is set on the Docket for 9:30 a.m. I have fallen very ill and cannot make the trip into Houston, so I would respectfully request that my hearing be dropped at this time so that I may appear in person at a later date.

[*Id.*].

Parks had not spoken with Prins about the hearing and believed that Prins was out of the country at the time, likely in Germany. [*Id.* at 5–6 of 20, ¶ 20]. Parks further stated that Prins had left the country on October 22, 2016, and had told his associates that he would be retiring.

---

35 With the transfer of this $300,000.00 out of the IOLTA, only $100,000.00 of the $2.4 million still remained in the IOLTA, as Prins had already transferred $2.0 million out of the IOLTA and into the Wells Fargo Operating Account on October 18, 2016. [*See* Finding of Fact No. 46].

[*Id.*].  Parks also alluded to the firm undergoing a "unique set of circumstances" and said that he was doing his "best to keep the wheels from falling off."  [*Id.*].  However, at this time, Parks disclosed no specifics about Prins' recent frequent use of the Proceeds.[36]  At the Court's request, Parks provided Prins' cell phone number, which allowed the Court's case manager to contact Prins and inform him that the Court wanted him to immediately appear at the hearing by telephone.  [*See* Main Case Doc. No. 117, Nov. 8, 2016, Hrg. 13:9–14:23, 24:12-13].  Prins complied and then called in to appear by telephone.  [Main Case Doc. No. 117, Nov. 8, 2016, Hrg. 24:12-13; Tape Recording, Nov. 8, 2016, Hrg. at 10:48:10 A.M.].  Upon questioning from the Court, Prins reiterated the statement in his email that he was ill and stated that he was dialing in from San Antonio, Texas.  [Main Case Doc. No. 197 at 6 of 20, ¶ 22].  Prins claimed that he was not retiring but instead "cutting back" on the number of his clients in order to spend more time with his family.  [*Id.*].  Critically, Prins was asked by Elbar's counsel whether the $2.4 million Elbar had wired on October 6, 2016, was still held in the IOLTA.  [Main Case Doc. No. 117, Nov. 8, 2016, Hrg. 44:8-11; Tape Recording, Nov. 8, 2016, Hrg. at 11:11:45 A.M.].  Prins answered "Yes, it is" and he confirmed that he was continuing to maintain the IOLTA.  [Main Case Doc. No. 197 at 6 of 20, ¶ 23].  Prins' response was a blatant lie, as by this time, he had already transferred at least $2.3 million of the $2.4 million out of the IOLTA.  [*See* Finding of Fact Nos. 46, 57].

59.     On November 8, 2016, when Prins told this Court that he was in San Antonio and too ill to appear at the hearing, the Wells Fargo Operating Account showed several charges that Prins was making on this same date in London, England.  [Pl.'s Ex. 8; Main Case Doc. No. 197 at 6 of 20, ¶ 24].  Thus, Prins' response that he was too ill to appear at the hearing and was in San

---

[36] There is nothing in the record to indicate, that Parks, who was an associate at the Prins Law Firm, had any knowledge whatsoever that Prins had improperly transferred the Proceeds out of the IOLTA and used a substantial portion of these funds for his personal benefit.

Antonio was another blatant lie—as he actually was in London freely spending some of the Proceeds that he had transferred from the IOLTA to the Wells Fargo Operating Account. Indeed, the balance in the Wells Fargo Operating Account on November 8, 2016, was $1,757,348.78.  [Pl.'s Ex. 8; Main Case Doc. No. 197 at 6 of 20, ¶ 24].

60.     On November 8, 2016, at 3:03 p.m., (i.e., after the hearing on the Motion for Relief and the Debtor Show Cause) Richard Battaglia ("Battaglia"), counsel for Elbar, emailed Prins and requested—for the first time—that the Proceeds be returned to Elbar.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 101:8-16, 118:1-4; Pl.'s Ex. 40; TransWorld's Ex. HH, Prins Dep. 106:10-19].  Between the dates of October 6, 2016, and November 8, 2016, Elbar did not ask for the deed to the Property because, as stated by Bustamante, "there was a bankruptcy estate, we're [i.e., Elbar] not entitled to a deed."  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 101:17-23].

61.     Also on November 8, 2016, an article was published in the San Antonio Express-News stating that Prins was being accused by former clients (the Ozers) of fabricating court documents.  [Pl.'s Ex. 39].

62.     At least by November 8, 2016, MacKenzie, on behalf of United Sentry, requested that Prins return the $2.4 million to Elbar.  [Main Case Doc. No. 197 at 6 of 20, ¶ 25].

63.     Sometime after the November 8, 2016, hearing, the Chapter 7 Trustee's counsel became aware that (i) Prins had filed a personal Chapter 7 bankruptcy case in the United States Bankruptcy Court for the Western District of Texas on September 29, 2016, and (ii) there was an adversary proceeding filed against Prins on November 4, 2016, alleging that Prins had misappropriated funds from his IOLTA and that he had perpetuated a fraud on former clients by forging court orders.  [Main Case Doc. No. 197 at 6–7 of 20, ¶ 26; *see* Main Case Doc. No. 34].

64.     On November 9, 2016, at 11:46 a.m., Prins emailed Battaglia, inquiring whether or not Elbar still wanted to buy the Note.[37]  [United Sentry's Ex. 3].  Battaglia responded to Prins via email that same day at 5:40 p.m., stating that Elbar might "still have an interest but would need to see all the loan documents."  [*Id.*].

65.     Also on November 9, 2016, MacKenzie emailed Prins at 3:44 p.m., asking that Prins move the Proceeds to another account and referenced the article that appeared in the San Antonio Express-News.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 233:1-8, 233:24–234:13, 235:19–236:1; United Sentry's Ex. 7].

66.     On November 10, 2016, MacKenzie emailed Prins, requesting a screenshot of the funds in the IOLTA.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 233:9-11; United Sentry's Ex. 7].  MacKenzie wanted Prins to send him a screenshot showing the amount of the funds in the IOLTA "to see that the funds were available and that . . . they were available for everybody involved, security."  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 233:12-15].  In response, Prins sent a falsified screenshot of the IOLTA balance to MacKenzie, showing a balance of $3.3 million in the IOLTA.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 241:4-15; TransWorld's Ex. HH, Prins Dep. 186:25–187:18].  Subsequently, at his deposition (taken on November 15, 2017), Prins admitted that the IOLTA did not have $3.3 million in it at that time and that he had manufactured the screenshot.  [TransWorld's Ex. HH, Prins Dep. 186:25–187:18].

67.     On November 10, 2016, at 5:56 p.m., Battaglia emailed Seidler and stated that he "literally found out about Mr. Prin's BK within the last 30 minutes and am extremely concerned as to the safekeeping of those funds."  [Industry Drive's Ex. 7].

---

[37] Elbar and United Sentry, through their respective agents, had previously conducted discussions as to Elbar's desire, under the right circumstances, to purchase the Note.  [*See* United Sentry's Ex. 3].

68.     On November 11, 2016, Twyman emailed Prins and requested that Prins wire the Proceeds from his account (i.e., the IOLTA) to Abdullatif's account.  [United Sentry's Exs. 4, 6].  Prins responded, stating that he would try to wire the funds the next day.[38]  [United Sentry's Ex. 4].  On November 12, 2016, Twyman replied, in which he stated that he would like Prins to immediately wire the Proceeds.  [*Id.*].  On November 14, 2016, Prins emailed Twyman and attached a release of escrow funds for execution by Elbar and United Sentry.  [*Id.*].  In the same email, Prins stated that he had received conflicting instructions about to whom to wire the Proceeds—one instruction to wire the Proceeds to Elbar and another instruction to wire the Proceeds to Abdullatif.[39]  [*Id.*].

69.     On November 18, 2016, MacKenzie once again emailed Prins and requested a screenshot of the funds in the IOLTA.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 241:16-22; United Sentry's Ex. 8].  Prins—continuing his deceit—once again sent MacKenzie a falsified screenshot of the IOLTA, showing a balance of $3,144,000.00.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 241:23–242:10; United Sentry's Ex. 11].

---

[38] Based upon Prins' lack of credibility, this Court believes that Prins gave this response with intent to deceive Twyman into believing that he (Prins) was going to return the Proceeds when, in fact, he had absolutely no intention of doing so.

[39] MacKenzie testified that in the "first couple weeks" of November 2016, Twyman called him and asked him to instruct Prins to return the money to the Purchasers.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 102:1-6, 102:21–103:1].  MacKenzie told Twyman that "I'm willing to help in any way you think may help in this position."  [*Id.* at 102:4-11].  MacKenzie then spoke with Prins, who suggested that a release be signed before Prins released the money back to the Purchasers.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 103:2-11; see United Sentry's Ex. 5 for release drafted by Prins].  MacKenzie instructed Prins to draft such a release so that the Proceeds could be returned to the Purchasers.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 102:4-14].  Prins drafted a release and sent it to MacKenzie; MacKenzie then immediately signed the release and emailed the signed release to Twyman and Prins.  [*Id.* at 102:13-16, 103:12-18].  Twyman apparently never signed the release drafted by Prins.  [*Id.* at 102:14-17, 103:19–104:10].  Even if Twyman had executed the release, there is no doubt in this Court's view that Prins would not have returned the Proceeds.  By this time, Prins had already transferred $2.3 million of the Proceeds from the IOLTA to the Wells Fargo Operating Account and the BBVA Operating Account and he had already begun spending this $2.3 million.  Thus, any communication that Prins was having with MacKenzie or Twyman about wiring the funds back to Elbar upon receipt of an executed release was nothing more than a ruse to delay their discovery that Prins had actually stolen the Proceeds, and Prins has admitted as much at his deposition.  [*See* TransWorld's Ex. HH, Prins Dep. 45:19–46:5].

70.     Also on November 21, 2016, Twyman emailed Prins and stated that Elbar would not execute any release prior to receiving funds, as this was Elbar's standard procedure.  [United Sentry's Ex. 4].  Twyman asked Prins whether he would be willing to wire the funds into this Court's registry in Houston.  [*Id.*].  Prins replied to Twyman on November 22, 2016, stating that he would be willing to consider interpleading the funds.[40]  [*Id.*].

71.     On November 27, 2016, MacKenzie again asked Prins to send him a screenshot of the IOLTA.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 242:11-20; United Sentry's Ex. 12; TransWorld's Ex. HH, Prins Dep. 189:20–190:8].  In his email, MacKenzie wrote the following to Prins:  "I must admit I am very Concerned about this matter another case you have against you With a estate matter of roughly 360,000 has popped up people Are losing there patience and trust Do not let me down Todd.  I have Used your services since 1999 With out problems."[41]  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 242:21–243:3; United Sentry's Ex. 12].  In response, Prins sent MacKenzie a screenshot of the IOLTA showing a balance of $3.14 million; Prins, however, like the previous responses to MacKenzie's requests for screenshots of the IOLTA, edited the screenshot in order to deceive MacKenzie.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 243:4-13; United Sentry's Ex. 12; TransWorld's Ex. HH, Prins Dep. 189:20–190:8].  In fact, Prins had already transferred most of the Proceeds out of the IOLTA into the Wells Fargo Operating Account and the BBVA Operating Account.  [*See* Finding of Fact Nos. 46, 57].

72.     On or around November 30, 2016, MacKenzie again requested a screenshot of the IOLTA to confirm the amount of funds in it.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 243:14-

---

[40] As already noted in footnotes 38 and 39, by responding that he would be willing to consider returning the funds to Elbar, Prins was clearly misleading Twyman because by this point, Prins had already transferred the Proceeds out of the IOLTA and spent or transferred to third parties a substantial portion of these funds.  Prins never had any intention whatsoever of even considering interpleading the Proceeds.  His statement to Twyman that he would be willing to consider interpleading the funds was a bald-faced lie.

[41] MacKenzie's email was grammatically deficient.

36

25].  In reply, Prins sent MacKenzie another falsified screenshot of the IOLTA, once against showing a balance of $3,144,000.00.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 243:14–244:3; United Sentry's Ex. 13].

73.    On December 2, 2016, MacKenzie and United Sentry's counsel[42] contacted the FBI regarding MacKenzie's suspicions that Prins was sending him doctored screenshots of the IOLTA.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 104:11–105:18, 245:8-17].

74.    On December 3, 2016, MacKenzie again requested another screenshot of the IOLTA from Prins.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 244:4-24; United Sentry's Ex. 14].  Prins responded to MacKenzie's email on December 4, 2016, and once again attached a falsified screenshot showing a balance of $3,144,000.00 in the IOLTA.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 245:18-24; United Sentry's Ex. 14].  This was at least the sixth time since October 24, 2016, that MacKenzie had requested that Prins send him a screenshot of the IOLTA as proof of the amount of funds in the account.  In Prins' own words:  "Mr. MacKenzie expressed to me a great deal of concern about this money.  Mr. MacKenzie was—for lack of a better term—like a dog on a bone on it and contacted me more than anybody, yes." [TransWorld's Ex. HH, Prins Dep. 190:16-20].

75.    On December 5, 2016, pursuant to yet another request from MacKenzie for verification of the amount of funds in the IOLTA, Prins, with MacKenzie listening in on the call, impersonated a BBVA employee—one "Levon Martin"—in order to falsely confirm the balance in the IOLTA as $3,144,000.00.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 246:9-18, 247:10-14, 248:17-20; United Sentry's Ex. 16; TransWorld's Ex. HH, Prins Dep. 192:15-20, 201:20–204:13; Tape Recording, Feb. 7, 2018, Tr. at 5:11:00–5:13:32 P.M.].  MacKenzie tape recorded

---

[42] The Court notes that United Sentry's counsel here was **no longer** Prins, but rather Benette Zivley ("Zivley").  [*See* United Sentry's Ex. 7].  MacKenzie, as the president of United Sentry, clearly had decided by this time that with respect to this particular matter, United Sentry needed a different lawyer than Prins to represent it.

this phone call.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 246:14-15].  On the same day, Prins also created a false email from "Levon Martin," confirming the balance of the IOLTA as $3,144,000.00.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 248:3-16; United Sentry's Ex. 15; TransWorld's Ex. HH, Prins Dep. 191:18–192:8].  Prins then forwarded this email to MacKenzie to continue attempting to deceive MacKenzie into believing that all of the Proceeds were still in the IOLTA.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 248:11-16; United Sentry's Ex. 15; TransWorld's Ex. HH, Prins Dep. 191:18–192:8].

76.     Around the beginning of December of 2016, because of MacKenzie's concerns about Prins based on news articles in San Antonio newspapers and the security of the Proceeds in the IOLTA, MacKenzie hired two ex-Texas Rangers to watch Prins and Ms. Prins 24 hours a day, so that MacKenzie would be alerted if Prins or Ms. Prins attempted to leave the country. [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 252:22–253:24].  MacKenzie believed this "was the right thing to do for the whole situation."  [*Id.* at 253:14-17].

77.     On December 6, 2016, this Court held a status conference at the request of the Chapter 7 Trustee.  At this hearing, the respective attorneys for the Chapter 7 Trustee, United Sentry, and Elbar raised very troubling concerns about Prins' misappropriation of funds from his IOLTA.  [Main Case Doc. No. 197 at 7 of 20, ¶ 27].  Specifically, United Sentry's counsel stated that he had learned from communications with the FBI that Prins had transferred funds out of his IOLTA on October 18, 2016, which would make his statements on the record at the hearing held on November 8, 2016, that he was still holding all of the $2.4 million in the IOLTA blatantly false.[43]  [*Id.*].

---

[43] For purposes of clarity, as of December 16, 2016, when this Court held the status conference, neither this Court nor the attorneys for Elbar, United Sentry, or the Trustee (or their respective clients) had any detailed information about Prins draining the IOLTA of the Proceeds and using these funds for his personal benefit.  More facts only

78.     On December 7, 2016, based upon the statements made by the attorneys who appeared at the status conference on December 6, 2016, this Court entered its Order (1) Requiring Todd Prins to Wire Transfer $2.4 million to the Chapter 7 Trustee by No Later than 5:00 P.M. on December 12, 2016; and (2) Requiring Todd Prins to Personally Appear in Court and Show Cause Why He Should Not be Sanctioned ("Prins Show Cause Order").[44] [Main Case Doc. No. 52].  The Prins Show Cause Order provided that in the event Prins failed to wire the $2.4 million to the Chapter 7 Trustee by the deadline of 5:00 p.m. on December 12, 2016, the Court would hold a hearing on December 14, 2016, at 11:30 a.m. at which Prins was ordered to personally appear and show cause why he should not be held in contempt for failing to turn over the $2.4 million to the Chapter 7 Trustee.  [Main Case Doc. No. 52].  The Prins Show Cause Order further provided that, regardless of whether the $2.4 million was transferred, the Court would hold a hearing on January 9, 2017, at which Prins was ordered to personally appear and show cause why he should not be sanctioned for:

> A.  violating the automatic stay on October 4, 2016 by conducting a foreclosure sale on 5506 Holly Springs Drive, Houston, Texas 77056 (the "Property"), which is property of the Debtor's bankruptcy estate;
>
> B.  violating the automatic stay on October 6, 2016 by accepting a wire of the Proceeds from Elbar Investments, Inc., which monies represent the funds attributable to the foreclosure sale of the Property; and
>
> C.  making a specific representation on the record via his telephonic appearance at the status conference held in this case on November 8, 2016 regarding the Proceeds: to wit, that on that day, the Proceeds were on deposit in his law firm's IOLTA account.

[*Id.*].

---

came to light after this status conference:  (a) through discovery and evidence introduced at hearings held in the future in the Main Case; and (b) at the trial in this adversary proceeding.

[44] The Court notes that in the Prins Show Cause Order, the Court made a finding that the $2.4 million was, at a minimum, arguably property of the estate over which this Court had jurisdiction.  [Main Case Doc. No. 52].

79.     On December 7, 2016, the Chapter 7 Trustee served Prins with a copy of the Prins Show Cause Order by email and facsimile.  [Main Case Doc. No. 53].  The Chapter 7 Trustee also served a courtesy copy of the Prins Show Cause Order on Prins' bankruptcy counsel, Seidler.  [*Id.*].  There is no question that Prins received notice of the Prins Show Cause Order.

80.     Prins did not wire transfer $2.4 million to the Chapter 7 Trustee by 5:00 p.m. on December 12, 2016, as required by the Prins Show Cause Order.  [Main Case Doc. No. 60; Main Case Doc. No. 197 at 8 of 20, ¶ 33].

81.     On December 9, 2016, Prins' license to practice law was placed on an interim suspension by the State Bar of Texas.  [Main Case Doc. No. 197 at 8 of 20, ¶ 32].

82.     On December 12, 2016, the United States (through the Department of Justice) seized the entirety of the funds in the Wells Fargo Operating Account, which amounted at that time to $1,601,542.14.  [Pl.'s Ex. 9; TransWorld's Ex. HH, Prins Dep. 50:12–51:8].

83.     On December 14, 2016, Prins filed his response to the Prins Show Cause Order (the "Response"), [Doc. No. 63], in which he asserted that (a) he did not violate the automatic stay because he believed the Property was owned by Triple Gate and was not property of the Debtor's estate, and (b) it was "impossible for him to effectuate the Court's [Prins Show Cause] [O]rder [because] [t]he United States, through the Department of Justice, has seized the account of Respondent rendering it impossible for him to transfer any funds or even afford transportation to Houston, Texas from San Antonio, Texas."  [Main Case Doc. No. 63 at 3 of 5, ¶ 11].  In the Response, Prins admitted that by no later than 10:15 a.m. on October 5, 2016, he had knowledge that the Property was titled in the name of the Debtor and her non-debtor spouse, i.e., Amos.[45] [Main Case Doc. No. 63-2].

---

[45] In his Response, Prins indicates that the 10:15 a.m. email from Payne to him on October 5, 2016, [*see* Finding of Fact No. 36], is attached to the Response as Exhibit A; however, this email was filed as Exhibit 2.

84.    On December 14, 2016, this Court held a hearing on the Prins Show Cause Order (the "Show Cause Hearing").  Prins failed to appear at the Show Cause Hearing as required by the Prins Show Cause Order.  [Main Case Doc. No. 197 at 9 of 20, ¶ 37].  Counsel for United Sentry also informed the Court at this hearing about the United States' seizure of funds in Prins' accounts.  [*Id.*].  On December 14, 2016, this Court entered its Order (1) Holding Todd A. Prins in Contempt of this Court's Order of December 7, 2016; and (2) Requiring the U.S. Marshals Service to Take Todd A. Prins Into Custody and Produce Him in Court (the "Contempt Order"). [Main Case Doc. No. 64].  In the Contempt Order, the Court found that (a) Prins had received adequate notice of the Prins Show Cause Order, (b) Prins failed to turn over the $2.4 million as required by the Prins Show Cause Order, and (c) Prins failed to appear before the Court at a hearing on the Prins Show Cause Order held on December 14, 2016, at 11:30 a.m.  [*Id.*].  As a result, the Court held Prins in civil contempt of the Prins Show Cause Order and required the U.S. Marshals Service to take him into custody and produce him in court.  [*Id.*].

85.    On December 15, 2016, Prins voluntarily appeared at the Bob Casey Federal Courthouse, 515 Rusk, Houston, Texas, 77002 and turned himself into the custody of the U.S. Marshals.[46]  [Main Case Doc. No. 197 at 9–10 of 20, ¶ 39].  The Marshals then brought Prins to the undersigned judge's courtroom; the Court then immediately held the Show Cause Hearing; and Prins proceeded to give testimony about the Prins Show Cause Order and the Response. One day after representing in the Response that he lacked funds to come to the scheduled Show Cause Hearing, Prins admitted that:  (a) he was able to come to Houston on the bus for $10 after receiving the Contempt Order; and (b) the statement in his Response regarding his inability to appear was false.  [*Id.*].  At the Show Cause Hearing held on December 15, 2016, Prins admitted

_____
[46] Main Case Doc. No. 118 is the transcript of the December 15, 2016, hearing.

receiving notice of the December 14, 2016, Show Cause Hearing.  [*Id.* at 10 of 20, ¶ 40].  The Court then asked Prins why he did not appear at the Show Cause Hearing to which Prins responded:  "Inability to answer questions, pursuant to the Fifth Amendment[.]"  [*Id.*].  At the Show Cause Hearing held on December 15, 2016, Prins asserted the Fifth Amendment privilege and refused to answer questions posed by the Chapter 7 Trustee's counsel regarding transfers of the $2.4 million out of the IOLTA.  [*Id.* at 10–11 of 20, ¶ 41].  Prins also asserted the Fifth Amendment privilege to questions regarding the statements made in the Response regarding the seizure of his accounts by the Department of Justice.  [*Id.* at 11 of 20, ¶ 42].[47]  The Court continued the Show Cause Hearing to December 19, 2016, and released Prins from the custody of the U.S. Marshals.[48]  [Main Case Doc. No. 197 at 11 of 20, ¶ 45; Main Case Doc. No. 69].

86.     At the continued Show Cause Hearing on December 19, 2016, the parties made further oral arguments about the testimonial and documentary Fifth Amendment privilege issues raised at the Show Cause Hearing held on December 15, 2016.  After listening to these oral arguments, the Court requested the parties to file written briefs on the privilege issues raised at the December 15 hearing.  [*See* Main Case Doc. Nos. 74 (Prins' brief) and 75 (Trustee's brief)].  The Court therefore recessed the Show Cause Hearing for approximately six hours.  After considering the parties' written submissions, the Court went back on the record and ruled that Prins did not have a Fifth Amendment privilege over his bank statements and, therefore, had to produce them to the Chapter 7 Trustee.  [Main Case Doc. No. 197 at 12 of 20, ¶ 47; *see also* Main Case Doc. No. 77].  The Court further ruled that Prins had waived his Fifth Amendment

---

[47] See Finding of Fact No. 82 regarding the seizure of the funds in the Wells Fargo Operating Account.

[48] The Court released Prins because he expressly promised that he would return to court on December 19, 2016, and, further, because he knew that a bench warrant would be issued immediately if he failed to appear.

privilege and was required to answer questions regarding the status of the $2.4 million wired by Elbar and into the IOLTA.  [Main Case Doc. No. 197 at 12 of 20, ¶ 47].  Thus, counsel for the Trustee was allowed to resume examining Prins.  Prins admitted that, even if the IOLTA had not been seized by the United States, he would not have been able to comply with the Show Cause Order because all $2.4 million had been transferred out of the IOLTA and several hundred thousand dollars of the $2.4 million was no longer in the Wells Fargo Operating Account—i.e., he had spent many of the Proceeds.  [*Id.* at 12 of 20, ¶ 48].  Prins further admitted that he had no justification or basis for transferring the $2.4 million from the IOLTA to the Wells Fargo Operating Account.  [*Id.*].  Prins also admitted to transferring substantial sums to two entities, TransWorld and Industry Drive.[49]  [*See id.* at 12 of 20, ¶ 49].  Prins also told the Court that the rest of depleted funds from the $2.4 million were used for "operating expenses of the practice."[50] [*Id.* at 12 of 20, ¶ 50].  The Court continued the Show Cause Hearing until January 9, 2017, in order to afford the Trustee time to review bank statements that the Court decided to require Prins to produce to the Trustee.

87.    On December 21, 2016, the Court entered an order requiring Prins to produce to the Chapter 7 Trustee bank statements for September to December 2016, for the IOLTA, the BBVA Operating Account, and the Wells Fargo Operating Account.  [*See* Main Case Doc. No. 77].  The Court gave Prins until noon on January 6, 2017, to comply with the order.  [*Id.*].

---

[49] At the hearing on December 19, 2016, Prins testified that the amount that he had transferred to these two entities was $600,000.00.  [Main Case Doc. No. 197 at 12 of 20, ¶ 49].  However, subsequently, based upon discovery conducted by the parties as well as testimony given by representatives of TransWorld and Industry Drive at the trial in this adversary proceeding, the aggregate amount that Prins actually transferred was $464,807.29, representing the sum of $300,000.00 (transferred to Industry Drive) plus $164,807.29 (transferred to TransWorld).  [Main Case Doc. No. 197 at 4 of 20, ¶ 13; Pl.'s Exs. 5, 7, 10–11; TransWorld's Ex. HH, Prins Dep. 37:9-25, 38:18-25].

[50] Prins' testimony here was false, as the funds that he had already spent were used not only for the expenses associated with the Prins Law Firm, but also for paying his personal taxes to the IRS, taking family trips to Europe and Portland, Oregon, and transferring monies to other clients in addition to TransWorld and Industry Drive.  [*See* Finding of Fact Nos. 47–48].

88.     On January 2, 2017, Elbar filed the instant adversary proceeding against the Debtor, Amos, the Trustee, Prins, United Sentry, MacKenzie, TransWorld, and Industry Drive. [Adv. Doc. No. 1].**51**

89.     On January 3, 2017, Elbar filed a lis pendens on the Property.   [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 126:8-23; Industry Drive's Ex. 10].   Elbar filed this lis pendens knowing that the Debtor claimed an interest in the Property and that therefore the Property was property of her Chapter 7 estate and protected by the automatic stay.   [*See* Pl.'s Exs. 26–27; Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 126:8-23; TransWorld Ex.'s HH, Prins Dep. 154:5-25]. Elbar did not seek relief from the automatic stay from this Court before filing the lis pendens. [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 126:11-13].

90.     On January 9, 2017, this Court held the continued Show Cause Hearing.   The Chapter 7 Trustee introduced the bank statements Prins had produced for the Wells Fargo Operating Account and the BBVA Operating Account discussed above.**52**   [Main Case Doc. No. 197 at 13 of 20, ¶ 52].   During this hearing, Prins testified that he did not believe he was in violation of the automatic stay when he transferred approximately $700,000 to $800,000 of the $2.4 million to Industry Drive and Transworld.**53**   [*Id.* at 13 of 20, ¶ 53].

91.     On January 27, 2017, Mr. Cash died. [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 11:17-22].

---

51 Subsequently, Elbar filed a First Amended Complaint.   [See *infra* Finding of Fact Nos. 103, 105–107 for further discussion of claims that were dismissed prior to, during, and after trial].

52 Prins testified that he was not able to access his online bank statements for the IOLTA as a result of the seizure of this account by the United States.   [Main Case Doc. No. 121, Jan. 9, 2017, Hrg. 12:24–13:13, 26:1-10].   This is one piece of testimony from Prins that the Court actually believes is entirely true.

53 As noted at footnote 49, Prins actually transferred the aggregate amount of $464,807.29, **not** $600,000.00 to $700,000.00, to TransWorld and Industry Drive.

92.      In late February of 2017, when she (as president of TransWorld) was served with a lawsuit, Ms. Cash learned for the first time that the check in the amount of $230,853.66 that TransWorld had made to the order of the IOLTA on February 4, 2008, for the purpose of Prins settling TransWorld's tax dispute with the Tax Assessor, may not have in fact been paid to the Tax Assessor.  [*Id.* at 23:20–24:1].

93.      On March 7, 2017, Prins submitted a resignation of his law license in lieu of discipline.[54]

94.      On March 13, 2017, Elbar filed a proof claim in the Debtor's Chapter 7 case, setting forth that its claim totals $1,594,424.17 and that it believes the Property is worth $3,500,000.00.  [Proof of Claim, Case No. 16-35021, Claim 11, at 2].

95.      On March 27, 2017, this Court, having completed the Show Cause Hearing on the Prins Show Cause Order, entered Findings of Fact and Conclusions of Law Regarding Order (1) Requiring Todd Prins to Wire Transfer $2.4 Million to the Chapter 7 Trustee By No Later Than 5:00 P.M. on December 12, 2016; and (2) Requiring Todd Prins to Personally Appear in Court and Show Cause Why He Should Not Be Sanctioned.  [Main Case Doc. No. 197].  The Court then entered an order imposing sanctions against Prins, which ordered the following:

[1]      [Prins] is liable to Elbar for sanctions in the amount of $800,000.00, representing [the] approximate difference between the $2.4 million paid by Elbar at the foreclosure sale and the funds frozen by the United States; [and]

[2]      Prins is liable for sanctions in the following amount of attorneys' fees to the following parties:

[A]      The Trustee in the amount of $20,485.00;

---

[54]      Todd      Prins'      public      state      bar      profile      is      available      at: https://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&template=/Customsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=183309 (last visited September 28, 2018).

[B]   Elbar in the amount of $13,350.00 for Richard A. Battaglia and $2,820.00 for Jerel S. Twyman; and

[C]   United Sentry in the amount of $19,808.11.

[Main Case Doc. No. 198].  This Court ordered that Prins was immediately liable for all sanctions set forth in the order and that Prins was to immediately pay all sanctions.  [*Id.*].  Prins has failed to comply with any portion of this order.

96.     On March 29, 2017, the Trustee filed a motion requesting this Court to approve the sale of the Property, [Main Case Doc. No. 199], which this Court granted.  [Main Case Doc. No. 200].  Pursuant to the Court's order granting approval of the sale of the Property, as amended, the amount of proceeds necessary to pay off United Sentry's mortgage on the Property was to be placed into the Court's registry.  [Main Case Doc. Nos. 200, 209].

97.     On April 5, 2017, the Debtor and Amos were indicted for conspiracy to commit health care fraud, health care fraud, and engaging in monetary transactions in property derived from specified unlawful activity, in the Southern District of Texas, Houston Division.[55]  [*United States v. Amos*, Crim. No. 4:17-cr-00197, S.D. Tex., ECF. No. 21].

98.     On April 27, 2017, in the adversary proceeding at bar, this Court granted the Trustee's motion to dismiss and dismissed all claims asserted by Elbar against the Trustee. [Adv. Doc. No. 45].  Elbar did not file any opposition to the Trustee's motion to dismiss all of the claims against the Trustee.

99.     On May 26, 2017, the Trustee closed on the sale of the Property.  [Main Case Doc. Nos. 218, 219].

---

[55] No trial has yet been held in this criminal case.

100.    On May 30, 2017, pursuant to the Court's order approving the sale of the Property, $1,719,062.93, was placed into the Court's registry.**56**  [*See* docket entry in Main Case dated 05/30/2017].  The amount of proceeds placed into the registry is sufficient to pay off all of United Sentry's lien, which totals $1,568,782.76.  This action was taken because prior to the sale, Elbar had filed the instant adversary proceeding and, among other relief requested, asserts that it should receive some or all of these sale proceeds in order to be made whole before United Sentry receives any portion of these proceeds.  [Adv. Doc. No. 1 at 6–7 of 9, ¶¶ 27–28].

101.    On June 7, 2017, Prins entered into a plea agreement with the U.S. Attorney for the Western District of Texas regarding the matter of *United States of America v. Todd A. Prins* ("Prins' Criminal Case").  [*See* Pl.'s Ex. 1; *United States v. Todd A. Prins*, Crim. No. 5:17-cr-00482-DAE-1, W.D. Tex., ECF. No. 3].  In the plea agreement, Prins stated that he "well knew and believed[] the true balance of the IOLTA account was less than $1,000, having been $2,041.17 prior to the receipt of the $2,400,000 transfer from E[lbar] I[nvestments], Inc."  [Pl.'s Ex. 1; *United States v. Todd A. Prins*, Crim. No. 5:17-cr-00482-DAE-1, W.D. Tex., ECF. No. 3 at 7-8 of 17].  Pursuant to the plea agreement, Prins is to make restitution to Elbar in the amount of $2.4 million.  [Pl.'s Ex. 1; *United States v. Todd A. Prins*, Crim. No. 5:17-cr-00482-DAE-1, W.D. Tex., ECF. No. 3 at 17 of 17].  Under the plea agreement, Prins is also to make restitution to other individuals; however, neither Industry Drive nor TransWorld are included in Prins' plea agreement.**57**  [Pl.'s Ex. 1; *United States v. Todd A. Prins*, Crim. No. 5:17-cr-00482-DAE-1, W.D. Tex., ECF. No. 3 at 17 of 17].

---

56 The $1,719,062.93 that was placed into the Court's registry does not represent the full purchase price of the home; instead, this amount represents the net proceeds from the sale of the Property, after the payment of closing costs and ad valorem tax claims.  [*See* Main Case Doc. No. 219].

57 Presumably, Industry Drive was not involved in the plea agreement because unlike Elbar, Industry Drive had suffered no harm at the time of the plea agreement.  Indeed, Prins had paid $300,000.00 to Industry Drive on November 4, 2016, [Finding of Fact No. 57], and therefore Industry Drive was made whole.  On the other hand,

102.    Because Triple Gate defaulted under the Note, the 13 investors who invested in United Sentry's loan to Triple Gate have not received any return on their investments in the form of interest payments by Triple Gate.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 77:6-24]. However, since July of 2017, MacKenzie himself has been making interest payments to the 11 investors (minus United Sentry and himself), in the amount of approximately $13,000.00 a month, as he believes that it is the "right thing to do."  [*Id.* at 77:6-24, 94:7-14].

103.    On July 6, 2017, Elbar filed a first amended complaint in this adversary proceeding, asserting the following claims:  (1) equitable subrogation as to Prins, United Sentry, and MacKenzie; (2) fraud in real estate transactions as to Prins, United Sentry, and MacKenzie: (3) common law fraud as to Prins, United Sentry, and MacKenzie; (4) Texas Theft Liability Act as to Prins, United Sentry, and MacKenzie; (5) theft as to Prins; and (6) money had and received, unjust enrichment, theft, and conversion against TransWorld and Industry Drive.  [Adv. Doc. No. 68].

104.    On August 10, 2017, Elbar, Bustamante, Abdullatif, and Jabbour filed a petition in the Prins' Criminal Case, claiming that they are entitled to recover the entire $1,601,542.14 that the United States government seized from the IOLTA.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 77:9-15; Pl.'s Ex. 49].

---

TransWorld has suffered damages from Prins' actions.  At a minimum, it is certain that TransWorld has suffered damages of $5,000.00 and it is quite probable that the harm is much higher.  As discussed in depth *supra* at Finding of Fact Nos. 9–10, TransWorld gave Prins $169,807.29 as "good faith" money while Prins allegedly worked out TransWorld's tax issues with the Tax Assessor.  TransWorld, however, only ever received $164,807.29 back from Prins—hence, TransWorld's damages are, at a minimum, $5,000.00.  [Finding of Fact No. 50].  Given Prins' blatant theft of the $2.4 million, it is conceivable that Prins **never** paid any money to the Tax Assessor on behalf of TransWorld, thus making the damages suffered by TransWorld much higher.  After all, TransWorld, aside from giving Prins the amount of $169,807.29 on May 17, 2016, had previously given Prins the sum of $230,853.66 on February 4, 2008, for the express purpose of providing Prins with sufficient funds to pay the Tax Assessor the amount owed by TransWorld at that time.  [*See* Finding of Facts No. 3].  Yet, it appears that Prins never paid the Tax Assessor any of the $230,853.66, as the Tax Assessor is now asserting that TransWorld owes almost a half million dollars.  [Finding of Facts No. 3].  Under these circumstances, it is not clear why TransWorld was not included in Prins' plea agreement.

105.    On August 11, 2017, Elbar filed a proposed order approving dismissal of Elbar's theft claim against Industry Drive.  [Adv. Doc. No. 114].  The Court subsequently signed the proposed order later that same day, thereby dismissing Elbar's theft claim against Industry Drive. [Adv. Doc. No. 116].

106.    On February 6, 2018, a three-day trial commenced in the instant adversary proceeding.[58]  At the conclusion of the trial:  (1) Elbar's counsel represented to the Court that Elbar had decided to dismiss all of Elbar's claims against the Debtor, Amos, and MacKenzie;[59] (2) this Court granted United Sentry and MacKenzie's motion to dismiss the cross-claims brought against them by the Debtor and Amos;[60] and (3) Elbar's counsel represented to the Court that Elbar was dismissing Elbar's claim of theft against TransWorld.[61]

107.    Thus, the only causes of action asserted by Elbar remaining in this adversary proceeding are the following:

---

[58] The Debtor, Amos, and Prins did not appear at trial.  Amos has not participated in this adversary proceeding since January 27, 2017, when he filed an answer and cross-claim through his legal counsel at the time.  [Adv. Doc. No. 10].  The Debtor has not participated in this adversary proceeding since February 13, 2017, when she filed an answer and cross-claim through her legal counsel at the time.  [Adv. Doc. No. 20].  Both counsel for Amos and counsel for the Debtor eventually withdrew as counsel for their respective clients.  [*See* Adv. Doc. Nos. 74, 75, 110, 111].  Prins, who was certainly well aware of the trial, could have appeared, as he had not yet been sentenced by the District Court in the Prins' Criminal Case.  However, Prins chose not to appear and participate at trial.

[59] On February 10, 2018, Elbar filed a "Stipulation of Dismissal of Claims Against Donald Anthony MacKenzie." [Adv. Doc. No. 195].  This document states that Elbar is dismissing all claims against MacKenzie with prejudice. [*Id.*].  Also on February 10, 2018, Elbar filed a "Stipulation of Dismissal of Claims Against Oluyemisi Omokafe Okedokun and Felix Amos."  [Adv. Doc. No. 196].  This document states that Elbar is dismissing all claims against the Debtor without prejudice.  [*Id.*].  Even though the stipulation only dismisses all claims as to the Debtor, at trial, Battaglia stated in open court that the dismissal was to both the Debtor and Amos.  [Adv. Doc. No. 222, Feb. 8, 2018, Trial Tr. 57:21-22].

[60] On February 15, 2018, this Court entered an order memorializing this ruling.  [Adv. Doc. No. 202].

[61] On February 26, 2018, this Court entered an order dismissing Elbar's theft claim against TransWorld.  [*See* Adv. Doc. No. 212].

A. As to United Sentry:  causes of action for equitable subrogation, fraud in real estate transaction, common law fraud, and the Texas Theft Liability Act;[62]

B. As to TransWorld:  causes of action for money had and received, unjust enrichment, and conversion;

C. As to Industry Drive:  causes of action for money had and received, unjust enrichment, and conversion; and

D. As to Prins:  causes of action for fraud in real estate transaction, common law fraud, and the Texas Theft Liability Act.[63]

108.    Ms. Cash estimated that she has paid approximately $20,000.00 for counsel to represent her in the instant adversary proceeding.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 40:24–41:1].

109.    Industry Drive has paid $44,000.00 in legal fees for this suit, not including the trial itself.  [*Id.* at 150:24-25].

110.    On February 22, 2018, in the Prins' Bankruptcy, Bankruptcy Judge Gargotta entered an Order Granting Motion of the United States of America, Internal Revenue Service, to Approve Compromise Pursuant to Federal Rule of Bankruptcy Procedure 9019.  [*Todd A. Prins and Paula R. Prins*, Case No. 16-52187-cag, Bankr. W.D. Tex., ECF. No. 135].  Judge Gargotta found that (1) the $82,373.28 paid to the IRS by Prins on October 19, 2016, from the IOLTA is the sole property of Elbar; and (2) the $82,373.28 is not part of the bankruptcy estate of Prins and Ms. Prins.  [*Id.*].  On that same day, Judge Gargotta approved an Agreed Final Judgment in the

---

[62] During his closing argument at trial, Battaglia stated that Elbar's claim for "theft" was not a separate claim than its claim under the Texas Theft Liability Act.  [Adv. Doc. No. 222, Feb. 8, 2018, Trial Tr. 21:16–22:2].  Thus, there is no separate "theft"claim separate and apart from Elbar's Texas Theft Libaility Act claim that Elbar is attempting to recover on.

[63] During his closing argument at trial, Battaglia clarified that the only claims Elbar was still pursuing against Prins were common law fraud, fraud in real estate transactions, and Texas Theft Liability Act.  [Adv. Doc. No. 222, Feb. 8, 2018, Trial Tr. 76:3-25].

adversary proceeding that the U.S. Internal Revenue Service had filed in the Prins' Bankruptcy. [*United States of America, Internal Revenue Service v. Prins*, Adv. Pro. No. 17-05063-cag, Bankr. W.D. Tex., ECF. No. 38].  The Agreed Final Judgment ordered, in relevant part, that (1) the $82,373.28 paid to the IRS on October 19, 2016, is the sole property of Elbar; and (2) the IRS is directed to turn over the $82,373.28 to Elbar within 30 days of the date of the order.  [*Id.*].

111.    On March 20, 2018, Elbar received a check from the United States Treasury in the amount of $82,373.28, in accordance with the Agreed Final Judgment signed by Judge Gargotta in the Prins' Bankruptcy.  [Adv. Doc. No. 237].

112.    On May 15, 2018, Prins was sentenced in the Prins' Criminal Case to 72 months imprisonment, three years of supervised release, and was ordered to pay $2,975,264.00 in restitution (of which, $2.4 million is restitution to Elbar).  [*United States v. Todd A. Prins*, Crim. No. 5:17-cr-00482-DAE-1, W.D. Tex., ECF. Nos. 58, 59].  Also on May 15, 2018, the District Court in the Prins' Criminal Case granted the United States' motion to set aside the preliminary order of forfeiture in lieu of restitution, [*id.* at ECF No. 62], essentially meaning that the government would not seek the funds and would allow the funds to be returned to Elbar.

113.    On June 7, 2018, the United States Attorney for the Western District of Texas filed a "Process Receipt and Return" in the Prins' Criminal Case, requesting that the Clerk of the Court in the Western District of Texas, San Antonio Division, transfer funds in the amount of $1,601,542.14 to Elbar for the purpose of payment as restitution.  [*United States v. Todd A. Prins*, Crim. No. 5:17-cr-00482-DAE-1, W.D. Tex., ECF. No. 63].  On July 2, 2018, Elbar in fact received a check from the United States Treasury in the amount of $1,601,542.14.  [Adv. Doc. No. 237].

114.    Of the $2.4 million that it initially sought to recover by initiating the instant adversary proceeding, Elbar has now received a total of $1,683,915.42:  $82,373.28 from the IRS in the Prins' Bankruptcy plus $1,601,542.14 from the Prins' Criminal Case.  [Adv. Doc. No. 237].  Thus, in this adversary proceeding, Elbar now seeks the return of $716,084.58 in order to be made whole (i.e., $2,400,000.00 minus $1,683,915.42 equals $716,084.58).  Additionally, Elbar seeks to recover attorneys' fees for the prosecution of this adversary proceeding.

115.    For their part, United Sentry, TransWorld, and Industry Drive seek to recover from Elbar all of the attorneys' fees that they have incurred in defending themselves against the claims brought by Elbar.

### III.    CREDIBILITY OF WITNESSES

#### A.  Vincent Bustamante

Bustamante gave testimony both as a fact witness and as an expert witness.  With respect to serving as a fact witness, the Court finds that Bustamante, for the most part, forthrightly answered the questions posed to him, and therefore the Court finds that he is a credible witness and gives some measure of weight to his testimony.  The Court wants to emphasize, however, that this finding is not to be construed as this Court condoning Bustamante's apparent belief that it is acceptable to violate the automatic stay by:  (1) wiring funds to Prins with the knowledge that the Property was protected by the automatic stay, [*see* Finding of Fact Nos. 38–41]; and (2) filing a lis pendens against the Property with the knowledge that the Property was protected by the automatic stay, [*see* Finding of Fact No. 89].

With respect to serving as an expert witness, the Court does not find Bustamante to be credible when he suggests that it is acceptable to consummate any foreclosure sale knowing that

52

the automatic stay is in place.[64]  Indeed, it is no mean point that Bustamante was a party in the

case of *Bustamante v. Cueva* (*In re Cueva*), 371 F.3d 232 (5th Cir. 2004), where he purchased

property at a foreclosure sale that was subject to the automatic stay.  The Fifth Circuit held that

the foreclosure sale was void because this sale had been held in violation of the stay—and that

---

[64] Bustamante was very clear in his testimony that he did not believe the fact that the Debtor had filed a bankruptcy petition and that the automatic stay was in place affected in any way the right to wire transfer the $2.4 million:

| | |
|---|---|
| Hyman: | And what downside was there to tendering the funds knowing about the bankruptcy filing? |
| . . . | |
| Bustamante: | I didn't know of any.  I didn't think of any. |
| Hyman: | Okay.  When you asked – who asked – what is – |
| Bustamante: | Osama [Abdullatif]? |
| Hyman: | Yes.  Who asked Osama [Abdullatif] to wire the funds to Mr. Prins? |
| Bustamante: | I don't think it was a question of asking.  I know I spoke to Osama [Abdullatif] and we just have the kind of relationship that either he volunteered or I asked.  It was not uncommon for him to wire funds for us. |
| Hyman: | When you were – so you talked to Osama [Adbullatif] yourself about wiring the funds. |
| Bustamante: | Right. |
| Hyman: | Okay.  Did you tell Osama [Abdullatif] that there had been a bankruptcy filing? |
| Bustamante: | I don't remember. |
| Hyman: | Would you have thought that was an important piece of information to share with him? |
| Bustamante: | No. |
| Hyman: | Why not? |
| Bustamante: | Because he trusts my judgment. |
| Hyman: | And you didn't think it mattered that there had been a bankruptcy filing? |
| Bustamante: | No. I didn't think it mattered. |

[TransWorld's Ex. II, Bustamante Dep. 83:5–84:13].

therefore Bustamante was not entitled to a deed—and this ruling was issued despite the fact that Bustamante, at the time he purchased the property, was himself unaware of the bankruptcy filing. If the Fifth Circuit can hold that a foreclosure sale is void because of the automatic stay and deny Bustamante's request for a deed even though Bustamante was unaware of the bankruptcy's existence, then assuredly the Fifth Circuit would hold that the foreclosure sale in the suit at bar is void because of the automatic stay and Elbar is not entitled to a deed when **Bustamante knew that the stay was in effect**.  Essentially, Bustamante's expert testimony at the trial was an attempt to convince this Court to disregard controlling Fifth Circuit law.  Such circumstances render his expert testimony valueless, and the Court gives it no weight whatsoever.

**B.  Todd Prins**

The Court finds that Prins is a dishonest individual whose credibility is sorely lacking. After all, Prins, among other despicable acts, did the following:  (1) he improperly transferred the Proceeds from the IOLTA to the IRS, to the Wells Fargo Operating Account, and to the BBVA Operating Account, and used many of these funds for his own personal benefit, [Finding of Fact Nos. 46–50, 57, 59]; (2) he lied at the hearing held on November 8, 2016, when he stated—in response to a question by Elbar's counsel—that the $2.4 million was still in the IOLTA when in fact he had already transferred these funds out of the IOLTA and had begun using them, [Finding of Fact No. 58]; (3) he lied at the hearing held on November 8, 2016, when he stated—in response to a question by this Court—that he was ill at home in San Antonio when in fact he was in London, England with his wife and two children on a trip that was made possible through his use of a portion of the Proceeds that he had stolen, [Finding of Fact Nos. 58–59]; (4) on April 6, 2016, he fabricated a letter on the letterhead of Linebarger (outside counsel for the Tax Assessor) setting forth that TransWorld owed taxes of $169,807.29 in order to trick Ms. Cash into

delivering a check for this amount to Prins, which he deposited into the IOLTA, and thereafter spent for his own purposes, [Finding of Fact Nos. 9–10]; and (5) on December 5, 2016, he impersonated an employee of BBVA Compass Bank on a conference call with MacKenzie in an effort to convince MacKenzie that Prins had not spent the Proceeds and that these funds were still in the IOLTA, [Finding of Fact No. 75]. These five examples by no means represent the universe of Prins' skullduggery—there are many more. However, for purposes of this credibility section, these five examples underscore his lack of trustworthiness; and because he is not trustworthy, this Court does not give much weight to Prins' testimony.

Indeed, given his outrageous behavior this Court would ordinarily give no weight whatsoever to any of his testimony. However, there is one reason to give at least some weight to portions of his testimony, much of which was given by deposition in this adversary proceeding on November 15, 2017.[65] It is this: on June 7, 2017, Prins entered into a plea agreement with the United States Attorney for the Western District of Texas, [Finding of Fact No. 101]; therefore, it behooved him thereafter to cooperate in all matters involving the Proceeds—as he believed that his cooperation (or lack thereof) might affect the length of the prison sentence to be imposed by the U.S. District Court in the Prins' Criminal Case. This Court has reviewed the transcript of Prins' deposition and finds that, in some instances, his testimony on certain discrete issues appears to be truthful. Thus, in rendering its findings of fact and conclusions of law for this adversary proceeding this Court does give some weight to certain portions of Prins' testimony—being careful of course to take even this testimony with a grain of salt.

---

[65] The Court notes that it may make credibility judgments when a person testifies by deposition. *See Deville v. U.S. ex rel Dept. of Veterans Affairs*, 202 F. App'x 761, 762–63 (5th Cir. 2006) (affirming trial court when trial court judge determined that an individual who testified by deposition was a credible witness).

## C.  Peggy Cash

The Court finds that Ms. Cash testified forthrightly and the Court finds her testimony to be very credible.  The Court therefore gives her testimony substantial weight.

## D.  Donald "Tony" MacKenzie

The Court finds that MacKenzie testified forthrightly and the Court finds his testimony to be very credible.  The Court therefore gives his testimony substantial weight.

## E.  Inez Cindy Gabriel

The Court finds that Gabriel testified forthrightly and the Court finds her testimony to be very credible.  The Court therefore gives her testimony substantial weight.

## F.  Osama Abdullatif

The Court has reviewed Abdullatiff's deposition testimony and finds it be credible; thus, the Court gives Abdullatif's testimony substantial weight.

## G.  John Jabbour

The Court has reviewed Jabbour's deposition testimony and finds it be credible; thus, the Court gives Jabbour's testimony substantial weight.

## H.  Elias Klaimy

The Court has reviewed Klaimy's deposition testimony and finds it be credible; thus, the Court gives Klaimy's testimony substantial weight.

### IV.    CONCLUSIONS OF LAW

## A.  Jurisdiction, Venue, and Constitutional Authority to Enter a Final Judgment

### 1.  Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).  Section 1334(b) provides that "the district courts shall have original but not exclusive

jurisdiction of all civil proceedings arising under title 11 [(the Bankruptcy Code)], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges of that district. 28 U.S.C. § 157(a). In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), because its resolution concerns the administration of the Debtor's Chapter 7 estate. Specifically, both Elbar and United Sentry have filed claims against this estate, and there is $1,719,062.93 in the registry of the Court that will be distributed, one way or the other, to these two entities as a result of this lawsuit.[66] Further, this adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) because both Elbar and United Sentry have filed claims against the Debtor's estate, and the resolution of this lawsuit will determine whether Elbar's claim is paid in full or United Sentry's claim is paid in full, as the $1,719,062.93 in the registry of the Court is insufficient to pay both claims in full. Finally, this adversary proceeding is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(O) because the resolution of this lawsuit affects the relationship between the Debtor and her creditors; specifically, one of the Debtor's creditors (i.e., United Sentry) will be paid as a result of the resolution of this lawsuit.

[66] Elbar has filed a claim in the amount of $1,594,424.17, [Proof of Claim, Case No. 16-35021, Claim No. 11, at 2], and United Sentry has filed a claim in the amount of $1,568,782.76, [Proof of Claim, Case No. 16-35021, Claim No. 12, at 2]. The Court notes that the amount of Elbar's claim listed in its Proof of Claim ($1,594,424.17) differs from the amount of its claim listed on the main page of the Claims Register on CM/ECF ($1,594,374.17). Battaglia entered both of these numbers. The Court finds that the amount Elbar indicated in its Official Form 410 – Proof of Claim ($1,594,424.17) is the amount Elbar intended to file a claim for in the Main Case.

2. <u>Venue</u>

Venue is proper pursuant to 28 U.S.C. § 1409(a) because Elbar commenced this adversary proceeding in this Court, which is where the Main Case was pending at the time this adversary proceeding was initiated.

3. <u>Constitutional Authority</u>

Having concluded that this Court has jurisdiction over this dispute, the Court nevertheless notes that *Stern v. Marshall*, 564 U.S. 462 (2011), sets forth certain limitations on the constitutional authority of bankruptcy courts to enter final orders and judgments. Therefore, this Court has a duty to inquire into its constitutional authority to enter a final order or judgment for any matter brought before this Court.

In the suit at bar, this Court concludes that it does indeed have the authority to enter a final judgment. All of the parties have consented, either expressly or impliedly, to adjudication of this dispute by this Court. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be expressed. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . ."). Indeed, the parties filed a Joint Pretrial Order in this Court, [Adv. Doc. No. 189], and also attended and participated at a multiday trial, and at no time did any of the parties object to this Court's constitutional authority to enter a final judgment. If these circumstances do not constitute consent, then nothing does.

**B. Elbar's Standing to Seek to Recover $2.4 Million**

Although none of the defendants, in any of their respective answers or in the pretrial statement, pleaded that Elbar lacked standing to prosecute this lawsuit, the defendants began

raising this issue at trial.  TransWorld, Industry Drive, and United Sentry argue that if this Court

is to find in Elbar's favor on any of Elbar's claims, the most Elbar can recover is $200,000.00, as

that is the amount of money Elbar itself contributed to the purchase price of the Property, [*see*

Adv. Doc. No. 216 at 15 of 43; Adv. Doc. No. 227 at 8-9 of 13; Adv. Doc. No. 219 at 1-2 of 16;

Adv. Doc. No. 222, Feb. 8, 2018, Trial Tr. 170:11-12]; Elbar, on the other hand, argues that

Federal Rule of Civil Procedure ("FRCP") 17(a)(1)(F), made applicable to this adversary

proceeding through Bankruptcy Rule 7017, allows it to bring suit on behalf of all Purchasers,

because the Purchasers are third party beneficiaries.  [Adv. Doc. No. 217 at 28 of 35, ¶ 60; Adv.

Doc. No. 228 at 12-13 of 19, ¶¶ 33-35; Adv. Doc. No. 230 at 9-10 of 19, ¶¶ 23-24].  Without

identifying the contract it alleges was made, Elbar argues that "[t]he evidence is uncontroverted

that Elbar made a contract in its name to purchase the Property for the benefit of those who

provided the funds."  [Adv. Doc. No. 217 at 28 of 35, ¶ 60].  In their post-trial briefs, neither

United Sentry, TransWorld, nor Industry Drive address Elbar's argument regarding FRCP 17.

The Court first considers whether Elbar has standing to bring this adversary proceeding.

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and

"controversies."  U.S. Const. art. III, § 2.  One element of the case-or-controversy requirement is

the doctrine of standing.  *Lujan v. Defenders of Wildlife*, 504 U.S 555, 560 (1992).  Notably:

> Over several decades of jurisprudence, the Supreme Court has formulated a two-
> component test to enable the federal courts to determine the standing of
> complainants before them.  Such parties must demonstrate both constitutional and
> prudential standing.
>
> . . .
>
> To meet the requirement of constitutional standing, [a party] must show that it has
> suffered an "injury in fact" that is: concrete and particularized and actual or
> imminent; fairly traceable to the challenged action of the [opposing party]; and
> likely to be redressed by a favorable decision.  The party must have such
> a *personal stake* in the outcome of the controversy as to assure . . . concrete

adverseness.  The injury-in-fact must be palpable, though this requirement is not
onerous.  The injury need not be current; even a "threatened" injury will suffice.

Once a party has met these constitutional requirements, its standing may yet be
challenged on three "prudential" grounds . . . .  A complainant's bid for standing
may be defeated if:   (a) it is asserting a third party's rights; (b) it alleges a
generalized grievance rather than an injury particular to it; or (c) it asserts an
injury outside the zone of interest the statute was designed to protect.

*In re Cypresswood Land Partners, I*, 409 B.R. 396, 416–17 (Bankr. S.D. Tex. 2009) (quoting *In
re A.P.I. Inc.*, 331 B.R. 828, 857–58 (Bankr. D. Minn. 2005)).

1.  Elbar's Constitutional Standing

In the suit at bar, Elbar meets the requirements for constitutional standing:  (1) Elbar has

suffered an injury-in-fact in the form of monetary damage:  namely, at a minimum, Prins stole

$200,000.00 of its money, [Finding of Fact Nos. 33, 46–50, 57]; (2) there is a "fairly traceable"

connection between Elbar's asserted injury and the alleged actions of the defendant(s):  Prins

(one of the defendants) himself stole all of the Proceeds (including Elbar's $200,000.00 *pro rata*

share), and the $300,000.00 Prins distributed to Industry Drive (one of the defendants) and the

$164,807.29 Prins distributed to TransWorld (one of the defendants) can be traced to these

Proceeds, [Finding of Fact Nos. 33, 46–50, 57]; and (3) there is a non-speculative likelihood that

Elbar's injury can be remedied by Elbar's requested relief.  There is no doubt that if this Court

grants the relief requested by Elbar, Elbar will recover all of the $200,000.00 from the Proceeds

presently in the registry of this Court.  Thus, there is no question that Elbar has constitutional

standing to bring this suit and to recover a judgment for up to its $200,000.00 share of the

Proceeds.

The question therefore is whether Elbar may prosecute this adversary proceeding in order

to recover a judgment for not only its own $200,000.00, but also for the $2.2 million contributed

by the other Purchasers.[67]  In fact, Elbar's expert witness, Bustamante, testified that Elbar's share of the $2.4 million that was wired to Prins was only $200,000.00;[68] he further testified that of the Proceeds wire transferred to the IOLTA, $800,000.00 was contributed by Abdullatif, another $800,000.00 was contributed by Jabbour, and the remaining $800,000.00 was contributed by himself.  [Finding of Fact No. 53].  Yet, none of these individuals are plaintiffs in the suit at bar; Elbar is the only plaintiff here.  The Court therefore must consider Elbar's prudential standing to bring this adversary proceeding:  that is, whether Elbar—as the sole plaintiff—can obtain a judgment for the full amount paid by all of the Purchasers, as opposed to just the $200,000.00 paid by Elbar.

>       2.   Elbar's Prudential Standing

Elbar easily meets two of the prudential standing grounds.  First, the injury Elbar is alleging is a particular injury, as opposed to a general grievance that is shared in equal measure by all or a large class of citizens.  *See In re A.P.I. Inc.*, 331 B.R. 828, 859 (Bankr. D. Minn. 2005).  Specifically, Elbar alleges that it, and the other Purchasers, have suffered a particular injury—namely, loss of their funds—due to Prins' theft of the Proceeds.  Second, the interest sought to be protected by Elbar is within the "zone of interests" to be protected by the statutes at issue in this adversary proceeding.  *See id.*  Here, Elbar is prosecuting several claims that are expressly based upon statutes promulgated under Texas law—namely, the Texas Theft Liability Act and fraud in real estate transactions.  Moreover, Elbar's injuries involve the type of interests that have traditionally been protected by the common law of Texas.  *See Servicios Azucareros de*

---

[67] Since Elbar filed this adversary proceeding on January 2, 2017, Elbar has been able to recover a total of $1,683,915.42.  [*See* Finding of Fact No. 114].  Thus, Elbar now seeks a judgment for $716,084.58 in order to be made whole (i.e., $2,400,000.00 minus $1,683,915.42 equals $716,084.58).

[68] [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 82:24–83:12, 93:24–94:3; TransWorld's Ex. II, Bustamante Dep. 143:8-12].  Moreover, at his deposition, Bustamante testified that "[o]nly a small portion of [the $2.4 million] is Elbar's money."  [TransWorld's Ex. II, Bustamante Dep. 145:6-7].

*Venez., C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 801 (5th Cir. 2012) (noting that plaintiff's breach of contract claim was not barred by any aspect of the prudential standing doctrine, as the plaintiff's "injuries involve the type of interests that have traditionally been protected by the common law of contracts or, in Louisiana, by a similar body of law, the Louisiana Civil Code articles on conventional obligations or contracts"); *Jordan v. Pugh*, 504 F. Supp. 2d 1109, 1116 (D. Colo. 2007) ("For prudential standing . . . (3) the plaintiff's injury must be within the zone of interests the statute or common law claim intends to protect.").

As to the third prudential standing ground, generally, a complainant's assertion of a third party's rights will defeat a complainant's bid for prudential standing.  *See In re Cypresswood Land Partners, I*, 409 B.R. at 416–17.  However, there are exceptions to this general rule. Federal Rule of Civil Procedure 17(a)(1)(F) expressly sets forth the following:

> An action must be prosecuted in the name of the real party in interest.  The following may sue in their own names without joining the person for whose benefit the action is brought: . . . a party with whom or in whose name a contract has been made for another's benefit[.]

Thus, the question is whether Elbar, in seeking to recover a judgment for the $2.2 million contributed by the other Purchasers, can establish that a contract was made for their benefit.[69]

---

[69] The Court notes that:

> Both standing and real party in interest are used to designate a plaintiff who possesses a sufficient interest in the action to entitle him to be heard on the merits.  The doctrine of standing requires a plaintiff to show that he suffered injury in fact traceable to the defendant's conduct and that this injury can be redressed by the relief the plaintiff seeks.  On the other hand, the real party in interest doctrine requires that every action be prosecuted by the entity possessing the particular right sought to be enforced.  Standing is jurisdictional, but real party in interest is not.

*Salim v. Nisselson (In re Big Apple Volkswagen, LLC)*, No. 11-11388 (JLG), 2016 WL 3034744, at *7 (Bankr. S.D.N.Y. May 19, 2016) (internal citations omitted).

### a. *Third Party Beneficiary Status Under FRCP 17(a)(1)(F)*

Elbar essentially argues that it is a real party in interest and that it can prosecute the instant adversary proceeding on behalf of all Purchasers because Elbar made a contract in its name to purchase the Property for the benefit of those who provided the funds (i.e., the Purchasers). As stated above, FRCP 17(a)(1)(F) specifically addresses third-party beneficiary contracts by providing that "a party with whom or in whose name a contract has been made for another's benefit" "may sue in [its] own name[] without joining the person for whose benefit the action is brought." *See also Drew Hardware, L.L.C. v. Hartford Fire Ins., Co.*, No. Civ-14-845-R, 2015 WL 13573970, at *2 (W.D. Okla. Jan. 12, 2015) ("Fed. R. Civ. P. 17(a)(1)(F) states that 'a party with whom or in whose name a contract has been made for another's benefit' may sue in its own name without joining the T[hird] P[arty] B[eneficiary]. The Advisory Committee Notes to Rule 17 further state that the rule 'does not say, because it is obvious, that the third-party beneficiary may sue (when the applicable law gives him that right.'"); 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1543 (3d ed. 1998, 2018 update) ("Under Rule 17(a)(1)(F), a party to a contract for the benefit of another person may sue in his own name."). As noted above, Elbar argues that it can sue in its own name without joining the other Purchasers because a contract was made with Elbar, or in Elbar's name, for the Purchasers' benefit. Elbar, however, does not identify the contract that was made for another's (i.e., the Purchasers') benefit. The Court will first consider whether such contract exists.

Whether a third party beneficiary contract exists is governed by Texas law. *See Farrell Const. Co. v. Jefferson Parish, La*, 896 F.2d 136, 140 (5th Cir. 1990); *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 466 (5th Cir. 1984). In order for the Purchasers to be third party beneficiaries to a contract, a contract must first exist. Elbar, however, does not

specifically point to *any* contract, let alone a contract that indicates that the Purchasers are third party beneficiaries.[70]  Even though there is no explicit written contract regarding the purchase of the Property,[71] the Court has found one Texas case where the notice of sale, the deed of trust, and the buyer's tender of the purchase money "provide all essential terms of [a] contract and satisf[y] the statute of frauds" such that the sale of the property in question was enforceable.  *Key v. Pierce*, 8 S.W.3d 704, 708 (Tex. App.—Fort Worth 1999, pet. denied).  The Court finds this case persuasive.

In *Key*, the homeowners defaulted on their mortgage obligation and the mortgage company requested that the substitute trustee, Kevin Key ("Key") post the property for a nonjudicial foreclosure sale.  8 S.W.3d at 706.  Key posted a notice under the terms of the deed of trust that stated that the property would be sold to the highest bidder for cash on a date and place certain.  *Id.*  At the subsequently held foreclosure sale, a real estate investor, Stewart Pierce ("Pierce"), was the highest bidder.  *Id.*  After Key accepted Pierce's bid, Key gave Pierce approximately one half hour to return with the money.  *Id.*  While Pierce was absent retrieving the purchase money, Key's employer told Key that the homeowners had declared bankruptcy and that the foreclosure sale was invalid.  *Id.*  When Pierce timely returned with the purchase money, Key told Pierce that the homeowners had filed for bankruptcy and that he would not accept Pierce's check.  *Id.*  The next day, Key learned that the homeowners had not filed for

---

[70] As noted above, Elbar summarily states that "[t]he evidence is uncontroverted that Elbar made a contract in its name to purchase the Property for the benefit of those who provided the funds."  [Adv. Doc. No. 217 at 28 of 35, ¶ 60].

[71] This Court rejects any effort to categorize Elbar's Exhibit Number 20 as a contract.  [*See* Pl.'s Ex. 20].  This document is a receipt for the Purchasers' tender of the eleven cashier's checks on October 4, 2016.  Bustamante himself identified Elbar's Exhibit Number 20 as a receipt given by Shum for the highest bid at the foreclosure sale.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 55:20–56:7].  Further, there is nothing from the face of the document that it intends to serve any other purpose than a receipt.  [*See* Pl.'s Ex. 20].  Finally, Elbar's witness and exhibit list presented to this Court at the start of the trial in this adversary proceeding identifies this document as "Shum Receipt"—not as a contract.

bankruptcy.  *Id.*  Approximately one week later, Key filed another notice that the property would be sold at a nonjudicial foreclosure sale at a date certain.  *Id.*  At this second nonjudicial foreclosure sale, before the bidding began, Pierce again tried to tender his check to Key; the mortgage company, however, had authorized Key to bid well beyond the price of Pierce's winning bid from the first nonjudicial foreclosure sale.  *Id.*  Thus, the mortgage company's bid was the highest bid at the second nonjudicial foreclosure sale and Key executed a deed conveying the property to the mortgage company.  *Id.*

Pierce filed suit against Key and the mortgage company seeking a declaratory judgment (among other causes of action) that awarded him title to the property.  *Id.* at 707.  The defendants argued that Pierce's claim was barred by the statute of frauds.  *Id.*  The parties filed cross motions for summary judgment and the trial court found in favor of Pierce on his declaratory judgment claim and it awarded Pierce a fee simple interest in the property once he deposited the purchase money from the first nonjudicial foreclosure sale into the court's registry.  *Id.*

The judgment was then appealed.  On appeal, the defendants argued that there was no writing for the purchase of the property sufficient to satisfy the statute of frauds, while Pierce asserted that the posted notice of sale and the deed of trust were "sufficient memoranda" to satisfy the statute of frauds.  *Id.* at 708.  The appeals court first noted that "[a] contract for the sale of real estate is not enforceable unless it is (1) in writing; and (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him."  *Id.* at 707–08 (citing Tex. Bus. & Com. Code Ann. § 26.01(a)(1)-(2)).  Discussing whether a contract comes within the statute of frauds, the appeals court stated that:

> Whether a contract comes within the statute of frauds is a question of law.  **The statute of frauds requires the written agreement or memorandum to contain all of the essential elements of the agreement so that the contract can be ascertained from the writings without resort to oral testimony.  It does not**

> **require that the contract itself be in writing**.  Rather, the written instrument merely furnishes written evidence of a contract and its essential terms.  A valid memorandum of the contract may consist of numerous communiques signed by the party to be charged and addressed to his agent or the other party to the contract, or even to a third party not connected with the transaction.

8 S.W.3d at 708 (emphasis added) (internal footnotes omitted).

Applying the above law to the facts of the case, the court of appeals affirmed the trial court and found that:  (1) the notice of sale was signed by Key; (2) the notice of sale described the property; (3) the notice of sale stated that the property would be sold to the highest bidder for cash; (4) the deed of trust dictated when, where, and upon what terms the property must be sold; (5) the deed of trust required that Key deliver a trustee's deed to the highest bidder; and (6) Pierce's tender of the purchase price, all together, "provide[d] all essential terms of the contract and satisfie[d] the statute of frauds."  *Id.*

This Court extrapolates *Key's* holding to the facts at bar and finds that even though there is no express written contract for the sale of the Property, the following documents provide all of the essential terms of a contract:  (1) the notice of sale being signed by the substitute trustee (i.e., Prins), [Pl.'s Ex. 18]; (2) the notice of sale describing the Property, [Pl.'s Ex. 18]; (3) the notice of sale stating the Property will be sold to the highest bidder or bidders for cash, [Pl.'s Ex. 18]; (4) the Deed of Trust dictating under what terms the Property must be sold, and the notice of sale, under the terms of the Deed of Trust, setting forth the date, location, and upon what terms the Property must be sold, [Pl.'s Exs. 14, 18]; (5) the Deed of Trust requiring that the Trustee deliver a trustee's deed to the highest bidder,[72] [Pl.'s Ex. 14]; and (6) the Purchasers' tender of

---

[72] Specifically, the Deed of Trust requires that the trustee "[s]ell and convey all or part of the Property to the highest bidder for cash with a general warranty binding Grantor[.]"  [Pl.'s Ex. 14].

the purchase price on October 4 and 6, 2016,[73] [Pl.'s Exs. 20, 31–32].   Thus, here, the Deed of Trust, the notice of sale, and Elbar's tender of the purchase price—not only in the initial form of eleven cashier's checks but also subsequently in the form of a wire transfer—contain all of the essential elements of the agreement so that a contract can be ascertained from the writings without resorting to oral testimony.   *Key*, 8 S.W.3d at 708.   Based on *Key*, this Court finds that a contract between Elbar and United Sentry existed for the purchase of the Property.[74]

The question now is whether it is possible to have a third party beneficiary to this contract under Texas law.   The answer is yes.   Indeed, under Texas law, one can be a third party beneficiary even if the contract is an oral contract.   *See Cunningham v. Healthco, Inc.*, 824 F.2d 1448, 1455 (5th Cir. 1987) (finding sufficient evidence to support jury's findings that "Dental Leasing was an intended beneficiary of the oral contracts in the testimony of Dr. Cunningham, Dr. Bonola, and Mr. Green"); *Steve & Sons, Inc. v. Trinity Glass Int'l Inc.*, No. SA-06-CA-0357-XR, 2008 WL 11334576, at *3 (W.D. Tex. June 24, 2008) ("It is possible to be a third-party beneficiary of an oral contract.") (citing *Cunningham*, 824 F.2d at 1458).   As Texas law allows for one to be a third party beneficiary to an oral contract, the Court must now examine whether the Property was purchased for the benefit of the Purchasers—i.e., whether the Purchasers are third party beneficiaries to the contract between Elbar and United Sentry.

To qualify as a third party beneficiary under Texas law, an alleged third party beneficiary must prove:

---

[73] The:  (1) receipt Shum provided to Twyman on October 4, 2016, for the tender of the eleven cashier's checks, [Pl.'s Ex. 20]; (2) the email exchange between Bustamante and Abdullatif on October 6, 2016, discussing how the wire transfer of the $2.4 million should be sent and then Abdullatif confirming with Bustamante that he in fact sent the wire, [Pl.'s Ex. 31]; (3) the Wire Transfer of Funds Notice from Allegiance Bank indicating that a wire transfer of $2.4 million was sent from Abdullatif's account to the IOLTA, [Pl.'s Ex. 32]; and (4) the account statement from the IOLTA showing it received an incoming wire transfer from Abdullatif in the amount of $2.4 million on October 6, 2016, represent written communications showing that the cash (i.e., the $2.4 million) was tendered.

[74] The Court emphasizes that although there is no written contract, the documents surrounding the sale (the Deed of Trust, the notice of sale, and the tender of purchase money) are sufficient to satisfy the statute of frauds.

> (1) that [the alleged third party beneficiary] was not privy to the written agreements; (2) that the contracts were actually made for [the alleged third party beneficiary]'s benefit; and (3) that the contracting parties intended for [the alleged third party beneficiary] to benefit by their written agreements.

*Talman Home Fed. Sav. & Loan Ass'n of Ill. v. Am. Bankers Ins.*, 924 F.2d 1347, 1350–51 (5th Cir. 1991); *see also Wallace v. Perry (In re Perry)*, 423 B.R. 215, 255 (Bankr. S.D. Tex. Feb. 3, 2010) ("To qualify as a third party beneficiary under Texas law: (1) [the alleged third party beneficiary] must not have been in privity of contract; (2) the contract . . . must have been made—at least in part—for [the alleged third party beneficiary]'s benefit; and (3) the contracting parties must have intended in the written agreement to benefit [the alleged third party beneficiary].").

Here, the first element is met.  "Privity of contract is established by proving that [one] [is] a party to an enforceable contract with either [another person] or a party who assigned its cause of action to [that other person]."  *Allan v. Nersesova*, 307 S.W.3d 564, 571 (Tex. App.—Dallas 2010, no pet.).  The Purchasers (not including Elbar) were not parties to any contract with United Sentry.  As discussed directly below, Elbar was to be the legal owner of the Property with the Purchasers being the beneficial owners.  There is no evidence that the Purchasers (i.e., Abdullatif, Jabbour, Twyman, Bustamante, <u>and</u> Elbar) all entered into an enforceable contract with United Sentry.

The second and third elements are met as well.  In determining whether one is a third party beneficiary to a contract, "the intention of the contracting parties is controlling."  *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999).  "[A] presumption exists that parties contracted for themselves unless it 'clearly appears' that they intended a third party to benefit from the contract."  *Id.*; *see also Cunningham*, 824 F.2d at 1455 ("Parties are presumed to contract for themselves and it follows that a contract will not be construed as having

68

been made for the benefit of a third person unless it clearly appears that such was the intention of the contracting parties.") (quoting *Briercroft Sav. & Loan Ass'n v. Foster Fin. Corp.*, 533 S.W.2d 898, 901 (Tex. Civ. App.—Eastland 1976, writ ref'd n.r.e.)).  Further, "the 'provisions of the contract' upon which the claim of 'third party beneficiary succeeds or fails' are the oral promises and understandings between the parties as reflected in the trial testimony and established by the findings of the jury."  *Cunningham*, 824 F.2d at 1455 (quoting *Greenville Indep. School Dist. v. B & J Excavating, Inc.*, 694 S.W.2d 410, 412 (Tex. App.—Dallas 1985, writ ref'd n.r.e.)).

The evidence clearly shows that (1) the purchase of the Property was made for the Purchasers' benefit and (2) the contracting parties (i.e., Elbar and United Sentry) intended for the agreement to benefit the Purchasers.  Even though the eleven cashier's checks, and later the wire-transfer of the Proceeds, came from Abdullatif, Jabbour, and Bustamante themselves, it is clear that Elbar was the contemplated purchaser of the Property at the foreclosure sale.  First, Twyman—who is a vice president of Elbar—was the individual who attended the foreclosure sale (and was the successful highest bidder) as a representative of Elbar.  [Finding of Fact No. 32].  Second, even though the money came from Bustamante himself, the four cashier's checks (that were not from Abdullatif and Jabbour) given to Shum at the foreclosure sale on October 4, 2016, were made payable to the order of Elbar.  [Finding of Fact No. 32; *see* Pl.'s Ex. 20].  Third, the receipt tendered by Shum—that is signed by both Shum as substitute trustee and Twyman as Elbar's vice president—sets forth that payment was received from Elbar.  [*See* Pl.'s Ex. 20].  Fourth, Bustamante testified that when purchasing real property, the individuals (and Elbar itself) provide the funds to purchase properties as their beneficial owners, and that Elbar

then acquires the legal title to the properties.[75]  [Finding of Fact Nos. 30–31, 33; Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 91:2-10; TransWorld's Ex. II, Bustamante Dep. 142:5–145:5]. Similarly, Klaimy testified that when buying property, the property is only titled in Elbar's name because "[t]his is, kind of, like a requirement, that if a group of people are buying it, the property goes into Elbar, because Elbar is a registered company and has been doing business for a long time, and they do business legally."  [TransWorld's Ex. JJ, Klaimy Dep. 12:1-10].  Moreover, Abdullatif testified that he participates in buying properties with Elbar and that Bustamante, as an officer of Elbar, is in charge of the purchase.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 165:13-16, 166:21–167:4, 167:8-15, 168:11-12].  Hence, even though the wire of the $2.4 million came from Abdullatif, Abdullatif wire transferred the $2.4 million at the direction of Elbar, [*id.* at 167:21-25], and for the benefit of all the Purchasers, [*see id.* at 168:11-12]. Likewise, Jabbour testified that at the foreclosure sale on the Property, Elbar did the bidding and the Purchasers put up the money for the purchase of the Property.  [*Id.* at 172:9-12].  Jabbour

---

[75] The Court finds that for this particular foreclosure sale (i.e., the one held on October 4, 2016), this arrangement between Elbar and the Purchasers constitutes an oral agreement between Elbar and the Purchasers as to how the Property would be purchased, as to how the Property would be titled, and as to what percentage of interest in the Property any one Purchaser would hold.  Indeed, Bustamante credibly testified as his deposition as follows:

Q:     And is there an agreement in place that that was the entity [i.e., Elbar] that you and Osama [Abdullatif] and Mr. Jabbour were going to use to purchase, or attempt to purchase, the Holly Springs property?

A:     Yes.

Q:     Oh, there is?

A:     Yes.

Q:     Okay.  Is it a written agreement?

A:     No.

Q:     Okay.  So it's just this verbal agreement that we're talking about.

A:     The custom we've used for years.

[TransWorld's Ex. II, Bustamante Dep. 173:3-17].

also testified that he relied on Bustamante to sort out whatever he needed to do next to complete the purchase of the Property.  [*Id.* at 173:19-22].

Fifth, before the wire transfer of the $2.4 million was sent to the IOLTA, Bustamante requested that the wire show Elbar as the sending party.  [Pl.'s Ex. 31].   Sixth, all of the correspondence after the occurrence of the foreclosure sale on October 4, 2016, concerning the return of the cashier's checks and payment by wire was between Shum/Prins and Twyman, as the attorney and vice president representing Elbar.  [*See* Pl.'s Exs. 21–31].   Thus, the evidence shows that Elbar, although not fronting all of the money for the purchase of the Property, was the intended legal purchaser of the Property.   All of the above described circumstances show that the Purchasers were the intended third-party beneficiaries of the agreement that Elbar entered into with United Sentry's substitute trustees to purchase the Property.[76]   These circumstances make Elbar a real party in interest pursuant to FRCP 17(a)(1)(F), as Elbar is "a party with whom or in whose name a contract has been made for another's benefit."   As Elbar is a real party in interest to this adversary proceeding, Elbar has prudential standing to prosecute this action and seek the remaining funds ($716,084.58) it has yet to collect on behalf of all Purchasers.

For all these reasons, Elbar has the right to prosecute this suit on behalf of itself and all other Purchasers seeking a judgment to recover all amounts still owed to all of the Purchasers.

---

[76] The Court notes that Federal Rule of Civil Procedure 19 does not require that the Purchasers, as third party beneficiaries, be joined as required parties.  *See Trammell Crow Residential Co. v. Am. Prot. Ins. Co.*, No. 3:11-CV-2853-N, 2012 WL 12885090, at *4 (N.D. Tex. Aug. 29, 2012) ("[C]ourts across the nation have ruled that third-party beneficiaries need not be joined under Rule 19 in a dispute between the original parties.  *See* 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1613, at 184 (3d ed. 2001) (citing cases and stating that 'the argument that a third-party beneficiary must be joined in a dispute between the original parties has not been successful.  This conclusion appears sound in light of the considerations set forth in Rule 19.')"); *Inmobiliaria Axial, S.A. de C.V. v. Robles Int'l Servs., Inc.*, No. EP-07-CA-00269KC, 2007 WL 2973483, at *6 (W.D. Tex. Oct. 11, 2007) ("Even more importantly, Robles fails to provide any authority to support its claim that a third-party beneficiary standing in the Clarkes' shoes would be indispensable under Rule 19.  In fact, it appears that relevant case law disfavors finding third-party beneficiaries as indispensable parties.  *See* 7 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 1613 n. 16-18 (3d ed. 2001) (stating that federal courts disfavor finding third-party beneficiaries as indispensable parties and providing a compilation of the case law on this issue).").

## C. Elbar's Violation of the Automatic Stay

In determining whether Elbar should recover on its claims for equitable subrogation, money had and received, and unjust enrichment, this Court is required to weigh the equities based upon the totality of the circumstances. *See Murray v. Cadle Co.*, 257 S.W.3d 291, 300 (Tex. App.—Dallas 2008, pet. denied) (equitable subrogation) *First Am. Title, Ins. Co. v. Brett C. Moody Invs., LLC*, No. H-14-0473, 2015 WL 1220733, at *5 (S.D. Tex. Mar. 17, 2015) (money had and received); *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 841 (5th Cir. 2004) (money had and received); *Helm v. Landry Serv. Co., Inc.*, No. 01-94-00348-CV, 1995 WL 319014, at *6 (Tex. App.—Houston [1st Dist.] May 25, 1995, writ denied) (unjust enrichment). In weighing the equities, a key issue is whether Elbar violated the automatic stay.[77]   In this section, the Court therefore analyzes whether Elbar violated the automatic stay:  (1) on October 4, 2016, when it was the high bidder at the foreclosure sale; (2) on October 6, 2016, when it wire transferred the Proceeds to the IOLTA; and (3) on January 3, 2017, when it filed a lis pendens against the Property.  The Court ultimately concludes that Elbar **did** violate the automatic stay on each of these occasions.  Later sections of this Memorandum Opinion will discuss what effect Elbar's violations of the automatic stay has on Elbar's claims for equitable subrogation, money had and received, and unjust enrichment.

1. October 4, 2016, Stay Violation

An analysis of whether Elbar violated the stay begins with a review of the Code provision that imposes the stay:  11 U.S.C. § 362(a).  The legislative history of 11 U.S.C. § 362 "reveals

---

[77] In its post-trial brief, Elbar argues that neither TransWorld nor Industry Drive has standing to assert any affirmative stay violation allegation against Elbar.  [Adv. Doc. No. 217 at 31-32 of 35, ¶¶ 68-73].  Elbar is mistaken, however, as neither TransWorld nor Industry Drive has asserted any "claim" for a stay violation against Elbar; rather, Industry Drive and TransWorld persuasively argue that Elbar's violation of the automatic stay should be considered in any weighing of the equities this Court undertakes in evaluating Elbar's claims for money had and received, equitable subrogation, and unjust enrichment.

that the automatic stay is one of the fundamental protections provided by the bankruptcy laws.  It gives the debtor a breathing spell from his creditors.  It stops all collection efforts and permits the debtor to attempt repayment or reorganization . . . .”  *In re Lile*, 103 B.R. 830, 836 (Bankr. S.D. Tex. 1989) (internal citations and quotations omitted).  Additionally, “[t]he automatic stay is designed to protect creditors as well as debtors.”  *Brown v. Chesnut* (*In re Chesnut*), 422 F.3d 298, 301 (5th Cir. 2005).  The automatic stay is effective upon the filing of the bankruptcy petition, and it does not require actual notice to be effective.  *In re Lile*, 103 B.R. at 836.  Further, a willful violation of the stay does not require a specific intent to violate the stay.  *Thornburg v. Lynch (In re Thornburg)*, 277 B.R. 719, 725 (Bankr. E.D. Tex. 2002).  Section § 362(a), in pertinent part, reads as follows:  “a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .”

Elbar’s participation in the foreclosure sale on the Property held at approximately noon on October 4, 2016, [Main Case Doc. No. 118, Dec. 15, 2016, Hrg. 10:12-17], coming away as the highest bidder, and its attempt to pay the bid price by tender of the eleven cashier’s checks—even without the knowledge that the Debtor had filed her bankruptcy petition at approximately 8:20 a.m. on October 4, 2016, [Finding of Fact No. 28], three and a half hours prior to the foreclosure sale taking place—amounts to a violation of the automatic stay.  *See, e.g.*, *Jackson v. Priority Trs. Servs. of Miss., L.L.C. (In re Jackson)*, 392 B.R. 666, 671 (Bankr. S.D. Miss. 2008) (holding that “the foreclosure sale, conducted the day after the filing of the Bankruptcy Petition, constituted an act ‘to obtain possession of property of the estate’ in violation of § 362”) (quoting 11 U.S.C. § 362(a)(3)); *Smith v. London (In re Smith)*, 224 B.R. 44, 46 (Bankr. E.D. Mich. 1998)

73

(finding that foreclosure sale was void because it violated the automatic stay and the fact that the mortgage company who conducted the foreclosure sale was not given notice of the debtor's bankruptcy filing was irrelevant in determining whether the stay was violated).  Thus, Elbar violated the automatic stay on October 4, 2016, merely by tendering the eleven cashier's checks to Shum in the aggregate amount of $2.4 million, [*see* Finding of Fact No. 32; Main Case Doc. No. 118, Dec. 15, 2016, Hrg. 10:12-17], as this act occurred three and a half hours after the Debtor's filing of her Chapter 7 petition, [Finding of Fact. Nos. 28–29].

      2.  October 6, 2016, Stay Violation

The next question is whether Elbar's act of wiring the $2.4 million to Prins was an act to obtain possession of property of the estate.  Case law says that it was.[78]  In *Capital Realty Services, LLC v. Benson (In re Benson)*, the question was whether the purchaser at a foreclosure sale—knowing that the owner of the property posted for sale had filed a bankruptcy petition—violated the stay by remitting funds to the trustee under the deed of trust.  293 B.R. 234 (Bankr. D. Ariz. 2003).  The court held that:

> If, as concluded here, payment of the bid price is necessary for the high bidder to conclude his purchase of the property, then payment of the bid price must be regarded as an "act to obtain possession of property of the estate."  Consequently payment of the bid price, unlike recordation of a trustee's deed, is not merely a ministerial act that preserves the status quo or only gives the world notice of what has occurred, but rather is an act of legal substance that changes the relationship of the parties and effectively removes property from property of the estate.  Consequently payment of the bid price after the bankruptcy petition is filed violates the automatic stay pursuant to § 362(a)(3).

---

[78] The Court notes that Bustamante tried to characterize the wire transfer of the $2.4 million to the IOLTA as merely a replacement of the earlier attempted tender of the eleven cashier's checks.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 59:5-14, 89:23-25].  The Court finds this testimony to be disingenuous.  Bustamante eventually admitted that by wiring the $2.4 million, the Purchasers acted with the goal to protect Elbar's ability to complete the purchase of the Property.  [*Id.* at 133:13–134:10].  As discussed above, any action taken to complete the purchase of property of the bankruptcy estate is "an act to obtain possession of property of the estate" that constitutes a violation of the automatic stay.

293 B.R. at 240–41.  Other cases support this holding.  *See, e.g.*, *Harris v. Ramel (In re Allen)*, 75 B.R. 572, 574 (Bankr. E.D. Mo. 1987) (finding that post-petition action taken by purchaser to perfect a pre-petition sale of debtor's real property "was an attempt to affect and exercise control over the bankruptcy estate's interest in the [d]ebtor's real property, contrary to 11 U.S.C. § 362(a)(3)"); *Ford v. Loftin (In re Ford)*, 296 B.R. 537, 543 (Bankr. N.D. Ga. 2003) (finding that postpetition foreclosure sale, where foreclosing creditor received notice of bankruptcy filing, violated § 362(a)).

The undersigned judge agrees with this conclusion.  An act to obtain title to estate property violates the stay pursuant to the very language of § 362(a)(3).  The sole objective of any purchaser at a foreclosure sale in giving money to the trustee is to have the trustee execute and deliver to the money-giver a deed to the property.  Yet, if this property is "property of the estate," then the money-giver's act—and objective—necessarily seeks to deprive the estate of title to the subject property.  Thus, here, Elbar violated the stay by wire transferring the $2.4 million to the IOLTA.  [*See* Finding of Fact No. 40].

To the extent that Elbar suggests that its wire transferring the Proceeds in violation of the automatic stay is essentially "no harm, no foul" because Elbar (or another party, such as Prins) could have moved to have the automatic stay retroactively annulled, such argument holds no weight with this Court.[79]  An opinion from the Fifth Circuit exposes the weakness of this argument.  In *In re Chesnut*, the creditor willfully violated the automatic stay by foreclosing on real property that the debtor argued was part of his bankruptcy estate because it was his community property.  422 F.3d at 300.  The Fifth Circuit, articulating a concept called

---

[79] 11 U.S.C. § 362(d) provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, *annulling*, modifying, or conditioning such stay[.]" (emphasis added).

"arguable" property of the estate, held that if there is a bona fide dispute over whether a debtor

has an interest in certain real property, then the non-debtor party should assume that it is indeed

property of the estate that is protected by the automatic stay; and that the non-debtor party should

therefore **not** proceed to foreclose, but rather should file a motion to lift stay requesting approval

from the bankruptcy court to go forward with the foreclosure.   *Id.*   The Fifth Circuit cogently

explained its reasoning for this holding:

> Whether an asset is property of the estate is a legal determination which
> frequently entails complex analyses involving a number of legal elements and a
> variety of facts . . . . [t]hese questions concerning the characterization of the . . .
> property . . . can only be answered with finality through the judicial process . . . .

*Id.* at 303.**[80]**

Application of *In re Chesnut* to the suit at bar lends strength to this Court's finding that

Elbar willfully violated the stay on October 6, 2016, when it wired the Proceeds to the IOLTA.

[*See* Finding of Fact Nos. 38–41].  If Elbar had complied with *In re Chesnut*, it would **not** have

wired the $2.4 million on the afternoon of October 6, 2016.  By this time and date, Elbar knew

that the Debtor had filed a bankruptcy petition and that she was asserting that she had an interest

in the Property.  [Finding of Fact No. 37].  Under these circumstances, Elbar could not—as a

matter of law—take the position that the Debtor had no interest in the Property and therefore

disregard the automatic stay and wire the $2.4 million.  Rather, pursuant to *In re Chesnut*, Elbar

should have filed a motion to lift stay, describing the factual background to support its position,

and requesting this Court to lift the stay to:  (1) allow Elbar to wire the $2.4 million to Prins, as

substitute trustee; and (2) authorize Prins to take all steps appropriate under state law to complete

the foreclosure sale under the Deed of Trust, including executing and delivering a deed to Elbar

---

[80] *In re Lile*, 103 B.R. 830, 837 (Bankr. S.D. Tex. 1989), provides a good example of the proposition that a creditor
or interested party should seek relief from the court before taking any action against property of the estate: "Even if
the IRS had a valid reason for seizing the property, it violated the bankruptcy laws by failing to obtain relief from
the automatic stay pursuant to 11 U.S.C. § 362(d) before seizing the property."

conveying title to the Property.  *See also In re Lile*, 103 B.R. at 837 (citations and quotations omitted) (noting that "[o]nce a party is put on notice of a bankruptcy filing, he is under a duty to seek further information which should reveal the applicability and scope of the automatic stay." Further, "[k]nowledge of the bankruptcy filing has been held to be the legal equivalent of knowledge of the automatic stay.  The creditor takes the risk of being assessed for damages if he fails to obtain clarification from the bankruptcy court.").

If Elbar had chosen this course, it would have fulfilled the public policy objectives of the Bankruptcy Code and due process as articulated in *In re Chesnut*:  namely, to afford all parties in interest, including the Debtor and all of her creditors, the opportunity to be heard; and to allow this Court to consider the evidence, reflect upon the parties' arguments, and then render a decision as to whether the Property was property of the Debtor's estate subject to the automatic stay and, if so, whether the stay should be annulled.  *In re Chesnut*, 422 F.3d at 303–04; *see also In re Lile*, 103 B.R. at 836 (citation omitted) ("All parties benefit from the fair and orderly process contemplated by the automatic stay and judicial relief procedure.  Judicial toleration of an alternate procedure of self-help and post hoc justification would defeat the purpose of the automatic stay.").  Elbar's willingness to violate the stay in the hope of preserving its claim to the Property through the subsequent annulment of the stay[81] is a large strike against Elbar in this Court's analysis of Elbar's claim for equitable subrogation against United Sentry and Elbar's claims for money had and received and unjust enrichment against Industry Drive and TransWorld, as these causes of action require a court to weigh the equities based on the totality

---

[81] Bustamante testified that he thought either (1) the stay would be annulled and the Purchasers would receive a deed to the Property; or (2) the stay would not be annulled and the Proceeds would be returned to the Purchasers.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial. Tr. 96:25–97:4, 133:13-25, 135:2-6; TransWorld's Ex. II, Bustamante Dep. 190:6-17, 194:13-19].  Either option seemed acceptable to Bustamante and wiring the $2.4 million (i.e., violating the stay) was just something the Purchasers had to do to preserve their claim to the Property.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial. Tr. 89:19-21, 133:13–134:10, 135:19-25; TransWorld's Ex. II, Bustamante Dep. 82:10–83:3].

of the circumstances when determining whether a plaintiff should prevail on those claims. *See Murray*, 257 S.W.3d at 300 (equitable subrogation) *First Am. Title, Ins. Co.*, 2015 WL 1220733, at *5 (money had and received); *Bank of Saipan*, 380 F.3d at 841 (money had and received); *Helm*, 1995 WL 319014, at *6 (unjust enrichment). Here, this Court finds that Elbar's willful violation of the automatic stay by wiring the $2.4 million represents a deliberate disregard of the law, a breach of its duty to comply with the Bankruptcy Code, a lack of good faith, and also violates principles of equity and righteous dealing. No plaintiff who knowingly violates the law can escape such a moniker. *See In re Lile*, 103 B.R. at 837 (noting that when IRS knowingly chose to disregard the automatic stay by seizing estate's assets instead of seeking further clarification from the court, the IRS "assumed the risk that [its] actions would be found wrongful").

3. January 3, 2017, Stay Violation

Elbar not only willfully violated the automatic stay on October 6, 2016, when it wire transferred the Proceeds to the IOLTA; Elbar also willfully violated the automatic stay for a second time when it filed a lis pendens against the Property in January 2017. [Finding of Fact No. 89]. Filing a lis pendens postpetition with knowledge of the debtor's Chapter 7 case is a blatant violation of the automatic stay. *See, e.g.*, *In re Thornburg*, 277 B.R. at 729–30 (holding postpetition filing of a notice of lis pendens violated automatic stay and noting that "[t]he effect of filing a Notice of Lis Pendens in the State of Texas is the 'functional equivalent of an involuntary lien as it acts as a cloud on title under Texas law.'") (quoting *F.D.I.C. v. Walker*, 815 F. Supp. 987, 990 (N.D. Tex. 1993)); *Byrd v. Hoffman*, 417 B.R. 320, 329 (D. Md. 2008) (holding postpetition filing of a notice of lis pendens violated automatic stay); *Elrod v. Elrod (In re Elrod)*, 91 B.R. 187, 189 (Bankr. M.D. Ga. 1988) (same); *Crumrine v. Blum (In re Crumrine)*,

261 B.R. 669, 671 n.1 (Bankr. N.D. Cal. 2001) (emphasis in original) ("In this circuit, the *postpetition* recording of a lis pendens violates the automatic stay.") (citing *Barnett v. Edwards (In re Edwards)*, 214 B.R. 613, 619 (9th Cir. BAP 1997)).  Elbar's second willful violation of the automatic stay further underscores Elbar's cavalier attitude towards the automatic stay and abiding by the Bankruptcy Code.

Elbar's business model and prior litigation history regarding foreclosure sales make its willful violations of the stay on October 6, 2016, and January 3, 2017, particularly egregious—which in turn makes this Court's finding of Elbar's bad faith and lack of equitable and righteous dealing even more pronounced.  Elbar's entire business is based upon conducting research about real properties that have been posted for foreclosure, deciding on which properties to bid, and then attending and participating at these sales.  [*See* Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 53:9-11, 111:24–112:15, 112:25–113:2, 113:16 -22, 114:4-7; TransWorld's Ex. JJ, Klaimy Dep. 7:10-18, 8:14-18, 13:5-7, 13:17–14:7].  Elbar has been pursuing this business model for approximately 34 years, and has frequently participated in sales where the owner of the property has filed for bankruptcy.  [TransWorld's Ex. II, Bustamante Dep. 67:15-20, 182:6-10; TransWorld's Ex. JJ, Klaimy Dep. 13:13-15; Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 134:11-14].  So, there is no question that Elbar is an **extremely sophisticated** entity that understands that property owners frequently file bankruptcy petitions at the last second in order to stop the foreclosure process through the imposition of the automatic stay.  Indeed, Elbar's in-house counsel—Twyman—has a substantial background himself representing home lenders in consumer bankruptcy cases in the Southern District of Texas before joining Elbar.[82]  He, of all

---

[82] Just to serve as a small example, Twyman—while serving as counsel for various home lenders in consumer bankruptcies—filed motions for relief from the automatic stay on multiple occasions.  *See, e.g., In re Jerrard C. Williams*, Case No. 02-31110, S.D. Tex., Doc. No. 37; *In re Clarence Richard Dalrymple*, Case No. 02-33496, S.D. Tex., Doc. No. 17; *In re Girlena M. Buchanan*, Case No. 02-37054, S.D. Tex., Doc. No. 30.

people, knows that once a participant in a foreclosure sale receives notice of the property owner's bankruptcy filing, the automatic stay immediately bars all participants from taking any further steps to consummate the sale. So, in the suit at bar, Elbar cannot gain any sympathy from this Court (as it analyzes all of the facts and circumstances) on the grounds that it is inexperienced in participating at foreclosure sales.

The circumstances here are similar to *In re Burke*, 147 B.R. 955 (Bankr. W.D. Mo. 1992). In *In re Burke*, the court found that a "local investor who purchases foreclosure properties on the courthouse steps" acted in willful violation of the automatic stay when two public records (i.e., a lis pendens filed against the property and a judgment lien against the property) existed prior to the foreclosure sale that connected the property to the debtor's bankruptcy, even though there was no evidence presented that the investor had actual knowledge of the bankruptcy estate's interest in the property. 147 B.R. at 957–59. Despite there being no evidence that the investor had actual knowledge of the estate's interest in the property, the court found that:

> [The investor]'s purchase of the property was a deliberate attempt to exercise control over estate property and he is deemed to have had notice of the bankruptcy estate's interest such that he should have known of that interest. **[The investor] is not an innocent consumer who purchased this property for a residence. He is an inveterate investor in distress properties and a regular buyer of foreclosure property. As such a higher standard of knowledge foreshadows his actions**.

*Id.* at 959 (emphasis added). Here, too, the Purchasers are very experienced and established investors in distressed properties and are regular purchasers of properties sold at foreclosure sales. [Finding of Fact Nos. 30–34]. As such, as in *In re Burke*, the Purchasers are held to a higher standard, i.e., they are required to do greater due diligence in determining whether the property to be sold at a foreclosure sale is owned by someone who is in bankruptcy. For

example, here, once Twyman learned on October 5, 2016, from the Prins Law Firm that the Debtor took the position that she had an interest in the Property pursuant to a deed, Twyman could have asked Prins, or Shum, or Payne (the Debtor's bankruptcy attorney), for a copy of this deed in order to determine the strength of the Debtor's assertion that she did own an interest in the Property on the date of the filing of her bankruptcy petition. [*See* Finding of Fact No. 37]. Had Twyman taken this action, he would have—or at least should have—informed Bustamante that the Property was arguably property of the estate and that therefore the automatic stay was in effect, and that Bustamante would therefore be violating the stay by wire transferring funds to the IOLTA.

But, there is more. Not only are Elbar and Bustamante experienced in participating at foreclosure sales, they are also experienced in appeals involving foreclosure sale disputes. Indeed, Elbar and Bustamante have been on the losing end of two disputes that have resulted in published opinions from the Fifth Circuit: *Elbar Investments Inc. v. Pierce* (*In re Pierce*), 91 F. App'x 927 (5th Cir. 2004) and *Bustamante v. Cueva (In re Cueva)*, 371 F.3d 232 (5th Cir. 2004). These two opinions merit inclusion in this Court's weighing of the equities based upon the totality of the circumstances when assessing whether Elbar should prevail on its claims for equitable subrogation, money had and received, and unjust enrichment.

In *In re Pierce*, Elbar purchased property at a judicial tax sale without knowledge of the bankruptcy petition and automatic stay. 91 F. App'x at 928. After the constable refused to issue a deed, Elbar filed a motion for relief from the automatic stay to validate the judicial tax sale retroactively. *Id.* Elbar also filed an adversary proceeding arguing that, even if the bankruptcy court did not annul the automatic stay, the automatic stay did not prevent Elbar from acquiring the mortgagee's interest in the property. *Id.* The Fifth Circuit affirmed the district court's

affirmance of the bankruptcy court's denial of Elbar's requested relief, stating that: "[c]ritically, 11 U.S.C. § 362(a) automatically stayed the tax sale proceedings; thus, the bankruptcy court correctly held that the tax sale . . . was null and without legal effect." *Id.* at 929.

In *In re Cueva*, Bustamante—who, it must be remembered, is a vice president of Elbar—purchased a one-half interest in property sold at a foreclosure sale without knowledge of the bankruptcy petition and automatic stay. 371 F.3d at 234. Bustamante filed pleadings requesting relief from the automatic stay and a declaration that his post-bankruptcy purchase of the property at the foreclosure sale was a valid purchase and not voided by the automatic stay. *Id.* The Fifth Circuit affirmed the district court's decision and held that "the foreclosure sale was in violation of the automatic bankruptcy stay and therefore invalid . . . ." *Id.* at 238.

The holdings issued in these opinions lead this Court to find that Elbar is an extremely knowledgeable and sophisticated litigant that understands perfectly that it is a direct violation of the Bankruptcy Code to (1) attempt to acquire fee simple to real property when the foreclosure sale occurs after the filing of the property owner's bankruptcy; and (2) file a lis pendens against a property in bankruptcy.[83]

And, there is even more. To the extent that Elbar suggests that it has clean hands because § 362(d) allows it—or, United Sentry—to seek to annul the stay in order to overcome any violation of the stay, this Court disagrees. The problem with this position is that there is ample case law holding that only innocent parties-in-interest who had no knowledge of the bankruptcy—and therefore no notice that the automatic stay was in effect—are able to obtain annulment of the stay. *See, e.g.*, *Jones v. Garcia (In re Jones)*, 63 F.3d 411, 412–13 (5th Cir.

---

[83] Even though Elbar was not mentioned as a party in *Bustamante v. Cueva (In re Cueva)*, 371 F.3d 232 (5th Cir. 2004), this Court still finds that by virtue of Bustamante's participation in *In re Cueva* and because Bustamante is a vice president of Elbar, Bustamante's knowledge is imputed to Elbar, and therefore Elbar is a sophisticated and knowledgeable litigant.

1995) (affirming lower courts' decision declining to void a postpetition foreclosure sale when purchasers were not sophisticated parties and they received neither actual nor presumed constructive notice of the bankruptcy filing until after title had been transferred to them); *Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 977 (1st Cir. 1997) ("When a creditor inadvertently violates the automatic stay in ignorance of a pending bankruptcy, courts sometimes have afforded retroactive relief.").

In *In re Soares*, the creditor, with knowledge of the debtor's bankruptcy, sought an order of default and a judgment authorizing foreclosure in state court but failed to notify the state court of the debtor's bankruptcy and the automatic stay. 107 F.3d at 972. The creditor thereafter filed a motion to annul the stay with the bankruptcy court. *Id.* The First Circuit reversed the bankruptcy court's decision to grant the motion and held "that bankruptcy courts ordinarily must hold those who defile the automatic stay to the predictable consequences of their actions and can grant retroactive relief only sparingly and in compelling circumstances . . . ." *Id.* at 978. The First Circuit based its decision on the purpose and policy behind the automatic stay. *Id.* at 972, 977 ("If retroactive relief becomes commonplace, creditors—anticipating *post facto* validation— will be tempted to pursue claims against bankrupts heedless of the stay . . . ."). Further, the First Circuit stated that the "[creditor]'s entreaty that the equities favor retroactive relief rings unmistakably hollow; though [the creditor] expended funds to clear title and maintain the property after foreclosing, this financial hardship is the natural consequence of its own failure to abide by the terms of the automatic stay." *Id.* at 978.

If Elbar's seasoned and veteran counsel (i.e., Twyman and Bustamante) had only done research on the law, they would have found this case and other case law on point. *See, e.g.*, *IMC Mortg. Co., Inc. v. Brown (In re Brown)*, 251 B.R. 916, 919 (Bankr. M.D. Ga. 2000) ("[B]ecause

it would be inappropriate for the Court to approve a wilful violation of the automatic stay, it should be clear that the Court will grant an annulment only if the Creditor justifiably believed its action did not violate the automatic stay."); *Stancil v. Bradley Invs., LLC (In re Stancil)*, 487 B.R. 331, 340 (Bankr. D.C. 2013) ("[K]nowledge of the bankruptcy filing precludes annulment of the automatic stay."); *In re Schumann*, 546 B.R. 223, 229 (Bankr. D.N.M. 2016) ("[A]nnulment of the automatic stay 'thereby reinstating previous claims retroactively . . . is rare and probably available only to claimants who were honestly ignorant of the bankruptcy stay.'") (quoting *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 31 F.3d 1020, 1023 (10th Cir. 1994)).

In fact, Elbar and Bustamante should be well aware of the specific set of circumstances in which it is proper for the Court to grant a motion to annul the stay.  In *In re Jefferson*, Elbar filed a motion to annul the automatic stay.  No. 13-33515-H3-13, 2013 WL 4505591, at *1 (Bankr. S.D. Tex. 2013).  The record made at the hearing on the motion to annul the stay reflected the following:  (1) on the date of the filing of the Debtor's bankruptcy petition, Elbar purchased certain real property at a foreclosure sale; (2) on the date of this foreclosure sale, the debtor had no interest in this property, but rather the debtor's sister owned the property; (3) ten days later, the debtor's sister conveyed the property to her; (4) the debtor then took the position that she owned the property and she had the right to reside in it, and that the stay prevented Elbar from taking title to and possession of this property; and (5) the debtor had not taken the required pre-petition credit counseling course.  *Id.*  The court granted Elbar's motion by emphasizing that the debtor did not own the property on the date of the filing of her petition and also had failed to take the requisite credit counseling course.  *Id.* at *1–2.  Stated differently, the court found cause under 11 U.S.C. § 362(d)(1) to annul the stay because the debtor had played fast and loose with

the property and the Bankruptcy Code, whereas Elbar had conducted a legitimate foreclosure that did not violate the automatic stay.

Here, unlike *In re Jefferson*, Elbar did violate the stay—willfully—because it knew of the Debtor's bankruptcy prior to wire-transferring the Proceeds and filing the lis pendens, [Finding of Fact Nos. 37–41, 89]; therefore, annulment of the stay for Elbar's benefit would be wholly inappropriate. Elbar violated the automatic stay clear and simple, and any annulment argument is simply not persuasive.

In sum, Elbar violated the automatic stay three times, and in two of these instances, Elbar did so willfully. The Court will take this conduct into account when analyzing Elbar's claims for equitable subrogation, money had and received, and unjust enrichment.

## D. The Claims Against Prins and United Sentry: Fraud in Real Estate Transactions, Common Law Fraud, Texas Theft Liability Act, and Equitable Subrogation

### 1. Agency Law as it Applies to the Fraud in Real Estate Transactions, Common Law Fraud, and Texas Theft Liability Act Claims

Elbar argues that because Prins, as the substitute trustee under the Deed of Trust expressly appointed by United Sentry, [Finding of Fact No. 19], had actual or apparent authority to act as United Sentry's agent, United Sentry is liable for Prins' fraud and theft. [Adv. Doc. No. 217 at 11–12 of 35, ¶¶ 28–29]. Elbar concedes that if this Court finds that Prins was not acting with actual or apparent authority, then Elbar's claims against United Sentry for fraud in real estate transactions, common law fraud, and the Texas Theft Liability Act fail as a matter of law. [Adv. Doc. No. 222, Feb. 8, 2017, Trial Tr. 23:6-15]. Thus, the threshold question is whether Prins was acting with actual or apparent authority from United Sentry.[84]

---

[84] The Court recognizes that Shum, who was an associate at the Prins Law Firm and took instructions from and was completely supervised by Prins, actually held the foreclosure sale pursuant to Prins' instructions; thereafter, however, Shum did not knowingly take any actions to assist Prins in violating the law, including but not limited to stealing the Proceeds. Thus, this Court's analysis of actual and apparent authority is focused on the relationship that

a.   *Review of Applicable Agency Law*

"Under Texas law, an agent is someone authorized by a person or entity to transact business or manage some affair for that person or entity." *Tex. Soil Recylcing, Inc. v. Intercargo Ins. Co.*, 273 F.3d 644, 650 (5th Cir. 2001). The party asserting the agency relationship has the burden of proof. *McGowan & Co., Inc. v. Bogan*, No. H-12-1716, 2015 WL 3422366, at *8 n.13 (S.D. Tex. May 27, 2015) (citing *Reliant Energy Servs. Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 783 (Tex. App.—Houston [1st Dist.] 2011, no pet.)).

"An agency relationship may be demonstrated by 'written or spoken words or conduct, by the principal, communicated either to the agent (actual authority) or to the third party (apparent authority)." *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 357 (5th Cir. 2003) (quoting *Hester Int'l Corp v. Fed. Republic of Nigeria*, 879 F.2d 170, 181 (5th Cir. 1989)); *see also Utils. Optimization Grp., L.L.C. v. TIN, Inc.*, 440 F. App'x 249, 252 (5th Cir. 2011) ("Absent actual or apparent authority, an agent cannot bind a principal.") (quoting *Tex. Cityview Care Ctr., L.P., v. Fryer*, 227 S.W.3d 345, 352 (Tex. App.—Fort Worth 2007, pet. dism'd [mand. dism'd])); *McGowan & Co.*, 2015 WL 3422366, at *8 n.13 ("A principal is liable for the acts of another acting as its agent only when the agent has actual or apparent authority to do those acts or when the principal ratifies those acts.") (quoting *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 783 (Tex. App.—Houston [1st Dist] 2011, no pet)).

"Actual authority includes both express and implied authority and usually denotes the authority a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses." *Utils.*

Prins—not Shum—had with United Sentry. The Court emphasizes that the evidence does not in any way indicate that Shum knowingly took part in assisting Prins in violating the law, including his theft of the Proceeds and numerous attempts to cover up his use of these monies.

*Optimization Grp., L.L.C.*, 440 F. App'x at 252 (quoting *Tex. Cityview Care Ctr., L.P., v. Fryer*, 227 S.W.3d 345, 352 (Tex. App.—Fort Worth 2007, pet. dism'd [mand. dism'd])).

Apparent authority, on the other hand, "is based on estoppel arising either from a principal knowingly permitting an agent to hold [himself] out as having authority" or "by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority [he] purports to exercise." *Utils. Optimization Grp., L.L.C.*, 440 F. App'x at 252 (internal quotation marks and citations omitted). Apparent authority arises either (1) "from a principal knowingly permitting an agent to hold herself out as having authority" or (2) "by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority she purports to exercise." *Hitachi Capital Am. Corp. v. Andress*, No. H-06-1959, 2007 WL 2752696, at *3 (S.D. Tex. Sept. 20, 2007) (quoting *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984)). "Because apparent authority is an estoppel principle, a party seeking to recover under such legal theory must show justifiable reliance on the principal's words or conduct resulting in harm to the party." *Reliant Energy Servs. Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 784 (Tex. App.—Houston [1st Dist.] 2011, no pet.). "To determine an agent's apparent authority, the court examines the conduct of the principal and the reasonableness of the third party's assumptions regarding the agency's authority." *Kirkindoll v. Nat'l Credit Union Admin. Bd.*, No. 3:11-CV-1921-D, 2015 WL 1636534, at *9 (N.D. Tex. Apr. 13, 2015).

"Key to the tests for both actual and apparent authority is the need for some action or omission by the principal, not merely the agent." *Utils. Optimization Grp., L.L.C.*, 440 F. App'x at 253. "An agent's authority . . . depends on some communication by the principal either to the

agent ([to establish] actual . . . authority) or to the third party ([to establish] apparent . . . authority)." *Id.* (quoting *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007)).

A principal is liable for the torts of his agent "committed in the course and scope of their employment." *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005). To determine whether an agent acted within the scope of his employment the plaintiff must show that the act was: (1) within the general authority given to the agent; (2) in furtherance of the principal's business; and (3) for the accomplishment of the object for which the employee was employed. *Id.* at 763–64; *see also Schrum v. Land*, 12 F. Supp. 2d 576, 582 (S.D. Tex. 1997) (emphasis in original) ("In determining the principal's vicarious liability, the proper question is not whether the principal authorized the specific wrongful act, but whether the agent was acting within the *scope* of the agency at the time of committing the act.").

"[U]nder Texas law, an agent's 'serious criminal activity' is almost never taken within the scope of authority granted by the principal." *Ross*, 426 F.3d at 764. A principal is not liable for the agent's intentional and malicious actions that are unforeseeable considering the agent's duties. *Id.* at 765 (citing *Williams v. United States*, 71 F.3d 502, 506 n.10 (5th Cir. 1995)); *see also Zarzana v. Ashley*, 218 S.W.3d 152, 160 (Tex. App.—Houston [14th Dist.] 2007, pet. struck) ("[E]mployers are generally not liable for serious criminal acts of employees that are unforeseeable considering the employee's duties."); *Milan v. Dean Witter Reynolds, Inc.*, 90 S.W.3d 760, 768 (Tex. App.—San Antonio 2002, pet. denied) ("In cases involving serious criminal activity, an employer is not liable for intentional and malicious acts that are unforeseeable considering the employee's duties"); *Adami v. Dobie*, 440 S.W.2d 330, 334 (Tex. Civ. App.—San Antonio 1969, writ dism'd) ("A master is not liable for unauthorized intended

tortious conduct of his servant, even when the act was done in connection with the servant's employment, where the wrongful act was unexpectable, in view of the duties of the servant.").

Generally, "a principal is deemed to know facts that are known to its agent." *Secs. Inv'r Prot. Corp. v. Cheshier & Fuller, L.L.P.* (*In re Sunpoint Secs., Inc.*), 377 B.R. 513, 562 (Bankr. E.D. Tex. 2007) (citation omitted). However, "[i]f the agent is acting adversely to the corporation, the corporation may not be bound by the agent's activity or knowledge." *Id.* at 564; *see also Ernst & Young and Ernst & Young, LLP v. Bankr. Servs., Inc.* (*In re CBI Holding Co., Inc.*), 311 B.R. 350, 369 (Bankr. S.D.N.Y. 2004) ("The 'adverse interest' exception . . . provides that when an agent is committing a fraud for his own benefit, and has totally abandoned his principal's interest, the acts of the agent will not be imputed to the principal . . . .") (citation and quotations omitted). For the adverse interest exception to apply "the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes." *In re Sunpoint Secs., Inc.*, 377 B.R. at 564 (citation omitted); *see also F.D.I.C. v. Shrader & York*, 991 F.2d 216, 223 (5th Cir. 1993) ("A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes . . . .") (quoting Restatement (Second) of Agency § 282(1) (1957)).

b. *Application of Agency Law to the Facts in This Adversary Proceeding*

The Court now applies these agency principles to the suit at bar. Whether United Sentry is liable for the acts committed by Prins hinges on whether Prins committed these acts in the course and scope of his employment. *Ross*, 426 F.3d at 763. The Court first considers the scope of actual authority United Sentry gave to Prins. The Deed of Trust expressly gives the substitute trustee (i.e., Prins)[85] the authority to give notice of a foreclosure sale and to sell the Property at a

---

[85] The Court recognizes that: (1) the Deed of Trust appointed Prins or Shum as the substitute trustee; and (2) it was Shum who was present in Houston and held the foreclosure sale on the Property. [Finding of Fact No. 30]. Shum

foreclosure sale.  [Finding of Fact No. 12].  Therefore, Prins had actual authority to hold a foreclosure sale as the agent of United Sentry.  *See First Edwards, LP v. Union Pac. R.R. Co.*, No. H-08-1573, 2009 WL 10693830, at *6 (S.D. Tex. Mar. 16, 2009) ("Actual authority is created when the principal communicates to the agent, by words or conduct, that the agent has authority to act on the principal's behalf.").  The Deed of Trust also expressly states what Prins, as trustee and agent of United Sentry, has the authority to do with the proceeds generated from a foreclosure sale.  [Finding of Fact No. 12].  Specifically, the Deed of Trust states that the trustee, if requested by the beneficiary to foreclose on the lien shall:

1.    Either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then amended;

2.    Sell and convey all or part of the Property to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to other exceptions to conveyances and warranty; and

3.    From the proceeds of the sale, pay, in this order:

    a.    expenses of foreclosure, including a normal hourly fee of the Trustee;

    b.    to Beneficiary, the full amount advanced, or the full amount of the principal, interest, attorney's fees, and other charges due and unpaid;

    c.    any amounts required by law to be paid before payment to Grantor; and to Grantor, any balance.

[Pl.'s Ex. 14].

---

was nevertheless an associate at the Prins Law Firm and even though Shum was conducting the sale, she conducted the sale under Prins' direction and supervision, and was in constant contact with Prins regarding the sale. [TransWorld's Ex. HH, Prins Dep. 210:24–211:14].  It is no coincidence that all of the emails regarding the foreclosure sale exchanged with MacKenzie and with Elbar include both Prins and Shum as recipients.  [*See, e.g.*, Pl.'s Exs. 19, 22–23].

A principal is liable only for the torts of his agent committed in the course and scope of the agent's employment.  *Ross*, 426 F.3d at 763.  Did Prins, as United Sentry's agent, in fact stay within the authority conferred upon him by the Deed of Trust?

He most certainly did not.  The Deed of Trust did **not** authorize Prins to steal the Proceeds and use them for his own personal benefit.  Indeed, the Deed of Trust did not authorize Prins:  (1) to hold the sale **after learning about the Debtor's bankruptcy**, [*see* Finding of Fact No. 29]; or (2) to accept the $2.4 million wire transfer from Elbar **at a time when he knew of the Debtor's filing of her bankruptcy petition and her position that she owned the Property**, [*see* Finding of Fact Nos. 29, 36, 39, 40].  Stated differently, the Deed of Trust did **not** authorize Prins to violate the automatic stay.  Further, there was no trial testimony that MacKenzie expressly directed Prins to go forward with the foreclosure sale after MacKenzie learned about the Debtor's bankruptcy.  To the contrary, MacKenzie testified at trial that it was Prins who decided to proceed with the sale on October 4, 2016, [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 256:17-19], and that October 11, 2016, was the first time Prins told MacKenzie that Elbar had wire transferred the Proceeds to the IOLTA, [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 221:3-10, 222:10-15; United Sentry's Ex. 1].  Therefore, Prins did not have actual authority to hold the foreclosure sale on the Property illegally or to accept the $2.4 million wire transfer from Elbar after the automatic stay was in effect.

The Court next considers the scope of any apparent authority Prins may have had.  "An agent's authority . . . depends on some communication by the principal . . . to the third party ([to establish] apparent . . . authority)."  *Utils. Optimization Grp., L.L.C.*, 440 F. App'x at 253 (quoting *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007)); *see also Kirkindoll.*, 2015 WL 1636534, at *9 ("To determine an agent's apparent authority, the court examines the conduct of

the principal and the reasonableness of the third party's assumptions regarding the agency's authority.").  Here, there was no testimony at trial that MacKenzie (or any other person who would be considered a principal of United Sentry) communicated **at all** with Elbar at the time of the foreclosure sale.  Nor was there any testimony from any representatives of Elbar concerning any assumptions Elbar might have had regarding whether or not Prins was acting within the scope of authority given to him by United Sentry when he held the foreclosure sale after learning about the Debtor's bankruptcy and accepting the $2.4 million wire transfer from Elbar after the automatic stay was in place.  As the party asserting the agency relationship, it was Elbar's burden to prove that apparent authority existed for Prins to take the actions that he did, *see McGowan & Co.*, 2015 WL 3422366, at *8 n.13, and this Elbar did not do.

Even if it was within the scope of Prins' employment as trustee under the Deed of Trust to accept the $2.4 million wire transfer from Elbar after notice of the bankruptcy and imposition of the automatic stay, it is wholly unforeseeable that Prins, as trustee, would engage in such serious criminal activity after receiving the $2.4 million by absconding with all of the funds for his own personal benefit.  [*See* Finding of Fact Nos. 46–50, 57].  It is so unforeseeable for a trustee under a deed of trust to misappropriate and steal such funds that even Elbar's own expert witness, Bustamante, testified that in his over 40 years of experience, he has never seen anything like Prins' misconduct.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 81:21–82:2].  Under Texas law, United Sentry simply cannot be held liable for Prins' unforeseeable serious and egregious criminal activity.  *See Ross*, 426 F.3d at 764; *Zarzana*, 218 S.W.3d at 160; *Adami*, 440 S.W.2d at 334.  For all of these reasons, Prins was not acting as United Sentry's agent; therefore, United Sentry is not liable to Elbar for fraud in real estate transactions, common law fraud, or theft.

Finally, Prins, in first accepting and thereafter absconding with the $2.4 million, was acting adversely to the interest of United Sentry.[86]  *See Bailey v. State*, 885 S.W.2d 193, 197–98 (Tex. App.—Dallas 1994, pet. ref'd) ("It is well settled that when a fiduciary decides, for whatever reason, to unlawfully and permanently deprive the lawful owner of its property, the fiduciary is then acting in an unauthorized capacity, *i.e.,* he is then exercising unauthorized control over the property and has committed the offense of theft.").  Any argument that the $2.4 million Prins took constituted his "fee" for acting as substitute trustee under the Deed of Trust is without merit.  There is no question that any trustee under a deed of trust is entitled to a fee, and the Deed of Trust here certainly provided for a "normal hourly fee" for the trustee (i.e., Prins);[87] but, there is no question $2.4 million is not a normal hourly fee for Prins (or, for that matter, for any trustee selling property for $2.4 million).  Moreover, while the Deed of Trust did authorize Prins to distribute monies legitimately received from a valid foreclosure sale, it did **not** authorize Prins to:  (1) abscond with the $2.4 million from Elbar and go on a European vacation and spending spree, [*see* Finding of Fact Nos. 46, 47(E)]; (2) use the Proceeds to pay his personal taxes, [*see* Finding of Fact No. 48]; (3) remit funds to clients, [*see* Finding of Fact No. 47(H)]; or (4) pay employees' of the Prins Law Firm, [*see* Finding of Fact No. 47(B)].  Therefore, because Prins "totally abandoned his principal's interest and [acted] entirely for his own . . . purposes," *In*

---

[86] The Court notes that at trial, MacKenzie credibly testified that he did **not** authorize Prins to misappropriate or steal the Proceeds.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 88:12-16, 92:2-11, 256:23-25].

[87] Specifically, the Deed of Trust provides for a fee to the trustee as follows:

> If requested by Beneficiary to foreclose this lien, Trustee shall:
> . . .
> 3.    From the proceeds of the sale, pay, in this order:
>
> > a.    expenses of foreclosure, **including a normal hourly fee to the Trustee**[.]

[Pl.'s Ex. 14] (emphasis added).

*re Sunpoint Secs., Inc.*, 377 B.R. at 564, United Sentry cannot be held liable for the actions that he took which harmed Elbar.

In sum, this Court finds that Prins had neither actual nor apparent authority from United Sentry to take the actions that he did:  i.e., hold the foreclosure sale after learning that the Debtor was in bankruptcy, accept the $2.4 million wire transfer in violation of the automatic stay, and then abscond with all of these funds for his own personal benefit.  [*See* Finding of Fact Nos. 29, 36, 39–40, 46–50, 57].  And, because Prins had no authority from United Sentry to take these illegal actions, the claims brought by Elbar against United Sentry for fraud in real estate transactions, common law fraud, and the Texas Theft Liability Act must necessarily fail— indeed, Elbar has admitted that if this Court finds that Prins had no authority, then these claims must be denied.  [Adv. Doc. No. 222, Feb. 8, 2017, Trial Tr. 23:6-15].

Thus, Elbar's only remaining claim against United Sentry is its claim for equitable subrogation, discussed *infra* in Section IV.D.5.  Now, however, the Court addresses Elbar's claims against Prins for fraud in real estate transactions, common law fraud, and the Texas Theft Liability Act.

2.  Fraud in Real Estate Transactions

a.  *Applicable Law*

"Section 27.01 of the Texas Business and Commerce Code establishes a statutory cause of action for fraud in real-estate transactions."  *United States v. Lacy*, 234 F.R.D. 140, 149 (S.D. Tex. 2005).  Section 27.01 provides for two types of statutory fraud in a real estate transaction:

> The first occurs when (1) the defendant makes a false representation of a past or existing material fact, (2) for the purpose of inducing the plaintiff to enter into a contract, and (3) the plaintiff relies on the false representation in entering into that contract.  The second type consists of a false promise to do an act that is (1) material, (2) made with the intention of not fulfilling it, (3) for the purpose of

inducing a person to enter into a contract, and (4) relied on by that person in entering into a contract.

*Ponce v. Conseco Fin. Servicing Corp.*, 1:13-CV-762 LY, 2014 WL 12589592, at *7 (W.D. Tex. Jan. 17, 2014) (citing Tex. Bus. & Comm. Code Ann. § 27.01(a)) (West 2018).  Section 27.01 only applies, however, when a valid, enforceable contract exists, and when a misrepresentation of material fact is made to induce another to enter into a contract for the sale of land or stock. *Cao v. BSI Fin. Servs., Inc.*, No. H-17-321, 2017 WL 5157625, at *8 (S.D. Tex. Oct. 19, 2017) (internal citation omitted); *Braley v. BAC Homes Loans Servicing, LP*, No. 3:10-CV-2105-O, 2011 WL 13233558, at *8 (N.D. Tex. July 8, 2011).

"Statutory fraud differs from common law fraud only in that [statutory fraud] does not require proof of knowledge or recklessness as a prerequisite to the recovery of actual damages." *Lacy*, 234 F.R.D. at 149; *see also Jericho Graphics Corp. v. Haynes*, No. 01-03-00987-CV, 2004 WL 2538677, at *3 (Tex. App.—Houston [1st Dist.]  Nov. 10, 2004, no pet.) ("A claim for statutory fraud under section 27.01 is 'generally less demanding than common law fraud, imposing liability upon the maker of a misrepresentation without proof that he intended to deceive or knew that the representation was false.'") (citing *Diversified, Inc. v. Walker*, 702 S.W.2d 717, 723 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.)).

"Intent to defraud is a fact question uniquely within the realm of the trier of fact and depends upon the credibility of the witnesses and the weight to be given to their testimony." *Tsai v. Chang*, No. 05-00-00177-CV, 2001 WL 717807, at *7 (Tex. App.—Dallas June 27, 2001, pet. denied); *see also Walker v. F.D.I.C.*, 970 F.2d 114, 122 (5th Cir. 1992); *LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, LLC*, No. H-07-126, 2009 WL 10681043, at *13 (S.D. Tex. Apr. 9, 2009).  Although a party's intent is determined at the time the party made the representation, intent may be inferred from the party's subsequent acts after the representation is

made.  *Thedford Crossing, L.P. v. Tyler Rose Nursery, Inc.*, 306 S.W.3d 860, 872 (Tex. App.—Tyler 2010, pet. denied); *see also Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).  "Failure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made.  However, that fact is a circumstance to be considered with other facts to establish intent."  *Thedford Crossing, L.P.*, 306 S.W.3d at 872; *see also Spoljaric*, 708 S.W.2d at 435.  "Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence."  *Thedford Crossing, L.P.*, 306 S.W.3d at 872; *see also Walker*, 970 F.2d at 122.

> ### b. Application of the Law of Fraud in Real Estate Transactions to the Facts at Bar

Here, Elbar has not met its burden in proving that Prins committed statutory fraud in real estate transactions.  First, Elbar has not shown that Prins made a "material misrepresentation" that caused Elbar to enter into a contract for the purchase of the Property, as required by the first type of statutory fraud set forth in Texas Business & Commerce Code § 27.01.  The evidence does not show that at the relevant time period (i.e., at the foreclosure sale of the Property), Prins made any material misrepresentations to induce Elbar to purchase the Property.  Second, Elbar has also failed to meet its burden to show that Prins engaged in the second type of statutory fraud set forth in Texas Business & Commerce Code § 27.01:  the evidence simply does not show that Prins made a false promise to do an act with the intention of not fulfilling it.  There is nothing in the record evidencing that Prins did not intend to deliver the deed to the Property at the time the foreclosure sale took place on October 4, 2016.  Further, he learned about the Debtor's bankruptcy and her claim that she had an interest in the Property it made sense for him not to deliver a deed to Elbar:  to do so would have violated the automatic stay.  *See, e.g.*, *In re Wheeler*, 5 B.R. 600, 604 (Bankr. N.D. Ga. 1980) (holding that delivery of the deed to buyer at

foreclosure sale was "an act to obtain property of the estate" in violation of the automatic stay because, under state law, the debtor retained a property right—called the "equity of redemption"—in the property); *Smith v. Mooney (In re Smith)*, 155 B.R. 145, 148 (Bankr. W. Va. 1993) (holding that postpetition delivery of a deed violated the automatic stay because, pursuant to state law, the debtor continued to maintain an equitable interest in the foreclosed property); *United States v. Bishop*, 262 B.R. 401, 405 (W.D. Tex. 2000) (finding that because debtor filed her bankruptcy petition approximately two hours before the foreclosure sale took place, under Texas law, the debtor still retained her legal and equitable interests in the property at the commencement of her bankruptcy case).  Further, although Prins' testimony regarding the timing of his decision to take a trip overseas using a portion of the $2.4 million that was transferred to the IOLTA and subsequently transferred by Prins to the Wells Fargo Operating Account, has been contradictory,[88] Prins' testimony is clear that he did not form an intent to use the Proceeds for his own benefit until approximately <u>two weeks after</u> the foreclosure sale of the Property and Elbar's wire-transfer of the Proceeds to the IOLTA.  [*See* Finding of Fact No. 47(A)].  Indeed, Elbar introduced no evidence to the contrary.  There is also no evidence that at the time Elbar decided to purchase the Property at the foreclosure sale, Prins had already formed an intent to use the Proceeds to pay his own personal taxes, the salaries of the employees of the Prins Law Firm, and his personal attorneys (Hilley & Solis and Seidler), or to return money to a former client, Carlos Pumarejo, that Prins had been holding.[89]  [Finding of Fact No. 47].  In sum,

---

[88] Prins testified that when he transferred the $2.0 million into the Wells Fargo Operating Account on October 18, 2016, he did not yet have the intention to leave for an overseas vacation.  [Finding of Fact No. 47(A)].  Prins later testified that as of October 19, 2016, he was contemplating the trip overseas.  [Finding of Fact No. 47(A)].  Later still, Prins testified that as of October 21, 2016, he had not made the decision to travel overseas but had made the decision to "shut down the practice and leave."  [Finding of Fact No. 47(A)].

[89] It is likely that after the conclusion of the foreclosure sale of the Property and the transfer of the Proceeds to the IOLTA, Prins realized that the Proceeds would be "tied up" for a matter of time due to the Debtor's bankruptcy, and he saw these circumstances as an opportunity to use the Proceeds for his own use.

based on the record from trial, Elbar has failed to meet its burden to prove all of the elements of Section 27.01, and therefore cannot recover on its claim against Prins for fraud in real estate transaction.

       3.   Common Law Fraud

              a.  *Applicable Law*

Under Texas law, to bring a successful claim for common law fraud, a plaintiff must prove the following:  (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.  *Law v. Ocwen Loan Servicing, LLC*, No. CV H-16-2675, 2017 WL 1169679, at *2 (S.D. Tex. Mar. 28, 2017) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)).  Each element of fraud must be proven by a preponderance of evidence.  *Seven Seas Petroleum, Inc. v. CIBC World Mkts. Corp.*, No. H-08-3048, 2013 WL 3803966, at *21 (S.D. Tex. July 19, 2013); *Griggs v. Webber* (*In re Webber*), 350 B.R. 344, 371 (Bankr. S.D. Tex. 2006).

              b.  *Application of the Law of Common Law Fraud to the Facts at Bar*

Like its claim for statutory fraud in real estate, Elbar has also failed to meet its burden in proving that Prins made a "material misrepresentation" that caused Elbar to purchase the Property.  Thus, Elbar also cannot recover in its common law fraud claim against Prins.

4. <u>Texas Theft Liability Act</u>

    a. *Applicable Law*

Under the Texas Theft Liability Act ("<u>TTLA</u>"), "a person who commits theft is liable for

damages resulting from the theft." *Beardmore v. Jacobsen*, 131 F. Supp. 3d 656, 669 (S.D. Tex.

2015); Tex. Civ. Prac. & Rem. Code § 134.003(a).  The TTLA "provides victims of a theft, as

defined in various sections of the Texas Penal Code, with a civil action to recover damages, fees,

and costs from the thief." *Powers v. Caremark Inc. (In re Powers),* 261 F. App'x 719, 721 (5th

Cir. 2008); *see also* Tex. Civ. Prac. & Rem. Code § 134.002.[90]  Under the Texas Penal Code,

"[a] person commits an offense if [1] he unlawfully appropriates property [2] with intent to

deprive the owner of property."  Tex. Pen. Code § 31.03(a).  The Texas Penal Code defines

"appropriate" as (1) to bring about a transfer or purported transfer of title to or other

nonpossessory interest in property, whether to the actor or another; or (2) to acquire or otherwise

exercise control over property other than real property.    Tex. Pen. Code § 31.01(4).

Appropriation is unlawful if (1) it is without the owner's effective consent; or (2) if the property

is stolen and the actor appropriates the property knowing it was stolen by another.  Tex. Pen.

Code § 31.03(b)(1)-(2).   "The Texas Court of Criminal Appeals has held that an electronic

transfer between bank accounts is an appropriation of property for purposes of [Texas Penal

---

[90] The Court notes that Texas Civil Practices & Remedies Code § 134.004 provides that:  "A suit under this chapter may be brought in the county where the theft occurred or in the county where the defendant resides."  Here, Prins' theft occurred in Bexar County, Texas, and this is the same county where Prins resided before being incarcerated. Yet, Elbar filed this adversary proceeding in the Houston Division of the Southern District of Texas, a District that does not include Bexar County.  However, no challenge to the venue of this adversary proceeding has been made. Because venue is not jurisdictional, it may be waived.  *See* Tex. R. Civ. Pro. 86(1) ("An objection to improper venue is waived if not made by written motion filed prior to or concurrently with any other plea, pleading or motion . . . ."); *Gordan v. Jones*, 196 S.W.3d 376, 383 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (internal citations omitted) ("Moreover, unlike subject-matter jurisdiction, which may be challenged at any time, venue may be waived if not challenged in due order and on a timely basis.  Because it may be waived, venue is not 'jurisdictional.'"). Here, this Court finds that Prins has waived any right to challenge venue of the TTLA claim that Elbar has brought against him.

Code] § 31.01." *Compass Bank v. Villarreal*, No. L-10-8, 2011 WL 1740270, at *14 (S.D. Tex. May 5, 2011); *see also Bailey*, 885 S.W.2d at 198 (holding that intangible property such as a bank balance can be appropriated by the exercise of control over that property under Texas Penal Code § 31.01); *Coats v. State*, 712 S.W.2d 520, 523 (Tex. Crim. App. 1986) (en banc) ("[W]e hold that money can be appropriated . . . by bringing about a transfer of title or other nonpossessory interest in the property.").

The Texas Penal Code defines "deprive" as (1) to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner; or (2) to dispose of property in a manner that makes recovery of the property by the owner unlikely.  Tex. Pen. Code § 31.01(2).  Intent to deprive under Texas Penal Code § 31.03(a) must exist at the time of the taking.  *In re Powers,* 261 F. App'x at 722. "Texas courts have held that the element of intent, for the crime of theft, can be inferred from the surrounding circumstances."  *Id.*

Although the TTLA is silent as to what burden of proof should be applied, "under Texas law, [legislative] silence mitigates in favor of applying the same burden of proof as any other civil action—the preponderance of the evidence standard."  *Id.* at 721 (quotation and citation omitted).

An individual who sustains damages under the TTLA resulting from the theft may recover "from a person who commits theft, the amount of actual damages found by the trier of fact and, in addition to actual damages, damages awarded by the trier of fact in a sum not to exceed $1,000[.]"  Tex. Civ. Prac. & Rem. Code § 134.005(a).  Additionally, "Texas courts have consistently held that a party who successfully defends a claim under the Theft Liability Act is a prevailing party, even if he loses on all other claims."  *Merritt Hawkins & Assocs., L.L.C. v.*

100

*Gresham*, 861 F.3d 143, 157 (5th Cir. 2017); *see also BHL Boresight, Inc. v. Geo-Steering Sols., Inc.*, No. 4:15-cv-00627, 2017 WL 2730739, at *16 (S.D. Tex. June 26, 2017) (same).  Further, under the statute, "[e]ach person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees."  Tex. Civ. Prac. & Rem. Code § 134.005(b); *see also Moak v. Huff*, No. 04-11-00184-CV, 2012 WL 566140, at *11 (Tex. App.—San Antonio Feb. 15, 2012, no pet.) ("We hold that a person who prevails in a TTLA cause of action is entitled to recover the reasonable fees necessarily incurred prosecuting or defending that cause of action, even if the party is unsuccessful on other claims and counterclaims litigated in the same suit.").  Thus, a prevailing plaintiff or a prevailing defendant has the right to recover attorneys' fees; this award of attorneys' fees to a prevailing party is mandatory.  *Merritt Hawkins & Assocs., L.L.C.*, 861 F.3d at 157; *Moak*, 2012 WL 566140, at *10; Tex. Civ. Prac. & Rem. Code § 134.005(b).

Although the TTLA does not define what it means to "prevail" in a suit, Texas courts have held that the phrase applies to defendants who successfully defend against a TTLA claim. *See, e.g.*, *Peoples v. Genco Fed. Credit Union*, No. 10-09-00032-CV, 2010 WL 1797266, at *1, *6–7 (Tex. App.—Waco May 5, 2010, no pet.) (awarding attorneys' fees pursuant to TTLA to defendant who disposed of plaintiff's TTLA claim through a motion for summary judgment); *Arrow Marble, LLC v. Estate of Killion*, 441 S.W.3d 702, 706–07 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (holding that dismissal of TTLA claim against the defendant with prejudice for plaintiff's want of prosecution entitles defendant to attorneys' fees as a prevailing party under the TTLA).  "A successful defense is one that materially alters the plaintiff's legal relationship with the defendant such as a dismissal with prejudice." *BHL Boresight, Inc.*, 2017 WL 2730739, at *17.

b.  *Application of the Law of the Texas Theft Liability Act to the Facts at Bar*

### i.  Elbar's Claim Under the TTLA Against Prins

Here, Elbar has met its burden of proof in showing that Prins has violated the TTLA. Under the Texas Penal Code, "[a] person commits an offense if [1] he unlawfully appropriates property [2] with intent to deprive the owner of property."  Tex. Pen. Code § 31.03(a).  Prins appropriated the Proceeds when he exercised control over the Proceeds by transferring $2.0 million to the Wells Fargo Operating Account on October 18, 2016, and $300,000.00 to the BBVA Operating Account on November 4, 2016, without Elbar's consent.  [Finding of Fact Nos. 46, 57].  *See Bailey*, 885 S.W.2d at 199 (finding that appropriate element of Texas Penal Code § 31.01 was met when defendant orchestrated a transfer of funds between two bank accounts).

Further, Prins acted with the intent to deprive Elbar of the Proceeds when he began freely spending the Proceeds for his own personal use, such as using the Proceeds to pay his personal taxes to the IRS on October 19, 2016; purchasing plane tickets on October 20, 2016, for an extended overseas family holiday and continuing to use the Proceeds to fund that vacation from approximately October 24, 2016, to November 28, 2016; paying salaries of the employees of the Prins Law Firm on October 21, 2016; paying his personal bankruptcy attorney on November 17, 2016; paying his criminal defense attorneys on November 21, 2016, and November 30, 2016; and using the Proceeds to make purcahses from Office Depot, Brookstone, Central Market grocery store, Gamestop, and the iTunes store throughout the months of October, November, and December of 2016.  [Finding of Fact No. 47].

Prins' intent to deprive can be inferred from all of the surrounding circumstances. *Countrywide Home Loans, Inc. v. Cowin* (*In re Cowin*), 492 B.R. 858, 896 (Bankr. S.D. Tex. 2013), *aff'd,* 538 B.R. 721 (S.D. Tex. 2015), *aff'd sub nom. Matter of Cowin*, 864 F.3d 344 (5th

Cir. 2017) (citing *McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989)).  Because Prins

wire transferred $2.0 million on October 18, 2016, from the IOLTA (the funds of which, at that

point in time, were almost entirely comprised of the Proceeds) to the Wells Fargo Operating

Account without informing anyone and the very next day began using the Proceeds for his own

personal expenditures, [*see* Finding of Fact Nos. 46–47], the Court finds that Prins had the intent

to deprive Elbar of the $2.0 million at the time of the "taking"—i.e., when he transferred the $2.0

million from the IOLTA to the Wells Fargo Operating Account on October 18, 2016.  *See*

*Bailey*, 885 S.W.2d at 198 (fiduciary acted with the intent to permanently deprive corporation of

funds when he transferred the corporation's funds without first notifying the corporation and

when he used the funds for his own benefit).  Similarly, the Court finds that when Prins—

without informing Elbar or anyone else for that matter—transferred the $300,000.00 from the

IOLTA on November 4, 2016, to the BBVA Operating Account and then cut a check from the

BBVA Operating Account to Industry Drive for $300,000.00 that same day in order to return to

Industry Drive money that Pfirrmann had taken from Industry Drive and given to Prins to hold,

[*see* Finding of Fact No. 57], Prins' intent to deprive Elbar of the $300,000.00 existed at the time

of his taking of the $300,000.00.  *Bailey*, 885 S.W.2d at 198 (fiduciary acted with the intent to

permanently deprive corporation of funds when he transferred the corporation's funds without

first notifying the corporation and when he used the funds for his own benefit).

      Here, because Elbar has met its burden of proof in showing that Prins has violated the

TTLA, Elbar is a "prevailing party" and is entitled not only to damages but also to its reasonable

attorneys' fees and costs.  When Elbar filed suit, it was seeking a judgment for $2.4 million;

since the filing of the suit, Elbar has recovered $1,683,915.42, [Finding of Fact No. 114], leaving

the amount now owed to be $716,084.58, [*id.*].  Thus, Elbar is entitled to a judgment against

Prins for $716,084.58, plus its reasonable attorneys' fees and costs.[91]

### ii.  Elbar's Claim Under the TTLA Against MacKenzie

At the close of trial, Elbar's counsel (Battaglia) represented in open court that Elbar had

decided to dismiss all claims against MacKenzie.[92]  Battaglia subsequently submitted a proposed

order, which this Court signed, that stated that the claims against MacKenzie were being

dismissed with prejudice.  [Finding of Fact No. 106].  Because Elbar dismissed all claims against

MacKenzie with prejudice, MacKenzie is entitled to his court costs and reasonable and necessary

attorneys' fees (related to his defense of the TTLA claim) as the prevailing party in the TTLA

claim brought by Elbar.  *See* Tex. Civ. Prac. & Rem. Code § 134.005(b); *Arrow Marble, LLC*,

441 S.W.3d at 706–07 (holding that dismissal of TTLA claim against the defendant with

prejudice for plaintiff's want of prosecution entitles defendant to attorneys' fees as a prevailing

party under the TTLA); *Munoz v. Cedar Park Constr., LLC (In re RTX Custom Homes, Inc.)*,

Case No. 14-11732-HCM, Adv. No. 15-01110-HCM, 2017 WL 2484850, at *56 (Bankr. W.D.

Tex. June 8, 2017) ("[I]f a Theft Act claim is dismissed with prejudice, then the defending party

has 'prevailed' and is entitled to an award of attorney's fees.").  As the court in *Arrow Marble,*

*LLC v. Estate of Killion* explained, a dismissal with prejudice invokes the doctrine of res

judicata, which materially alters the relationship between the parties:

---

[91] The record from the trial reflects that $2.4 million was wired into the IOLTA, and that Prins unquestionably transferred $2.0 million from the IOLTA to the Wells Fargo Operating Account and another $300,000.00 to the BBVA Operating Account.  [Finding of Fact Nos. 40, 47, 57].  The record is unclear as to what Prins did with the remaining $100,000.00 of the $2.4 million.  The lack of a record on this particular point does not in any way reduce the amount to which Prins is liable to Elbar.  Indeed, in the Prins' Criminal Case, he was ordered to pay the entire $2.4 million to Elbar as restitution, so this Court's ruling is entirely consistent with the order in the Prins' Criminal Case.

[92] Specifically, Battaglia stated that:  "After consultation last night with counsel and my client, we don't believe the evidence that came in in this record would be sufficient on appeal to sustain a claim against Mr. Donald Anthony MacKenzie."  [Adv. Doc. No. 222, Feb. 8, 2018, Trial Tr. 7:11-14].

A party prevails [under the TTLA] if he successfully prosecutes the action or successfully defends against it . . . .

. . .

The legal relationship between a plaintiff and defendant . . . change[s] . . . when the plaintiff's claims are dismissed with prejudice.  When a plaintiff's claims are dismissed with prejudice, the doctrine of res judicata prohibits the plaintiff from re-asserting his claims against that defendant in a later suit.

Res judicata attaches to a dismissal with prejudice even though the plaintiff's claims have not been fully litigated at trial.  Res judicata applies because a dismissal or nonsuit with prejudice is tantamount to a judgment on the merits, and the effect of res judicata in that instance works a permanent, inalterable change in the parties' legal relationship to the defendant's benefit:  the defendant can never again be sued by the plaintiff or its privies for claims arising out of the same subject matter.

441 S.W.3d at 706–07 (internal citations and quotations omitted).  Thus, MacKenzie's counsel will need to submit documentation to Elbar's counsel evidencing what MacKenzie believes are its reasonable fees and costs for successfully defending against Elbar's TTLA claim.

### iii.    Elbar's Claim Under the TTLA Against United Sentry

Just as the Court has determined that Elbar has to pay MacKenzie's court costs and reasonable and necessary attorneys' fees because MacKenzie was the prevailing party on Elbar's TTLA claim, so too must Elbar pay United Sentry's court costs and reasonable and necessary attorneys' fees.  As discussed above, this Court has found that Prins had neither actual nor apparent authority from United Sentry to take the actions that he did:  i.e., holding the foreclosure sale, despite being on notice of the Debtor's Chapter 7 case, then accepting the $2.4 million wire transfer in violation of the automatic stay, and then absconding with all of these funds for his own personal benefit.  [Finding of Fact Nos. 29–41, 46–48].  And, because Prins had no authority from United Sentry to take these actions, the TTLA claim brought by Elbar against United Sentry must necessarily fail and the Court will therefore deny this claim with

prejudice against United Sentry.  Now the question is whether Elbar can prevail against United

Sentry on its equitable subrogation claim.

     5.  <u>Equitable Subrogation</u>

          *a.  Applicable Law*

Equitable subrogation is "a legal fiction whereby an obligation, extinguished by a

payment made by a third person, *is treated as still subsisting* for the benefit of this third person,

so that by means of it one creditor is substituted to the rights, remedies, and securities of

another."  *Cont'l Cas. Co. v. N.A. Capacity Ins. Co.*, 683 F.3d 79, 88 (5th Cir. 2012) (emphasis

in original) (internal citation omitted); s*ee also Premium Plastics v. Seattle Speciality Ins. Servs.,

Inc.*, No. H-10-3960, 2012 WL 1029528, at *4 (S.D. Tex. Mar. 26, 2012); *Dickey v. Healthcare

Recoveries, Inc.*, No. 03-97-00351-CV, 1998 WL 20728, at *3 (Tex. App.—Austin Jan. 23,

1998, no pet.) ("[U]nder the laws of [Texas], subrogation places one party in the place of another

so that the new party gains the rights of the former party regarding a claim.").  "The general

purpose of equitable subrogation is 'to prevent the unjust enrichment of the *debtor* who owed the

debt that is paid.'"  *Bank of Am. v. Babu*, 340 S.W.3d 917, 926 (Tex. App.—Dallas 2011, no

pet.) (emphasis in original) (quoting *First Nat'l Bank of Kerrville v. O'Dell*, 856 S.W.2d 410,

415 (Tex. 1993)); *see also Doctors Hosp. 1997 LP v. Beazley Ins.*, No. H-08-3340, 2009 WL

3719482, at *7 (S.D. Tex. Nov. 3, 2009).  Equitable subrogation "does not depend on a contract

but arises in every instance in which one person, not acting voluntarily, has paid a debt for which

another was primarily liable and which in equity should have been paid by the latter."  *Doctors

Hosp. 1997 LP*, 2009 WL 3719482, at *7 (citing *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*,

236 S.W.3d 765, 774 (Tex. 2007)).  Further, "[a]s a general rule, a person is not entitled to

subrogate to the rights of a creditor until the creditor's claim against the debtor has been satisfied

or paid in full." *Dietrich Indus., Inc. v. United States*, 988 F.2d 568, 572 (5th Cir. 1993); *see also Providence Inst. for Sav. v. Sims*, 441 S.W.2d 516, 519 (Tex. 1969) ("We recognize the general rule that a person who is subrogated to the rights or securities of another may not enforce the same until the claim of the latter against the debtor has been paid in full.  This rule is for the protection of the prior creditor, who cannot equitably be compelled, without his consent, to place another on equal footing with respect to security held for the satisfaction of the entire indebtedness."); *SEC v. Kaleta*, No. 4:09-3674, 2011 WL 6016827, at *2 (S.D. Tex. Dec. 2, 2011) ("Texas law provides for . . . equitable subrogation, and requires that the party seeking subrogation establish that its funds paid off the debt of another.").  Texas courts interpret the equitable subrogation doctrine liberally.  *Frymire Eng'g Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 142 (Tex. 2008); *Anadarko E & P Onshore, LLC v. Mary Marshall Smith Trust Under Will Dated Oct. 24, 1977*, No. 4:14-cv-03168, 2017 WL 4390500, at *6 (S.D. Tex. Sept. 30, 2017) (quoting *Frymire Eng'g Co.*, 259 S.W.3d at 142), *vacated pursuant to settlement on other grounds by*, No. 4:14-cv-03168, 2017 WL 6760756 (S.D. Tex. Nov. 6, 2017).

"There are two key elements to equitable subrogation:  (1) the person whose debt was paid was primarily liable on the debt, and (2) the claimant paid the debt involuntarily."  *Cho v. Wells Fargo Bank, N.A.*, No. 4:16-CV-256, 2017 WL 3301529, at *6 (E.D. Tex. Aug. 3, 2017) (citing *Murray*, 257 S.W. 3d at 299).  "A payment is voluntary when the payor acts without any assignment or agreement for subrogation, without being under any legal obligation to make payment, and without being compelled to do so for the preservation of any rights or property."  *Frymire Eng'g Co.*, 259 S.W.3d at 145 (citation omitted).  Stated differently, equitable subrogation is "not applied for the mere stranger or volunteer who has paid the debt of another, without any assignment or agreement for subrogation, without being under any legal obligation

to make payment, and without being compelled to do so for the preservation of any rights or property of his own." *TXI Transp. Co. v. Empire Fire & Marine Ins. Co.*, No. 3:06-cv-0968-N, 2007 WL 9711697, at *2 (N.D. Tex. Dec. 7, 2007) (quoting *Matagorda Cty. v. Tex. Ass'n of Ctys. Cty. Gov't Risk Mgmt.*, 975 S.W.2d 782, 786 (Tex. App.—Corpus Christi-Edinburg, 1998), *aff'd* 52 S.W.3d (Tex. 2000)).  "Texas courts are liberal in their determinations that payments were made involuntarily."  *Frymire Eng'g Co.*, 259 S.W.3d at 145 (citation omitted).  The burden is on the party who is claiming equitable subrogation to establish that he is entitled to it. *Zepeda v. Fed. Home Loan Mortg. Ass'n*, No. 4:16-cv-3121, 2018 WL 781666, at *7 (S.D. Tex. Feb. 8, 2018).

When the issue is purely equitable subrogation, each case is controlled by its own facts. *Murray*, 257 S.W.3d at 300.  The court must weigh the equities based on the totality of the circumstances to determine whether the plaintiff is entitled to equitable subrogation.  *Id.*; *see also Conversion Props., L.L.C. v. Kessler*, 994 S.W.2d 810, 814 (Tex. App.—Dallas 1999, pet. denied) ("[Equitable subrogation] is predicated upon principles of equity, and absent the requisite balancing of those equities, a party may not prevail on this theory."); *Yonack v. Interstate Secs. Co. of Tex.*, 217 F.2d 649, 651 (5th Cir. 1954) ("Subrogation is perhaps the purest of equities . . . .  Subrogation is typically allowed when not to allow it will result in an unjust enrichment.").  "What the parties knew and intended are all relevant factors in balancing the equities . . . ."  *Prosper Bank v. Comerica Bank, N.A. (In re Hwang)*, 452 B.R. 187, 194 (Bankr. N.D. Tex. 2011) (citing *Murray*, 257 S.W.3d at 300).

"Factors a court may consider in conducting this balancing test are the negligence of the party claiming subrogation, whether that party had notice of the intervening lien, and whether the intervening lienholder will be prejudiced if equitable subrogation is allowed."  *Murray*, 257

S.W.3d at 300; *see also Kaleta*, 2011 WL 6016827, at *9 ("In conducting this balancing test, courts generally consider factors such as (1) whether there was negligence on the part of the party claiming subrogation, (2) whether that party had notice of other interests, and (3) whether the superior or equal equities of other interests will be prejudiced if equitable subrogation is allowed.").

### b.   Application of the Law of Equitable Subrogation to the Facts at Bar

Elbar argues that it should be equitably subrogated to the Note and Deed of Trust held by United Sentry because the non-judicial foreclosure sale on October 4, 2016, was invalid. [Adv. Doc. No. 217 at 13 of 35, ¶ 31; Adv. Doc. No. 229 at 2–3 of 10, ¶¶ 3–10]. Elbar does not explain why it believes that that the foreclosure sale on October 4, 2016, was invalid; it merely states that it was so.[93] In support of its argument that it should be subrogated to United Sentry's lien on the Property, Elbar cites the following:

> One who discharges the vendor's lien upon lands, even the homestead, either by paying as surety, or at the request of the debtor, or at a judicial sale, which, for irregularities in the process, fails to convey the title, is entitled to be subrogated to the lien of the creditor to the extent of the payment so made.

*Faires v. Cockrill*, 31 S.W. 190, 194 (Tex. 1895). Although Elbar cited this case law, [*see* Adv. Doc. No. 217 at 13 of 35, ¶ 21; Adv. Doc. No. 229 at 2–3 of 10, ¶ 4], Elbar does not explain why or how the foreclosure sale held on October 4, 2016, was invalid or irregular. If Elbar wishes to challenge the validity of the October 4, 2016, foreclosure sale, it needed to point out exactly

---

[93] Elbar is wrong on the law. In the Fifth Circuit, "actions taken in violation of an automatic stay are not *void*, but rather . . . they are merely *voidable*, because the bankruptcy court has the power to annul the automatic stay pursuant to section 362(d)." *Barnes v. Barnes (In re Barnes)*, 279 F. App'x 318, 320 n.1 (5th Cir. 2008) (emphasis in original) (quoting *Picco v. Global Marine Drilling Co.*, 900 F.2d 846, 850 (5th Cir. 1990)). Thus, the foreclosure sale held on October 4, 2016, was not automatically void merely because it was held in violation of the automatic stay. Indeed, Elbar's argument that the foreclosure sale was void is disingenuous given that Elbar's own witness (Bustamante) testified that Elbar wired the $2.4 million to Prins after Elbar became aware of the Debtor's bankruptcy (and therefore the automatic stay) because Elbar's objective of acquiring title to the Property could be achieved by ensuring that Prins had the funds while permission was sought from this Court to annul the stay retroactive to October 4, 2016—thereby ensuring that the foreclosure sale was valid. For Elbar to now argue that the foreclosure sale was *ipso facto* void in order to prevail on its equitable subrogation claim is blatantly inconsistent with the testimony of Elbar's key witness (i.e., Bustamante).

what facts made the foreclosure sale invalid. *Cameron v. U.S. Bank*, No. H-15-1116, 2016 WL 6909333, at *2 (S.D. Tex. Mar. 23, 2016) ("The plaintiff challenging a foreclosure sale must plead and ultimately prove any irregularities that rendered the sale invalid.") (quoting *Motten v. Chase Home Fin.*, 831 F. Supp. 2d 988, 994 (S.D. Tex. 2011)).  If Elbar means to argue that it should be subrogated to United Sentry's lien because the Property was subject to a non-judicial sale which, due to irregularities in the process (i.e., Prins stealing the Proceeds), failed to convey title, the Court still believes this argument fails, as discussed in more detail below, because "the vendor's lien upon lands" was never discharged.

United Sentry argues that Elbar is not entitled to equitable subrogation of United Sentry's interest on the Property because Elbar was negligent when it willfully violated the automatic stay, Elbar was aware of United Sentry's lien on the Property, and United Sentry will be extremely prejudiced if equitable subrogation is allowed.  [Adv. Doc. No. 218 at 12–14 of 24].  United Sentry also argues that Elbar is not entitled to equitable subrogation because there is no evidence that Elbar discharged a lien on the Property.  [*Id.* at 15 of 24].

The Court finds that Elbar has failed to satisfy all the elements to prevail under its equitable subrogation claim.  Here, because Prins stole the Proceeds, the debt to United Sentry—i.e., the balance owed under the Note—was never paid.  The Fifth Circuit, citing the Texas Supreme Court, has stated that "[a]s a general rule, a person is not entitled to subrogate to the rights of a creditor until the creditor's claim against the debtor has been satisfied or paid in full." *Dietrich Indus., Inc.*, 988 F.2d at 572 (citing *Providence Inst. for Sav.*, 441 S.W.2d at 519); *see also Kaleta*, 2011 WL 6016827, at *2.  United Sentry's claim—i.e., the balance due under the Note—has not been satisfied or paid in full due to Prins' theft of the Proceeds and, thus, Elbar is not entitled to equitable subrogation.  Even assuming that Elbar's wire transfer of the Proceeds to

Prins as the substitute trustee satisfied the requirement that the creditor's claim has been "satisfied or paid in full"—notwithstanding the fact that United Sentry has not received one cent of the Proceeds—this Court is still required to weigh the equities when determining whether a party is entitled to equitable subrogation. *Murray*, 257 S.W.3d at 300. The Court now undertakes this analysis.

The first factor a court may consider in conducting this balancing test is the negligence of the party claiming subrogation—in this instance, Elbar.[94] *Murray*, 257 S.W.3d at 300. The "negligence" of the party claiming subrogation is examined not in the strict legal sense in which one owes a duty, but rather whether the acts (or non-acts) of the party claiming subrogation were careless or sloppy. *See Kaleta*, 2011 WL 6016827, at *9–10 (describing negligence of the party claiming subrogation as not knowing the nature of their investments, failing to undertake due diligence, and presenting no proof they sought information about the loans they were extending or the loan documents, among other "deficiencies").[95] Here, once Elbar received notice from Prins that one of the principals of Triple Gate (i.e., the Debtor) was claiming that the Property was deeded in her name personally and that she had filed for bankruptcy prior to the foreclosure

---

[94] Citing *Murray v. Cadle Co.*, 257 S.W.3d 291, 300–01 (Tex. App.—Dallas 2008, pet. denied), Elbar argues that the consideration of negligence only applies when there is an intervening lien, and that since there is no intervening lien in the instant suit, negligence should not be considered when balancing the equities. [Adv. Doc. No. 229 at 3]. The Court does not construe *Murray* to stand for this proposition, nor does it construe other cases that discuss the three factors to be considered when balancing the equities to stand for this proposition either. *See, e.g., SEC v. Kaleta*, No. 4:09-3674, 2011 WL 6016827, at *10 (S.D. Tex. Dec. 2, 2011); *Bank of Am. v. Babu*, 340 S.W.3d 917, 926, 928 (Tex. App.—Dallas 2011, no pet.); *NSEW Holdings LLC v. Wells Fargo Bank, N.A.*, No. 4:15-CV-828, 2017 WL 1030313, at *3 (E.D. Tex. Mar. 17, 2017). The Court therefore will consider the negligence of the party claiming subrogation—that is, Elbar's negligence—when balancing the equities in the dispute at bar.

[95] The Court is aware that at least one Texas court has analyzed the "negligence" factor according to the word's strict legal definition. *See Babu*, 340 S.W.3d at 928 ("The threshold inquiry with regard to negligence is whether a legal duty existed."). The Court does not read U.S. District Judge Atlas' opinion in *Kaleta* to analyze the "negligence" factor in the strictly legal sense of the word—and this Court, as a unit of the District Court, is bound by *Kaleta. See Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 459 B.R. 623, 634 n.8 (Bankr. S.D. Tex. 2011). However, even if this Court is incorrect and "negligence" is defined solely by its legal definition, then this Court finds that Elbar had a legal duty to obey the law and a legal duty not to violate the Bankruptcy Code. Elbar, however, broke the law when it violated the automatic stay. See discussion of Elbar's violation of the automatic stay *supra* in Section IV.C.

sale, Elbar should have taken further action to determine the legitimacy of the Debtor's claim that the Property was deeded in her name—and therefore property of the estate subject to the automatic stay—before Elbar wire transferred the Proceeds.  Elbar received this information (i.e., that the Debtor was claiming that the Property was deeded in her name), at the latest, at 2:53 p.m. on October 5, 2016.  [Finding of Fact No. 37].  Once Elbar received this information, Elbar should have, at the least, taken the following steps:  (1) contacted Payne (the Debtor's attorney) to further investigate the Debtor's assertion that the Property was deeded in her name; (2) requested the unrecorded deed that the Debtor claimed transferred ownership of the Property from Triple Gate to herself and her husband; and/or (3) done its own title work on the Property.

Elbar did none of these things.  Instead of investigating whether a wire transfer of the $2.4 million purchase price would violate the automatic stay if in fact the Property had pre-petition been deeded to the Debtor, Elbar did nothing.  Further, once it was confirmed the next day (prior to the Proceeds being wire transferred) that the Property had in fact been deeded to the Debtor pre-petition, Bustamante did not change his mind about wire-transferring the $2.4 million to Prins; stated differently, he did not worry that wiring the Proceeds would violate the automatic stay.  [Finding of Fact Nos. 27–41].  In Bustamante's own words, "We paid the money knowing about the bankruptcy.  It doesn't get more complicated than that."  [Finding of Fact No. 41].  Bustamante testified that he "didn't know of any" downside to tendering the $2.4 million when he already knew about the Debtor's bankruptcy filing.  [TransWorld's Ex. II, Bustamante Dep. 83:5-10].  In Bustamante's mind, one of two scenarios would happen if the Purchasers wire-transferred the money after learning about the bankruptcy filing and the automatic stay:  the stay would either be annulled and the Purchasers would receive a deed to the Property or the stay would not be annulled and the Purchasers would receive their money back.  [Adv. Doc. No. 220,

Feb. 6, 2018, Trial. Tr. 96:25–97:4, 133:13-25, 135:2-6; TransWorld's Ex. II, Bustamante Dep. 190:6-17, 194:13-19].

Essentially, the Purchasers—and it must be kept in mind that Elbar is one of the Purchasers—were willing to roll the dice and see what happened when they violated the automatic stay by wire transferring the Proceeds; according to Bustamante, wiring the money (i.e., violating the automatic stay) was just something the Purchasers had to do to preserve their right to the Property.  [Adv. Doc. No. 220, Feb. 6, 2018, Trial. Tr. 89:19-21, 133:13–134:10, 135:19-25; TransWorld's Ex. II, Bustamante Dep. 82:10–83:3].  Stated differently, it did not matter to the Purchasers that the Debtor held title to the Property and that the automatic stay was in effect; the Purchasers really wanted the Property and they were willing to violate the automatic stay to make sure its bid on the Property was secure.  Elbar's failure to conduct due diligence regarding whether the Debtor held title to the Property—and, frankly, Elbar's bald apathy regarding violating the automatic stay as expressed by Bustamante's testimony[96]—lead this Court to find that this "negligence" factor weighs strongly against a finding that Elbar is subrogated to United Sentry's interest in the Property.  *See Kaleta*, 2011 WL 6016827, at *9–10 (finding that negligence factor weighed against party seeking equitable subrogation when that party (1) did not know the nature of their investments, (2) failed to undertake due diligence, and (3) presented no proof they sought information about the loans they were extending or the loan documents, among other "deficiencies").

---

[96] Bustamante's testimony that Elbar has, on multiple occasions, paid a purchase price at a foreclosure sale with full knowledge of a bankruptcy, [Finding of Fact No. 41], demonstrates the little regard Elbar holds for complying with the Bankruptcy Code and abiding by the automatic stay.

The second factor a court may consider is whether the party claiming subrogation had "notice of other interests."[97] *Kaleta*, 2011 WL 6016827, at \*9. The only other interest related to the Property was United Sentry's Deed of Trust lien on the Property, and Elbar certainly had notice of the Deed of Trust, as Elbar was the highest bidder at the foreclosure sale held by United Sentry.[98] This factor therefore weighs against a finding that Elbar is subrogated to United Sentry's interest in the Property.

The third factor a court may consider is whether "the superior or equal equities of other interests will be prejudiced if equitable subrogation is allowed." *Kaleta*, 2011 WL 6016827, at \*9. As stated above, the only other interest related to the Property is United Sentry's Deed of Trust lien on the Property. United Sentry has filed a claim in the Main Case in the amount of $1,568,782.76. [Proof of Claim, Case No. 16-35021, Claim No. 12, at 2]. United Sentry has not received any funds from the Debtor's bankruptcy estate related to its claim. There is $1,719,062.93 in the registry of this Court as a result of the sale of the Property. [Finding of Fact No. 100]. Elbar has also filed a claim in the Main Case in the amount of $1,594,424.17, [Proof of Claim, Case No. 16-35021, Claim No. 11, at 2], and asserts in its pleadings that it is seeking the entire $2.4 million it wire transferred to the IOLTA. At trial, Battaglia correctly stated that any recovery Elbar receives as a result of the other actions it is pursuing will offset the amount of

---

[97] The Court notes that courts other than the court in *Kaleta*, No. 4:09-3674, 2011 WL 6016827, at \*10 (S.D. Tex. Dec. 2, 2011) that have discussed the three factors in the balancing test describe the second factor as "whether [the] party [claiming subrogation] had notice of the **intervening lien**," *Babu*, 340 S.W.3d at 926, 928 (emphasis added); *NSEW Holdings LLC*, 2017 WL 1030313, at \*3 (emphasis added), as compared to the court in *Kaleta* describing this factor as "whether [the] party [claiming subrogation] had notice of **other interests**," 2011 WL 6016827, at \*9 (emphasis added). To the extent any meaningful difference exists between the two phrasings of the test for the second factor as set forth in *Kaleta*, *Babu*, and *NSEW Holdings LLC*, the Court finds that it is bound by the interpretation of the second factor as it is set forth in *Kaleta*, a case from the Southern District of Texas binding upon this Court. *See In re Ritz*, 459 B.R. at 634 n.8.

[98] At the time of the foreclosure sale, there were also ad valorem tax liens on the Property. The record is unclear as to whether Elbar had notice of these tax liens. Unlike the lien held by United Sentry—which remains unpaid pending the outcome of this lawsuit—the tax liens were paid when the Trustee, with this Court's approval, sold the Property in the Main Chapter 7 case. [*See* Main Case. Doc. No. 209].

recovery Elbar seeks from this Court. Since the conclusion of the trial in this adversary proceeding Elbar has received $1,683,915.42 of the $2.4 million it seeks: specifically, Elbar received $1,601,542.14 from the Prins' Criminal Case and $82,373.28 from the Prins' Bankruptcy. [Finding of Fact Nos. 111, 113–114]. In order to be made whole, Elbar still seeks the amount of $716,084.58. Thus, United Sentry's interest in the Property will be prejudiced if its interests are subrogated to the $716,084.58 Elbar still seeks to recover. United Sentry's claim in the amount of $1,568,782.76 will be reduced to $565,804.41—but not paid in full—if Elbar is subrogated to United Sentry's interest.[99] Stated differently, United Sentry will be prejudiced if equitable subrogation is allowed here. This factor therefore weighs against a finding that Elbar is subrogated to United Sentry's interest in the Property.

Besides considering the three factors identified above when deciding whether equitable subrogation should apply in a particular suit, a court may also consider whether the party who is requesting equitable subrogation has come to the court with unclean hands. *Cho*, 2017 WL

---

[99] Presently in the registry of the Court is the amount of $1,719,062.93, representing the net funds generated from the sale of the Property (not including the interest earned to date). [Finding of Fact No. 100]. If this Court holds that Elbar is subrogated to United Sentry, then Elbar would necessarily receive the amount of $716,084.58, thus making Elbar whole because it has already recovered the other $1,683,915.42. [Finding of Fact No. 114]. Thus, there would be $1,002,978.35 remaining for distribution to United Sentry, which amounts to United Sentry collecting 63.9% of its claim, as demonstrated by the mathematical calculations below:

$1,002,978.35 (the amount left in the Court's registry if Elbar is subrogated to United Sentry's claim)
÷
$1,568,782.76 (the amount of United Sentry's proof of claim).

Conversely, if Elbar is not subrogated to United Sentry's claim (i.e., if United Sentry receives a distribution of its entire claim of $1,568,782.76), then Elbar's total recovery of the $2.4 million it seeks would amount to a 76.4% recovery, as demonstrated by the mathematical calculations below:

$1,601,542.14 (the amount Elbar has collected from the Prins' Criminal Case)
+
82,373.28 (the amount Elbar has collected from the Prins' Bankruptcy)
+
$150,280.17 (the amount Elbar would collect from this Court's registry if not subrogated to United Sentry's claim)
=
$1,834,195.59. The $1,834,195.59 is then divided by the total amount Elbar wired to the IOLTA ($2,400,000), which is 76.4%.

3301529, at *6 ("[E]quitable subrogation—like all equitable remedies—is sometimes denied to litigants who come to court with unclean hands."). As one court within the Fifth Circuit has described it:

> The doctrine of unclean hands closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. Although equity does not demand that the parties have led blameless lives . . . it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. For the doctrine to apply, a party's conduct does not need to be one punishable as a crime or one that would justify legal proceedings of any sort. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the court to invoke the doctrine. The wrongful acts upon which the claim of unclean hands is premised must in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication. Plaintiff's alleged wrongdoing will not bar relief unless the defendant establishes personal injury resulting from plaintiff's conduct. The unclean hands doctrine does not purport to search out or deal with the general moral attributes or standing of a litigant.

*Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 847–48 (W.D. Tex. 2001) (internal citations, quotations, and footnotes omitted); s*ee also Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979) ("The maxim of unclean hands is not applied where plaintiff's misconduct is not directly related to the merits of the controversy between the parties, but only where the wrongful acts 'in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.' The alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct.") (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)); *SA Bay LLC v. Hall*, 849 F. Supp. 2d 761, 773 (S.D. Tex. 2012) ("In the Fifth Circuit, the defense of unclean hands further requires a defendant to 'show that he has personally been injured by the plaintiff's conduct.'") (quoting *Mitchell Bros. Film Grp.*, 604 F.2d at 863); *Compaq Comput. Corp. v. Procom Tech., Inc.*, 908 F. Supp. 1409,

1428 (S.D. Tex. 1995) (internal citations omitted) ("The doctrine of unclean hands permits a court to deny equitable relief to a party guilty of fraud, deceit, unconscionability, or bad faith relative to an issue present in the pending lawsuit.  Application of the doctrine is discretionary and does not apply when the party's behavior is not sufficiently serious."); *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 379 (5th Cir. 2004) ("The unclean hands doctrine is used to defeat an undeserving plaintiff's claim for equitable relief against a defendant that he has injured."), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).

In the Fifth Circuit, the application of the unclean hands doctrine requires a defendant to show that he has personally been injured by the plaintiff's conduct.[100]  *Mitchell Bros. Film Grp.*, 604 F.2d at 863; *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 796–97 (5th Cir. 1999). This, United Sentry cannot do.  The unclean hands doctrine does not apply here because United Sentry is unable to show that it has been personally injured by Elbar's conduct.  United Sentry's injury—the failure to receive payment of the balance due under the Note from the $2.4 million paid by Elbar at the foreclosure sale—was not caused by Elbar's actions, but rather by Prins' actions.  Even though Elbar violated the automatic stay, Elbar does not have "unclean hands" because any injury United Sentry might suffer is due to Prins' actions, not Elbar's.  Thus, the unclean hands doctrine does not come into play as the Court weighs the equities in this suit.

Another factor to consider when weighing the equities based on the totality of the circumstances is that United Sentry is the party who selected Prins to serve as the substitute trustee.  MacKenzie has known Prins for approximately 20 years and during that time, Prins

---

[100] Application of the unclean hands defense under Texas law also requires that the party relying on the doctrine show that she herself suffered because of the other party's conduct.  *Kinsel v. Lindsey*, 526 S.W.3d 411, 426 (Tex. 2017).

occasionally performed legal work for MacKenzie. [Finding of Fact No. 13]. Prior to Prins stealing the Proceeds, during the time that MacKenzie knew Prins and Prins performed legal work for MacKenzie, MacKenzie did not have any indication that Prins might be engaged—to use MacKenzie's own words—in "questionable activities." [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 92:21–93:4]. MacKenzie, for his part, did everything he could to protect and return the Proceeds to Elbar. After Twyman directly contacted MacKenzie around the beginning of November 2016 and asked him to instruct Prins to return the Proceeds to Elbar, MacKenzie, at Prins' suggestion, had Prins draft a release—which MacKenzie immediately signed and returned to both Prins and Twyman—so that the Proceeds could quickly be returned to the Purchasers. [Finding of Fact No. 68 and Footnote 39]. After MacKenzie began to suspect that something suspicious was going on with Prins, it was MacKenzie who contacted the FBI and provided assistance to the FBI regarding the recovery of approximately $1.6 million of the Proceeds. [Finding of Fact No. 73]. It was MacKenzie's actions that led to the FBI becoming involved and ultimately seizing the funds in the Wells Fargo Operating Account. [Finding of Fact No. 82]. The $1,601,542.14, that was seized by the FBI in the Wells Fargo Operating Account eventually went to Elbar as restitution in the Prins' Criminal Case. [Finding of Fact No. 113]. MacKenzie also tried to safeguard the Proceeds—once he became suspicious of Prins—by paying for two ex-Texas Rangers to watch Prins and Ms. Prins 24 hours a day, so that MacKenzie would be alerted if Prins or Ms. Prins attempted to leave the country. [Finding of Fact No. 76]. Thus, although it was MacKenzie who selected Prins to serve as the substitute trustee,[101] it was also MacKenzie who played a significant role in the recovery of approximately 66% of the Proceeds in the Wells Fargo Operating Account. The funds that were recovered from the Wells Fargo

---

[101] The Court reiterates that at the point that MacKenzie chose Prins to serve as the substitute trustee, based on Prins' 20 plus years of providing intermittent legal services for MacKenzie, MacKenzie had no reason to think that Prins would behave unethically. [Finding of Fact No. 13].

Operating Account have been given <u>only</u> to Elbar—the other individuals and entities who are to receive restitution pursuant to Prins' plea agreement did not receive any of these funds, nor did United Sentry, which, it must be remembered, held the lien on the Property that has since been sold by order of this Court.  [*See* Finding of Fact No. 113].  The work MacKenzie did in helping to recover these funds directly and solely benefitted Elbar.  Thus, under all of these circumstances, the Court views the fact that MacKenzie chose Prins to serve as the substitute trustee under the Deed of Trust as a neutral factor when weighing the equities based on the totality of the circumstances.

Finally, the Court emphasizes that the "general purpose of equitable subrogation is 'to prevent the unjust enrichment of the *debtor* who owed the debt that is paid.'"  *Babu*, 340 S.W.3d at 926 (emphasis in original) (citing *First Nat'l Bank of Kerrville v. O'Dell*, 856 S.W.2d 410, 415 (Tex. 1993)).  Here, whether Elbar is equitably subrogated to United Sentry's claim in no way affects whether the Debtor is unjustly enriched; the Debtor would not be unjustly enriched regardless of whether Elbar is equitably subrogated.  Under no scenario will the Debtor receive any of the funds from the sale of the Property; therefore, there is no scenario allowing the Debtor to be unjustly enriched.

Considering all of the above factors, Elbar, as the party claiming equitable subrogation, has failed to meet its burden that it is entitled to be equitably subrogated to United Sentry's Deed of Trust on the Property.

**E. The Claims Against TransWorld and Industry Drive:   Money Had and Received, Unjust Enrichment, and Conversion**

    1.  <u>Money Had and Received</u>

        *a.  Applicable Law*

"Money had and received is an equitable doctrine designed to prevent unjust enrichment." *Merry Homes, Inc. v. Dao*, 359 S.W.3d 881, 883 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *see also Ellis v. Wells Fargo Bank, N.A.*, No. G-13-249, 2014 WL 12596473, at *6 (S.D. Tex. Feb. 10, 2014) ("A claim for money had and received arises from equity.").  A claim for money had and received is not based on wrongdoing, "but looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another." *BP Exploration & Prod. Inc. v. Cashman Equip. Corp.*, 132 F. Supp. 3d 876, 889 (S.D. Tex. 2015) (quotation omitted); *see also Tornado Bus Co. v. Bus & Coach Am. Corp.*, No. 3:14-CV-3231-M, 2015 WL 5164731, at *6 (N.D. Tex. Sept. 2, 2015) (noting that a claim for money had and received differs from an unjust enrichment claim in that a money had and received claim is not premised on wrongdoing).  This claim is "less restricted and fettered by technical rules and formalities than any other form of action.  It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which belongs to the plaintiff." *Bank of Saipan*, 380 F.3d at 840 (quoting *Staats v. Miller*, 243 S.W.2d 686, 687–88 (Tex. 1951)).

Under Texas law, "[t]o establish a cause of action for money had and received, a plaintiff must show that a defendant holds money which in equity and good conscience belongs to him." *Brown v. Wells Fargo Bank, N.A.*, No. H-13-3228, 2015 WL 926573, at *5 (S.D. Tex. Mar. 4, 2015); *see also Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 302 n.4 (Tex. 2015) (citation omitted).  In general, "[o]ne who acquires stolen property does not

acquire its title.  Title remains with the original owner, who can recover the property or its value from whomever has received it."  *Matter of Approximately $80,600.00*, 537 S.W.3d 207, 211 (Tex. App.—Houston [1st Dist.] 2017, pet. filed) (internal citations omitted).  Money, however, is the exception to this general rule.  *Id.* at 211–12 ; *see also Sinclair Houston Fed. Credit Union v. Hendricks*, 268 S.W.2d 290, 295 (Tex. Civ. App.—Galveston 1954, writ ref'd n.r.e.) (noting that money is an exception to the general rule "because of the necessity that money pass freely in commercial transactions").  That is why "[i]n examining the 'good conscience' element, courts have concluded that, 'one who receives money which has been illegally obtained by a third party in due course of business, in good faith, and for valuable consideration, can keep it without liability to him from whom it was stolen.'"  *GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, No. 3:09-CV-572-L, 2011 WL 124237, at *6 (N.D. Tex. Jan. 13, 2011) (quoting *Sinclair Houston Fed. Credit Union*, 268 S.W.2d at 295); *see also Compass Bank v. Villareal*, No. L-10-08, 2012 WL 13046324, at *9 (S.D. Tex. Feb. 28, 2012) (noting that the cases of *Bank of Saipan* and *Casstevens* stand for the proposition that "one who in good faith gives valuable consideration in exchange for a benefit can keep the benefit without liability to the victim"); *Thabico Co. v. Kiewit Offshore Servs., Ltd.*, No. 2:16-CV-427, 2017 WL 175815, at *4 (S.D. Tex. Jan. 17, 2017) (dismissing claim for money had and received because defendant's receipt of funds had been supported by consideration and was in the due course of business).

In defending against a money had and received claim, "a defendant may present any facts and raise any defenses that would deny the claimant's right or show that the claimant should not recover."  *First Am. Title, Ins. Co.*, 2015 WL 1220733, at *5 (quoting *Hunter v. PriceKubecka, PLLC*, 339 S.W.3d 795, 807 (Tex. App.—Dallas 2011, no pet.)); *see also Best Buy Co. v. Barrera*, 248 S.W.3d 160, 162 (Tex. 2007).  In a claim for money had and received, the court

must base its decision "upon a balancing of the equities in each unique case." *First Am. Title, Ins. Co.*, 2015 WL 1220733, at *5; *see also Bank of Saipan*, 380 F.3d at 841 ("Texas courts have long spoken in terms of weighing the equities, even when foreclosing recovery completely; the inquiry must thus go beyond an analysis of the plaintiff's errors of omission or commission, to balance these against the defendant's unjust acts.").  Any detrimental reliance suffered by the defendant may be considered in weighing the equities.  *First Am. Title, Ins. Co.*, 2015 WL 1220733, at *12; *Chesapeake Operating, Inc. v. Whitehead*, No. C-10-301, 2011 WL 3813174, at *8 (S.D. Tex. Aug. 26, 2011).  To show detrimental reliance, a party must demonstrate that it materially changed its position in reliance on the money received.  *First Am. Title, Ins. Co.*, 2015 WL 1220733, at *8; *Arcturus Corp. v. Espada Operating, LLC*, No. 13-13-00713-CV, 2016 WL 4272381, at *9 (Tex. App.—Corpus Christi-Edinburg Aug. 11, 2016, no pet.).

The affirmative defense of "unclean hands" can also apply to an action for money had and received.  *See Bank of Saipan*, 380 F.3d at 840 n.1 ("[R]ecovery for money had and received, though legal in nature, is controlled by equitable principles, and . . . it is axiomatic that the 'clean hands' doctrine functions in equitable actions.") (quoting *Tex. Bank & Trust Co. of Dallas v. Custom Leasing, Inc.*, 498 S.W.2d 243, (Tex. Civ. App.—Tyler 1973), *rev'd on other grounds sum. nom. Custom Leasing, Inc. v. Tex. Bank & Trust Co.*, 516 S.W.2d 138 (Tex. 1974)); *Sirus Computer Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 838 (W.D. Tex. 2015) ("Unclean hands is an affirmative defense that may bar a party with unclean hands from obtaining equitable relief").

Finally, "[w]hat the parties knew and intended are all relevant factors in balancing the equities . . . ."  *In re Hwang*, 452 B.R. at 194 (citing *Murray*, 257 S.W.3d at 300).

b.  *Application of the Law of Money Had and Received to the Facts at Bar*

i.  **TransWorld**

Elbar argues that it should prevail on its claim for money had and received because (1) the $164,807.29 Prins gave to TransWord was not received in the due course of TransWorld's business; (2) the $164,807.29 Prins gave to TransWorld was not received in good faith; and (3) TransWorld did not pay valuable consideration for the $164,807.29 it received from Prins.  [Adv. Doc. No. 217 at 24 of 35, ¶ 53].  Elbar further argues that TransWorld had notice of Prins' poor financial condition.  [Adv. Doc. No. 217 at 21–23 of 35, ¶¶ 47–50].  Essentially, Elbar argues that TransWorld does not meet the requirements, as articulated by *Sinclair* and other cases, to qualify as an exception to the general rule that one who acquires stolen property does not acquire its title.

TransWorld argues that Elbar's claim for money had and received fails for lack of tracing because Elbar gave its $200,000.00 share directly to Bustamante and there was no testimony that Bustamante used this exact $200,000.00 to fund (in part) the purchase of the Property.  [Adv. Doc. No. 216 at 15–25 of 43].  Unlike conversion, "tracing" is not an element of the claim of money had and received,[102] and this argument therefore fails.  In any event, there is no question that the $164,807.29 Prins gave to TransWorld on October 21, 2016, from the Wells Fargo Operating Account is directly traceable to the Proceeds.  [Finding of Fact Nos. 46–50].

---

[102] TransWorld cites *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496 (Tex. App.—Fort Worth 2012, no pet.) apparently for the proposition that tracing is an element that must be proven in a claim for money had and received.  *H.E.B.*, however, does not stand for the proposition that "tracing" is an element of a money had and received claim.  Further, the instant adversary proceeding is not like *H.E.B.*  In *H.E.B.*, the court found that Ardinger—the defendant who received H.E.B's money from a third-party fraudster—could not keep the money under a claim for money had and received because Ardinger did not give any consideration for the money it received from the third-party.  Here, as discussed in detail *infra*, even though this Court finds that TransWorld did not give any valuable consideration for the $164,807.29 it received from Prins, the equities in this case weigh towards a finding that Elbar cannot succeed on its claim for money had and received.

123

To be successful on its claim for money had and received, Elbar must show that the $164,807.29 Prins gave to TransWorld, in equity and good conscience, belongs to Elbar. *Plains Expl. & Prod. Co.*, 473 S.W.3d at 302 n.4. The Court first considers the "good conscience" element. When considering this element, "courts have concluded that, 'one who receives money which has been illegally obtained by a third party in due course of business, in good faith, and for valuable consideration, can keep it without liability to him from whom it was stolen.'" *GE Capital Commercial, Inc.*, 2011 WL 124237, at *6 (quoting *Sinclair Houston Fed. Credit Union*, 268 S.W.2d at 295). When determining whether Elbar has shown that TransWorld holds money which in "good conscience" belongs to Elbar, this Court will examine in turn each of the three considerations identified by the court in *GE Capital Commercial, Inc.*—"due course of business," "in good faith," and "for valuable consideration."

### (1) *"Good Conscience" Considerations*

### a) Good Conscience: Due Course of Business

Elbar argues that there was no evidence that the $164,807.29 that Prins paid to TransWorld on October 21, 2016, was received in the due course of TransWorld's business of leasing property. [*See* Adv. Doc. No. 217 at 24 of 35, ¶ 53; Adv. Doc. No. 230 at 6 of 19, ¶ 18]. TransWorld argues that a business paying its taxes and/or settling its tax disputes—as TransWorld believed it was doing when Prins gave TransWorld the $164,807.29 on October 21, 2016, and told it that TransWorld had settled its outstanding issues with the Tax Assessor for $5,000.00—falls within the due course of a business. [Adv. Doc. No. 225 at 13–14, ¶¶ 33–34].

The Court finds that settling a tax dispute is not in the due or ordinary course of TransWorld's business. TransWorld is a leasing company. [Finding of Fact No. 1]. If, for example, Prins had wanted to lease a truck and gave TransWorld $164,807.29 in order to lease

that truck, then the $164,807.29 TransWorld received from Prins would have been received in the "due course" of TransWorld's business—i.e., leasing personalty. Here, however, at least from TransWorld's point of view, the $164,807.29 Prins gave TransWorld represented a settlement with the Tax Assessor over outstanding tax issues. [*See* Finding of Fact No. 50]. Transactions not directly related to a business's purpose are not conducted in "due course of business." *Compare Shelby Eng'g Co., Inc. v. Action Steel Supply, Inc.*, 707 N.E.2d 1026, 1028 (Ind. Ct. App. 1999) (finding that defendant Shelby Engineering was not selling a crane in the due course of business, but rather was "attempting to find a buyer for an item of equipment it no longer desired"), *with Ohio Cas. Ins. Co. v. Smith*, 297 F.2d 265, 266–67 (7th Cir. 1962) (finding that defendant who sold home goods merchandise door to door and who received payment from plaintiff for such certain home goods received the money from plaintiff in "the due course of her business dealings"). As TransWorld did not receive the $164,807.29 from Prins as a result of TransWorld's core business dealing—leasing property—the $164,807.29 was not received in the "due course of business."[103]

### b)  Good Conscience:  In Good Faith

Elbar asserts that TransWorld did not offer any evidence that TransWorld was acting in good faith when it received the $164,807.29 from Prins. [Adv. Doc. No. 217 at 24 of 35, ¶ 53]. Moreover, Elbar argues that TransWorld had notice about Prins' poor financial condition because (1) Ms. Cash testified that she was curious as to why TransWorld's check to the Tax Assessor in 2008 for taxes due was made out to the IOLTA instead of directly to the Tax

---

[103] The Court notes that it is applying this factor from TransWorld's point of view, as it believed the facts to be at the time Prins delivered the $164,807.29.  In reality, Prins had not negotiated any settlement at all with the Tax Assessor.  [Finding of Fact No. 50].  If the Court considers this factor from Prins' point of view—that is, no settlement was being made and Prins was attempting to return the $169,807.29 TransWorld had given him a number of months prior—then the result is the same:  he did not give these funds to TransWorld in its "due course of business."

Assessor; (2) Ms. Cash testified that in January of 2016 she discovered that TransWorld was listed in the local newspaper as one of the largest delinquent taxpayers in San Antonio; and (3) TransWorld was listed as a creditor in the Prins' Bankruptcy and, thus, had notice of all proceedings in the Prins' Bankruptcy. [Adv. Doc. No. 217 at 21–23 of 35, ¶¶ 47–50]. Citing no case law, Elbar further argues that after experiencing continued issues with TransWorld's taxes after Prins claimed they had been paid, TransWorld had a "duty of inquiry that could not be satisfied by simply continuing to rely solely on information obtained from Prins" and that TransWorld's continued reliance on Prins from 2008 to 2016 was not reasonable. [Adv. Doc. No. 230 at 15–16 of 19, ¶¶ 39–40]. Elbar further argues that after TransWorld learned about the Prins' Bankruptcy, TransWorld should have continually monitored the Prins' Bankruptcy and doing so would have led to notice of the contents of the Wasserteil Motion to Lift Stay and the Ozer Adversary, both of which made allegations regarding Prins' wrongful conduct towards the Wasserteils and the Ozers.[104] [Adv. Doc. No. 230 at 16–17 of 19, ¶ 41].

---

[104] The Wasserteil Motion for Relief from Stay was filed in the Prins' Bankruptcy on October 28, 2016. [Pl.'s Ex. 37]. In the Motion for Relief from Stay, the Wasserteil Estate alleged that Prins refused to turn over money that belonged to a former client of Prins. [*Id.*]. Specifically, Jose Wasserteil was a former client of Prins for ten years. [*Id.*]. Mr. Wasserteil died in June 2013; subsequent to Mr. Wasserteil's death, a limited partnership that Mr. Wasserteil had owned an interest in when he was alive made a distribution to its limited partners, which included a distribution to the (now deceased) Mr. Wasserteil. [*Id.*]. Since a probate proceeding had not been filed at the time of the distribution, eventually the majority of the money from the distribution was wired to the IOLTA ($360,902.26), to be held by Prins until a probate proceeding was established. Mr. Wasserteil's estate was subsequently established and counsel for the Wasserteil Estate requested the $360,902.26 from Prins. [*Id.*]. Prins agreed to deliver the money to the Wasserteil Estate, but never followed through with the delivery. [*Id.*]. The Wasserteil Estate then filed the Motion for Relief from Stay, arguing that the $360,902.26 is not part of Prins' bankruptcy estate. [*Id.*].

William and Karen Ozer, former clients of Prins and the Prins Law Firm, filed a complaint initiating an adversary proceeding in the Prins' Bankruptcy on or around November 4, 2016. [Pl.'s Ex. 38]. In their complaint, the Ozers allege that during the seven years that Prins represented them in a civil lawsuit in San Antonio, Texas, Prins repeatedly lied to them about the status of their lawsuit. [*Id.*]. In furtherance of his lies, the Ozers allege that Prins: (1) forged court documents, including judicial opinions and final judgments, from state and federal judges; (2) forged numerous communications from various elected and appointed officials, including state court judges, federal court judges, a former San Antonio mayor, and the United States Attorney General; (3) claimed to have received over $1.6 million in settlement funds for the Ozers but never disbursed the settlement money; (4) failed to disclose to the Ozers that he had filed for personal bankruptcy; (5) after filing for bankruptcy, executed a $1.6 million promissory note in favor of the Ozers; and (6) failed to disclose the promissory note in his bankruptcy schedules.

126

TransWorld argues that the good faith element is met because TransWorld did not acquire the $164,807.29 in an unlawful manner and there is no evidence that TransWorld knew that the funds were stolen. [Adv. Doc. No. 216 at 33 of 43]. TransWorld further argues that Ms. Cash did not know about the Prins' Bankruptcy until October 21, 2016, and—citing Elbar's Amended Complaint—that even if TransWorld had known about the Prins' Bankruptcy prior to receiving the $164,807.29, there is no evidence to suggest that such knowledge should have put TransWorld on notice that the $164,807.29 Prins paid to TransWorld might have been stolen. [Adv. Doc. No. 216 at 35–37 of 43].

The Court finds that TransWorld received the $164,807.29 in good faith. TransWorld had been working, through Prins, from sometime in 2008 through October 2016 to sort out the tax issues TransWorld believed it had with the Tax Assessor. [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 19:7–21:14]. Because of his poor health, it was very important to Mr. Cash to resolve all outstanding issues with the business that he founded, TransWorld, as soon as possible. [Finding of Fact Nos. 7, 49]. Ms. Cash testified that she believed that the $164,807.29 TransWorld received from Prins on October 21, 2016—which represented the amount it had paid to the IOLTA on May 17, 2016, in order to resolve the tax issues with the Tax Assessor, minus $5,000.00—represented a settlement with the Tax Assessor regarding TransWorld's outstanding tax issues, and that the money it was receiving from Prins was TransWorld's own money, less $5,000.00 paid for the settlement. [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 22:5-15]. As noted in the Credibility of Witnesses Section, the Court has found Ms. Cash to be a very credible witness. Further, Prins himself testified that he told TransWorld that the matter with the Tax

---

[*Id.*]. The Ozers allege that Prins began forging court documents as early as April of 2011. [*Id.*]. In their adversary proceeding, the Ozers bring claims for common law fraud, breach of fiduciary duty, the Texas Theft Liability Act, conversion, Online Impersonation, and an objection and an exception to discharge under the Bankruptcy Code. [*Id.*].

127

Assessor was settled for $5,000.00, [TransWorld's Ex. HH, Prins Dep. 96:19–97:3], and that is why TransWorld would be receiving back from Prins the amount of $164,807.29, [Finding of Fact No. 50]. Having known Prins as a personal friend for several years, and also having trusted him as TransWorld's attorney for this same period of time, [Finding of Fact No. 2], this Court finds that Ms. Cash was reasonable to believe that Prins' representation was truthful.

Additionally, Ms. Cash has testified that she did not know about the Prins' Bankruptcy until after TransWorld received the $164,807.29. [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 163:3-21]. Even if Ms. Cash and/or TransWorld had learned about the Prins' Bankruptcy prior to receiving the $164,807.29 from Prins, the mere fact that Prins had personally filed for bankruptcy would not automatically put the Cashes and/or TransWorld on notice that any business dealings with Prins should be suspect. As TransWorld pointed out in its briefing, the vast majority of people who file for bankruptcy every year do so in good faith. [*See* Adv. Doc. No. 216, at 36 of 43]. Prins had worked as TransWorld's attorney for almost two decades, and Prins had a personal relationship with the Cashes, and they trusted him. [Finding of Fact No. 2]. Prins also had no history of professional misconduct that could put a client on notice—at least the Cashes—that Prins was not the upright attorney he presented as. [TransWorld's Ex. HH, Prins Dep. 12:1-18].

The Court is not persuaded by Elbar's argument that TransWorld lacked good faith because it continued to rely upon Prins as its attorney once the tax issues were brought to its attention in January 2014 and January 2016. [*See* Finding of Fact Nos. 5, 9–10]. While it may be true that a reasonable business would have conducted a more thorough investigation once tax issues that it believed were settled in 2008 were twice again brought up in 2014 and 2016, TransWorld's reliance on Prins—which perhaps could be characterized as naïve—was honest.

Only when the receiver of the money has actual knowledge that the money was stolen will the receiver of the money be found to be not in "good faith":  "[M]ere ground of suspicion of defect of title, or knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker, will not defeat title.  **Bad faith alone will defeat the right of the taker without knowledge**."  *See Merchants' Loan & Trust Co. v. Lamson*, 90 Ill. App. 18, 21 (Ill. App. Ct. 1899) (emphasis added) (finding that individuals who received stolen money were "not shown to have had knowledge of the theft by which the moneys in question were obtained.  At most it can only be said that there were grounds of suspicion, or that they were guilty of some degree of negligence.  No bad faith upon the part of appellees can be predicated upon these facts."); *see also Am. Surety Co. of N.Y. v. Bache*, 82 S.W.2d 181, 182–83 (Tex. Civ. App.—Fort Worth, 1935, writ ref'd); *Ohio Cas. Ins. Co.*, 297 F.2d at 266–67 (citing *Merchants' Loan & Trust Co.*, 90 Ill. App. at 19–21); *First Nat'l Bank of Birmingham, Ala. v. Gibert & Clay*, 49 So. 593, 596 (La. 1909).  Considering all of the circumstances described above, the Court finds that TransWorld received the $164,807.29 from Prins in good faith.

### c)  Good Conscience:  For Valuable Consideration

TransWorld contends that the $5,000.00 settlement the Cashes accepted with the Tax Assessor qualifies as valuable consideration.[105]  [Adv. Doc. No. 216 at 37–38 of 43].  TransWorld argues that even though it eventually discovered that there was no settlement with

---

[105] The Court notes that at various points in its briefs, TransWorld characterizes the "consideration" that was exchanged was in payment on behalf of the debt (1) Prins owed to TransWorld [Adv. Doc. 216, at 38 of 43; Adv. Doc. No. 225, at 8 of 23, ¶ 22]; (2) TransWorld owed the Tax Assessor [Adv. Doc. 216, at 37, 38 of 43]; and (3) as **both** settlement of the tax issue and "return of the funds Prins owed TransWorld."  [Adv. Doc. No. 216, at 32 of 43]. Prins, however, did not owe any debt to TransWorld; the only debt in play was the debt TransWorld owed to the Tax Assessor.  From TransWorld's point of view at the time, Prins was acting as a conduit for the monies TransWorld owed to the Tax Assessor; TransWorld never adduced any testimony that it believed that Prins, **personally**, owed TransWorld some type of debt.

the Tax Assessor, at the time Prins transferred the $164,807.29 to TransWorld on October 21, 2016, TransWorld believed that by accepting the $164,807.29 it was paying the Tax Assessor $5,000.00 as consideration for a settlement of its tax issues.[106]  [*Id.*].  TransWorld cites 11 U.S.C. § 548(d)(2)(A) and the Texas Business and Commerce Code § 24.004 in support of its argument. [*Id.*].    As an alternative argument, TransWorld argues that forbearance qualifies as consideration—i.e., TransWorld did not pursue claims against Prins because it believed that when Prins gave TransWorld the $164,807.29, Prins had paid back TransWorld the money owed. [*Id.* at 38 of 43].   Elbar argues that antecedent debt does not constitute present value or a valuable consideration for bona fide purchaser status, and that 11 U.S.C. § 548(d)(2)(A) and Chapter 24 of the Texas Business and Commerce Code do not apply to this action.  [Adv. Doc. No. 230 at 5–6 of 19, ¶ 14].[107]

Here, this Court finds that TransWorld did not provide valuable consideration for the $164,807.29 Prins gave TransWorld on October 21, 2016, which amount allegedly represented a $5,000.00 settlement with the Tax Assessor regarding TransWorld's tax issues.   Even if TransWorld is correct regarding the general proposition that satisfaction of an antecedent debt constitutes valuable consideration in Texas, in the dispute at bar, there was no antecedent debt that was satisfied when Prins gave TransWorld the $164,807.29 because there was no actual settlement between TransWorld and the Tax Assessor.   As such, no consideration passed between those two parties.   "Consideration is a present exchange bargained for in return for a

---

[106] In truth, Prins did not enter any kind of settlement with the Tax Assessor on behalf of TransWorld and/or the Cashes.  [Finding of Fact No. 50].  Prior to transferring the $164,807.29 to TransWorld on October 21, 2016—which was $5,000 less than the $169,807.29 TransWorld had given Prins on May 17, 2016, in order for Prins to negotiate the issues with the Tax Assessor, hence where the difference of $5,000.00 came from—Prins told the Cashes that he had settled with the Tax Assessor on TransWorld's behalf for $5,000.00.  Prins, however, did not, negotiate any $5,000.00 settlement with the Tax Assessor.  [Finding of Fact No. 50].  What he told TransWorld was simply a bald-faced lie.

[107] Elbar does not address TransWorld's forbearance argument, but this Court does *infra* at Section IV.E.1.b.i.1.c.

promise.  It consists of either a benefit to the promisor or a detriment to the promisee.  The detriment must induce the making of the promise, and the promise must induce the incurring of the detriment."  *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (internal citations omitted).  In order for the exchange of "valuable consideration" to occur, there must be two parties to the promise.  Here, the Tax Assessor was not a party to any alleged settlement with TransWorld in October of 2016.  [Finding of Fact No. 50].  Indeed, Prins testified that he lied to TransWorld about the settlement and that none actually existed.  [Finding of Fact No. 50].  There can be no consideration exchanged when only one of the parties to the alleged promise is aware of the promise.

TransWorld's argument that forbearance constitutes valuable consideration—i.e., TransWorld not pursuing any claims against Prins—also fails.  Again, this argument fails because there was no present bargained-for exchange between Prins and TransWorld specifically setting out that TransWorld would not pursue any potential claims against Prins as long as Prins paid back TransWorld all the money he owed to TransWorld.  In order for the exchange of consideration to occur, there must be two parties to the promise.  There is absolutely no evidence indicating that Prins and TransWorld exchanged consideration on this subject.  For example, there is no evidence that TransWorld signed a release of all claims it had—or might have— against Prins when he gave the $164,807.29 to TransWorld.

Thus, in determining whether Elbar has shown that TransWorld holds money which "in good conscience" belongs to Elbar, of the three considerations identified by the court in *GE Capital Commercial, Inc.*, one weighs in favor of TransWorld and the other two weigh in favor of Elbar.  Specifically, TransWorld received the $164,807.29 from Prins in good faith.  However, TransWorld did not receive the $164,807.29 from Prins in "due course of business," nor did

TransWorld give valuable consideration for the $164,807.29.  Under these circumstances, Elbar has satisfied the first element of its claim against TransWorld for money had and received.

The second element the Court must consider is whether the equities of the case "in view of the totality of the circumstances," *Murray*, 257 S.W.3d at 300, show that TransWorld holds money that belongs to Elbar.  When balancing these equities, a court may consider, but is not limited to, the following:  (1) any detrimental reliance suffered by the defendant;[108] (2) the plaintiff's unclean hands;[109] and (3) "what the parties knew and intended."[110]

### (2) *"Balancing the Equities" Considerations*

#### a) **Balancing the Equities:  Detrimental Reliance**

TransWorld argues that it materially changed its position in reliance on the payment, which it claims is a full defense to a claim for money had and received.  [Adv. Doc. No. 216 at 38 of 43].  TransWorld further argues that it "clearly" materially changed its position once it received the $164,807.29 from Prins by no longer pursuing Prins or the possible legal remedies that were available at the time (including filing a claim in the Prins' Bankruptcy or objecting to his discharge).  [*Id.* at 39 of 43].

Here, TransWorld did not meet its burden in demonstrating that it materially changed its position in reliance on the $164,807.29 it received.  *See First Am. Title, Ins. Co.*, 2015 WL 1220733, at *9, *12 (discussing what kind of showing a defendant must make in order to show detrimental reliance).  Ms. Cash did not testify that TransWorld changed positions or assumed

---

[108] *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 843 (5th Cir. 2004); *First Am. Title, Ins. Co. v. Brett C. Moody Invs., LLC*, No. H-14-0473, 2015 WL 1220733, at *12 (S.D. Tex. March 17, 2015); *Chesapeake Operating, Inc. v. Whitehead*, No. C-10-301, 2011 WL 3813174, at *8 (S.D. Tex. Aug. 26, 2011).

[109] *Bank of Saipan*, 380 F.3d at 840 n.1 (quoting *Tex. Bank & Trust Co. of Dallas v. Custom Leasing, Inc.*, 498 S.W.2d 243, (Tex. Civ. App.—Tyler 1973)); *Sirus Computer Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 838 (W.D. Tex. 2015).

[110] *Prosper Bank v. Comerica Bank, N.A. (In re Hwang)*, 452 B.R. 187, 194 (Bankr. N.D. Tex. 2011) (citing *Murray*, 257 S.W.3d at 300).

liabilities or obligations that TransWorld would not otherwise have done if it had not received the $164,807.29. *See Pickett v. Republic Nat'l Bank of Dallas*, 619 S.W.2d 399, 400 (Tex. 1981). While TransWorld argues in its briefs that it materially changed its position once it received the $164,807.29 by no longer pursuing Prins or other possible legal remedies against Prins that were available at the time, there was no testimony adduced or exhibits introduced that TransWorld was even considering legal action against Prins, let alone that TransWorld changed its position of "going after" Prins for the $164,807.29, after Prins returned the $164,807.29. At the time Prins returned the $164,807.29 to TransWorld on October 21, 2016, TransWorld was under the impression that it was getting back the $164,807.29 because Prins had negotiated a settlement with the Tax Assessor on TransWorld's behalf, [*see* Finding of Fact No. 50]; TransWorld had no idea at that point in time that the $164,807.29 Prins gave it could be traced to Elbar and that in fact no settlement with the Tax Assessor had taken place, [*see* Finding of Fact No. 50]. There is absolutely no evidence in the record to the effect that TransWorld had a strategy of pursuing legal remedies against Prins prior to the $164,807.29 being returned to TransWorld, and that the return of the $164,807.29 in fact caused TransWorld to materially change its position to not pursue any legal remedies against Prins.

Further, Ms. Cash testified that she did not discover until late February of 2017 when she was served with a lawsuit that Prins had not, in fact, resolved TransWorld's tax issues, [*see* Finding of Fact No. 92]. Thus, any impetus for TransWorld to pursue legal action against Prins related to the $164,807.29 (or other amounts related to taxes Prins supposedly paid on TransWorld's behalf but did not) arose in late February 2017—when Ms. Cash found out for the first time that the check in the amount of $230,853.66 that TransWorld made to the order of the IOLTA on February 4, 2008, (for the purpose of Prins settling TransWorld's tax dispute with the

Tax Assessor) may not have in fact been paid to the Tax Assessor, [Finding of Fact No. 92]. Since Prins gave TransWorld the $164,807.29 on October 21, 2016, and the earliest possible date that TransWorld states that it learned that Prins was not being honest in its dealings with TransWorld was late February of 2017, then TransWorld could not possibly have materially changed its position on reliance of the payment of $164,807.29 when the first indication that TransWorld received that Prins was not being honest with TransWorld regarding the tax issues occurred <u>after</u> October 21, 2016.   Thus, any detrimental reliance allegedly suffered by TransWorld does not come into play as the Court weighs the equities in regards to Elbar's claim of money had and received against TransWorld.

### b)  Balancing the Equities:  Unclean Hands

As discussed *supra* in Section IV.D.5 regarding equitable subrogation, in the Fifth Circuit, "[t]he alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct."  *Mitchell Bros. Film Grp.*, 604 F.2d at 863; *see also SA Bay LLC*, 849 F. Supp. 2d at 773.  Here, TransWorld is unable to show that it has been personally injured by Elbar's conduct.  Any injury suffered by TransWorld is due solely to Prins' conduct relating to his representation of TransWorld in its tax issues with the Tax Assessor.  Further, even though Elbar broke the law when it violated the automatic stay, TransWorld was not personally injured by this act.

Finally, even if this Court were to find that TransWorld was liable for at least some percentage of Elbar's claim for money had and received, the source of TransWorld's injury (i.e., having to pay Elbar all or some portion of the $164,807.29) is due to Prins' misconduct of stealing the $2.4 million, not any misconduct of Elbar.  Thus, the unclean hands doctrine does

not come into play as the Court weighs the equities in regards to Elbar's claim of money had and received against TransWorld.

### c) Balancing the Equities:  What the Parties Knew and Intended

"What the parties knew and intended are all relevant factors in balancing the equities . . . ."  *In re Hwang*, 452 B.R. at 194 (citing *Murray*, 257 S.W.3d at 300).  This factor weighs heavily in favor of TransWorld.

What Elbar "knew and intended" demonstrates that Elbar has little respect for the Bankruptcy Code and has acted solely in its perceived best interests.  Elbar violated the automatic stay on October 4, 2016, when it was the highest bidder at the foreclosure sale.  *See In re Jackson*, 392 B.R. at 671 (holding that "the foreclosure sale, conducted the day after the filing of the Bankruptcy Petition, constituted an act 'to obtain possession of property of the estate' in violation of § 362") (quoting 11 U.S.C. § 362(a)(3)); *Smith v. London*, 224 B.R. at 46 (finding that foreclosure sale was void because it violated the automatic stay and the fact that the mortgage company who conducted the foreclosure sale was not given notice of the debtor's bankruptcy filing was irrelevant in determining whether the stay was violated).  It does not matter that Elbar did not know that the Debtor had filed for bankruptcy at the time of the foreclosure sale; a technical stay violation occurred.

If this had been the only violation of the automatic stay, the Court would perhaps have more sympathy for Elbar.  However, two days later, on October 6, 2016, Elbar **willfully** violated the automatic stay when it wire transferred the $2.4 million into the IOLTA.  [*See* Finding of Fact No. 40]; *see also In re Benson*, 293 B.R. at 240 ("[P]ayment of the bid price must be regarded as an 'act to obtain possession of property of the estate.'"); *In re Allen*, 75 B.R. at 574 (finding that post-petition action taken by purchaser to perfect a pre-petition sale of debtor's real

135

property "was an attempt to affect and exercise control over the bankruptcy estate's interest in the [d]ebtor's real property, contrary to 11 U.S.C. § 362(a)(3)"); *In re Ford*, 296 B.R. at 543 (finding that postpetition foreclosure sale, where foreclosing creditor received notice of bankruptcy filing, violated the automatic stay of § 362(a)). In Bustamante's own words: "We paid the money knowing about the bankruptcy. It doesn't get more complicated than that." [TransWorld's Ex. II, Bustamante Dep. 228:17-20].

There is even more. Elbar willfully violated the automatic stay for a **second** time when it filed a lis pendens against the Property on January 3, 2017. [Finding of Fact No. 89]. As discussed more fully *supra* in Section IV.C, Elbar's two willful violations of the automatic stay—particularly when Elbar is a sophisticated purchaser who has been involved in hundreds of foreclosure sales where the debtor was in bankruptcy, [Finding of Fact Nos. 30–31, 33–34, 41]— lead this Court to find Elbar's stay violations egregious and in bad faith, and this finding works heavily against Elbar as the Court weighs the equities of what "the parties knew and intended." Elbar intended to preserve its ability to complete the purchase of the Property, [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 133:13–134:10], and Elbar's two willful stay violations show the extreme lengths Elbar was willing to go to meet that goal. Elbar is not an innocent party here;[111] it is a sophisticated entity who knowingly violated the automatic stay twice with the ultimate goal of reaping a huge profit.[112] TransWorld, on the other hand—without knowledge of Prins'

---

[111] The Court notes that there are prior published opinions involving Elbar and/or Bustamante holding that foreclosure sales in these particular cases were void because they were held in violation of the stay. *See In re Cueva*, 371 F.3d at 237–38; *Elbar Invs. Inc. v. Pierce* (*In re Pierce*), 91 F. App'x 927, 929–30 (5th Cir. 2004); *Bustamante v. Cueva* (*In re Cueva*), 200 F. App'x 334, 334 (5th Cir. 2006) ("Once again, Vincent Bustamante comes before this court demanding a return of money he lost in foreclosure speculation. And, once again, we must deny him."). Thus, not only is Elbar very sophisticated, but its business plan has already resulted in adverse rulings in prior litigation.

[112] As discussed in footnote 19, based on the proof of claim Elbar filed in the Debtor's Main Chapter 7 case setting forth that Elbar believed the Property was worth $3.5 million, the Purchasers stood to make a $1.1 million profit on their investment in the Property, or a 45.8% return on their investment.

dishonest dealings or knowledge of Elbar's existence—was genuinely trying to work out its tax issues with the Tax Assessor in a timely manner, as TransWorld wished to settle all outstanding tax issues before Mr. Cash passed away.  [Finding of Fact Nos. 5, 8, 10, 49].

Another fact that Elbar knew was that its chosen line of work—purchasing foreclosed properties in nonjudicial foreclosure sales, [Finding of Fact No. 30]—is a risky business.  The amount of risk Elbar is willing to undertake is measured against the profit it expects to make on any given foreclosed property.  Here, Elbar hoped to make a substantial profit in its purchase of the Property.  [Finding of Fact No. 34].  This Court can consider the type of work Elbar engages in when weighing the equities, and the fact that Elbar is engaged in a line of business that has inherent monetary risks that Elbar has freely chosen to take on and build into its business model works against Elbar when weighing the equities.  *See Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 840 n.10 (Tex. App.—Dallas 2008, pet. denied) (affirming trial court's judgment that plaintiff take nothing in a claim for money had and received when, in balancing the equities, the trial court found that "[t]he transaction between [the parties] was a high-risk transaction through which [the plaintiff] hoped to make a significant profit").

In regards to what TransWorld "knew and intended" when Prins transferred the $164,807.29 to TransWorld on October 21, 2016, TransWorld (i.e., the Cashes) honestly believed that it was getting back its own money—the original $169,807.29 TransWorld gave to Prins, minus $5,000.00, allegedly representing a settlement with the Tax Assessor.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 22:2-12; Pl.'s Ex. No. 46].  TransWorld did not have any knowledge or any reason to believe that the $164,807.29 Prins gave to TransWorld was related to Elbar, or anyone else for that matter.  [Pl.'s Ex. No. 46].  Further, at this point in time, October of 2016, in addition to trying to work out the issues related to TransWorld's tax delinquencies,

Ms. Cash was also heavily focused on Mr. Cash's health, as his cancer had recently taken a turn for the worst:

> Well, my husband had been very, very [ill] with cancer for almost six years. And in October we found out that not only was the cancer in his lungs and reactive but also in his brain and had gone to the bone. And so where he had not been in pain before, now he was in excruciating pain constantly.

[Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 11:17-22]. Given that Ms. Cash was devoting most, if not all, of her time to caring for and trying to comfort her dying husband, it is not surprising that she was not focused on Prins and his representation about TransWorld's tax issues.

Elbar argues that TransWorld had notice about Prins' poor financial condition and that this notice should have put TransWorld on alert to further investigate its own tax issues with the Tax Assessor because (1) Ms. Cash testified that she was curious as to why TransWorld's check to the Tax Assessor in 2008 for taxes due was made out to the IOLTA instead of directly to the Tax Assessor; (2) Ms. Cash testified that in January of 2016 she found out that TransWorld was listed in the local newspaper as one of the largest delinquent taxpayers in San Antonio; and (3) TransWorld was listed as a creditor in the Prins' Bankruptcy and, thus, had notice of all proceedings in the Prins' Bankruptcy. [Adv. Doc. No. 217 at 21–23 of 35, ¶¶ 47–50]. Citing no case law, Elbar further argues that after experiencing continued issues with TransWorld's taxes after Prins claimed they had been paid, TransWorld had a "duty of inquiry that could not be satisfied by simply continuing to rely solely on information obtained from Prins" and that TransWorld's continued reliance on Prins from 2008 to 2016 was not reasonable. [Adv. Doc. No. 230 at 15–16 of 19, ¶¶ 39–40]. Elbar further argues that after TransWorld learned about the Prins' Bankruptcy, TransWorld should have continually monitored the Prins' Bankruptcy and doing so would have led to notice of the contents of the Wasserteil Motion to Lift Stay and the

138

Ozer Adversary, in which allegations regarding wrongful conduct of Prins were brought forth. [*Id.* at 16–17 of 19, ¶ 41].

The Court agrees that TransWorld should have done more on its own to investigate its tax issues once it received notice in January 2014, [Finding of Fact No. 5] and January 2016, [Finding of Fact Nos. 5, 8], that it was delinquent in its tax payments, especially since TransWorld was under the impression that its tax issues had been resolved in February 2008, [*see* Finding of Fact No. 3]. Although it is true that not only was TransWorld relying on Prins— its attorney of more than 15 years—to remedy its tax issues but also that Prins was actively telling TransWorld that he was working on the tax issues and that there was some kind of internal mistake with the Tax Assessor regarding the taxes due, a more prudent business would have investigated the matter itself, especially after receiving notice on two occasions that the tax issues were not resolved. Even though a more shrewd business might have acted differently under these circumstances, this Court has already found Ms. Cash to be a very credible witness and believes that TransWorld was not acting in bad faith or duplicitously in regard to its tax issues. On the contrary, this Court believes that TransWorld was doing what it believed was best in order to resolve the tax issues, even though a more sophisticated business might have taken different steps.

Additionally, the fact that Ms. Cash testified that she twice called into question—once in 2008 and again in 2016—why TransWorld's check for tax payments needed to be made out to the IOLTA instead of directly to the Tax Assessor but did not further question Prins on the matter is also troubling to the Court. [*See* Finding of Fact Nos. 3, 8]. When writing a check in 2008 to cover TransWorld's tax issues, Prins told Ms. Cash that she needed to make the check payable to the IOLTA, and that he (i.e., Prins) would then write a check to Linebarger and

Linebarger would then apply the money to TransWorld's accounts for the county.  [Finding of Fact No. 3; Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 35:22-24].  Ms. Cash initially questioned why she could not make the check directly payable to Romo (the actual Tax Assessor for Bexar County at that time) or to Linebarger, instead of to the IOLTA, as it was "kind of, you know, a long chain of everybody,"  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 35:20–36:6], and Prins replied that this was the way things were done in order to avoid a tax payer writing a bad check, [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 36:6-8].  Ms. Cash then wrote the check to the order of the IOLTA instead of to the Tax Assessor directly because she believed that "that's the way things are done." [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 36:11-13].

In 2016, Ms. Cash again questioned why she needed to provide money directly to the IOLTA for TransWorld's tax issues.  In approximately April 2016, Prins told the Cashes that the Tax Assessor wanted TransWorld to deposit into his IOLTA a percentage of the monies it owed as "good faith" money in the amount of $169,807.29 while he and the Tax Assessor worked out the issues.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 19:21–20:1; TransWorld's Ex. HH, Prins Dep. 78:2-10, 78:19-25].  Ms. Cash questioned Prins as to why she needed to put the disputed money into the IOLTA, as she did not believe that TransWorld owed any taxes.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 20:2-3].  Prins told Ms. Cash that it was "just a formality" and that TransWorld would get the money back as soon as the matter was settled [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 20:3-5].  "Reluctantly"—her words—Ms. Cash wrote out the check that Prins had requested to the order of the IOLTA.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 20:5-11].

Although in hindsight it is easy to question why TransWorld (i.e., the Cashes) did not more fully question Prins' suspicious activity of requiring that the money for TransWorld's tax

140

issues be directly deposited into the IOLTA, Prins was, by all accounts, a crafty liar who was very skilled at hiding his thieving and skullduggery from his clients.[113]  Prins had been juggling funds for a number of years before his misdeeds came to light.  [TransWorld's Ex. HH, Prins Dep. 22:5-6, 22:21, 22:24–23:4, 227:19–228:12].   Further, not only was Prins verbally telling TransWorld lies about the status of the tax matter with the Tax Assessor, Prins also created at least one false letter from Linebarger (on that law firm's letterhead) stating that TransWorld owed delinquent taxes in the amount of $169,807.29.[114]  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 35:10-14; Pl.'s Ex. 46; TransWorld's Ex. A; TransWorld's Ex. HH, Prins Dep. 94:1–95:4, 114:3-13, 223:22–224:5].  Moreover—and this is no small point—Prins presented himself as an upstanding family man who represented sophisticated clients, [see Adv. Doc. No. 221, Feb. 6, 2018, Trial Tr. 92:25–93:4; TransWorld's Ex. HH, Prins Dep. 166:10-20]; even though some of his actions alerted some warning bells in Ms. Cash's head, she ultimately relied on her long-time attorney to best represent TransWorld's interest, [see Finding of Fact Nos. 2, 10].  It was not unreasonable for her to do so.  Indeed, the Cashes were personal friends of Prins and Ms. Prins [Finding of Fact No. 2], and this relationship no doubt engendered Ms. Cash's trust of Prins.  Moreover, as already noted, Mr. Cash was seriously ill with lethal cancer for several months, [Finding of Fact Nos. 4, 7], and both he and Ms. Cash were understandably focused on his physical and painful demise, as opposed to concentrating on Prins' actions and investigating

---

[113] In his own case (the Prins' Bankruptcy), the filings by the Ozers and Wasserteil Estate show that Prins was lying and cheating not just TransWorld, but also other clients.  [See Pl.'s Exs. 37–38].  Notably, in the complaint in the adversary proceeding filed by the Ozers, the Ozers allege that Prins had forged court orders and government documents as early as April of 2011.  [Pl.'s Ex. 38].

[114] Prins not only created false letters, but he also (1) forged false screenshots that he sent to MacKenzie in order to deceive MacKenzie about the amount of funds in the IOLTA; (2) created a false BBVA Compass Bank employee named "Levon Martin" and then pretended to be "Levon Martin" in a phone call with MacKenzie in order to convince MacKenzie that the IOLTA still held the Proceeds; and (3) created a false email from "Levon Martin" that followed up on the phone call with MacKenzie, again (falsely) confirming the amount of funds in the IOLTA. [Finding of Fact Nos. 66, 69, 71–72, 74–75].

them.  The Court also notes that Prins had no prior history of professional suspensions, reprimands, or grievances, so it was not as if the Cashes had any known basis to think that Prins was lying to them.  [TransWorld's Ex. HH, Prins Dep. 12:1-18].

The Court rejects Elbar's argument that by merely being listed as a creditor in the Prins' Bankruptcy, TransWorld had an affirmative duty to monitor the bankruptcy and thus would have discovered Prins' misdeeds through the filing of the Wasserteil Motion to Lift Stay and the Ozer Adversary.  Just because an entity is listed on a creditor matrix does not mean that the entity has an affirmative duty to monitor the bankruptcy docket.  Granted, if an entity is represented by counsel and the entity files pleadings in the bankruptcy, the entity's counsel might then have a duty to monitor the bankruptcy; here, however, TransWorld had no counsel representing it in the Prins' Bankruptcy, as they had no inclination to believe that they needed representation in the Prins' Bankruptcy.  Further, even though TransWorld was listed as a creditor in the Prins' Bankruptcy, there was no evidence that TransWorld received actual notice of the Wasserteil Motion to Lift Stay or the Ozer Adversary, which Elbar claims would have alerted TransWorld to Prins' misdeeds.  In fact, TransWorld is not listed on the certificate of service on the motion for relief from stay filed by the Wasserteil Estate, [*see Todd A. Prins and Paula R. Prins*, Case No. 16-52187-cag, Bankr. W.D. Tex., ECF. No. 14], nor was the complaint in the Ozer Adversary served on TransWorld, [*Ozer v. Prins*, Case No. 16-05090-cag, Bankr. W.D. Tex., ECF. No. 1], so it is not as if Ms. Cash (or some other TransWorld employee) had the opportunity to conveniently open the mail and read these pleadings about various dishonest acts of Prins.  Additionally, TransWorld received the $164,807.29 from Prins on October 21, 2016, [Finding of Fact No. 50], which was *before* the Wasserteil motion for relief from stay[115] and the

---

[115] The motion for relief from stay was filed on October 28, 2016.  [*See Todd A. Prins and Paula R. Prins*, Case No. 16-52187-cag, Bankr. W.D. Tex., ECF. No. 14].

Ozer Adversary[116] were even filed.[117]   Ms. Cash very credibily testified that the first time she received any notice that the check in the amount of $230,853.66 (that TransWorld had made to the order of the IOLTA on February 4, 2008, for the purpose of Prins settling TransWorld's tax dispute with the Tax Assessor) may not have in fact been paid to the Tax Assessor was when she was served with a lawsuit in February of 2017.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 23:20–24:1].   Thus, this Court finds her very credible when she asserts that she did not first become suspicious of Prins' dishonesty until February of 2017.

In sum, when weighing the equities, detrimental reliance and unclean hands do not factor into the Court's analysis of Elbar's claim for money had and received; however, what the parties knew and intended weigh in TransWorld's favor.  When weighing the equities, the Court is given much leeway and is permitted to give certain factors more weight than other factors.  *See Mid-Continent Office Distributs., L.P.*, 252 S.W.3d at 836 (stating that "a trial court exercises broad discretion in balancing the equities involved in a case seeking equitable relief"); *Dominguez v. Safety Nat'l Cas. Corp.*, No. H-09-1681, 2009 WL 10692958, at *6 n.5 (S.D. Tex. Oct. 8, 2009) (citing *Mid-Continent Office Distributs., L.P.* for the proposition that a trial court has broad discretion in balancing the equities).  Here, this Court gives most weight to the factor of what the parties knew and intended.  The Purchasers are sophisticated businessmen—two of them trained and seasoned attorneys with experience in bankruptcy law—who went into the foreclosure sale of the Debtor's Property hoping to make a large return on their investment. [Finding of Fact No. 30–32, 34, 41].  It is Elbar's entire business model to purchase distressed

---

[116] The Ozer Adversary was filed on November 4, 2016.  [*See Ozer v. Prins*, Case No. 16-05090-cag, Bankr. W.D. Tex., ECF. No. 1].

[117] If TransWorld had received the complaint in the Ozer Adversary and the Wasserteil motion to lift stay, then this Court would be more receptive to Elbar's argument.  However, there is no evidence that TransWorld did in fact receive notice of these filings.

properties at foreclosure sales in order to make a profit.  [Finding of Fact No. 30].  Yet, the Purchasers—including Elbar—**willfully violated the automatic stay twice** in pursuit of receiving the deed to the Property.  First, Bustamante did not hesitate to make the decision to wire transfer the $2.4 million after the Purchasers learned of the automatic stay because, according to Bustamante, the Purchasers would either receive the deed to the Property if the automatic stay was eventually annulled or they would get their money back if the automatic stay was not annulled.  [Finding of Fact No. 40; Adv. Doc. No. 220, Feb. 6, 2018, Trial. Tr. 96:25–97:4, 133:13-25, 135:2-6; TransWorld's Ex. II, Bustamante Dep. 190:6-17, 194:13-19].  Prins stealing the Proceeds was an unforeseeable consequence of wire transferring the Proceeds, but the Purchasers would not be in the position that they are if they had not violated the automatic stay in the first place by wire transferring the Proceeds.  Second, Elbar filed the lis pendens on the Property on January 3, 2017, i.e., approximately three months after Elbar became aware of the Debtor's bankruptcy.  [Finding of Fact Nos. 37, 89].  Elbar had no hesitation about taking this action despite its violation of the automatic stay because, as Bustamante testified, "[a]ll of our title suits involve Lis Pendens."  [TransWorld's Ex. II, Bustamante Dep. 236:6-10].  The Court finds this violation of the stay to be brazen and a huge strike against Elbar in this Court's weighing of the equities.

TransWorld, on the other hand, while its management (i.e., the Cashes) was perhaps naïve or unsophisticated in some of its business dealings, justifiably trusted its attorney and personal friend (Prins) and worked in good faith with Prins to resolve its tax issues.  As some courts have noted when considering claims for money had and received:  "[O]ther courts have held that as between two innocent parties, the party that must suffer the loss is the one that mistakenly created the situation and was in the best position to have avoided it."  *First Am. Title,*

*Ins. Co.*, 2015 WL 1220733, at *4.  Here, in the Court's view, Elbar and TransWorld are not equally innocent parties.  Both are innocent in the sense that both are victims of Prins' bad acts, but Elbar is less innocent than TransWorld because Elbar twice willfully violated the automatic stay—that is, Elbar blatantly violated the law.[118]  Because of this stark fact, Elbar must suffer the loss on its claim for money had and received because it *purposefully* created the situation—by wire transferring the Proceeds knowing that the stay was in effect—and it was in the best position to have avoided it.  Thus, when balancing all the equities, the Court concludes that Elbar cannot prevail on its claim for money had and received against TransWorld.

### ii.  <u>Industry Drive</u>

Elbar argues that it should prevail on its claim for money had and received against Industry Drive because (1) the $300,000.00 Prins gave to Industry Drive was not received in due course of Industry Drive's business; (2) the $300,000.00 Prins gave to Industry Drive was not received in good faith; and (3) Industry Drive did not pay valuable consideration for the $300,000.00 it received from Prins.  [Adv. Doc. No. 217 at 17–19 of 35, ¶ 41].  Elbar further argues that Industry Drive had notice of Prins' poor financial condition, and thus that Industry Drive "was on actual and inquiry notice that any money Industry [Drive] received from Prins did not belong to Prins."  [Adv. Doc. No. 217 at 19 of 35, ¶ 42].

Industry Drive argues that Elbar cannot show that Industry Drive lacked good faith in the acceptance of the $300,000.00 sent by Prins.  [Adv. Doc. No. 219 at 7–8 of 16].  Industry Drive also argues that, if the Court chooses to weigh the equities, there was no evidence adduced at trial that Industry Drive did anything wrong, whereas Elbar engaged in several questionable activities, including wiring the Proceeds when Elbar was aware that the automatic stay was in

---

[118] TransWorld's failure to pay taxes was not a blatant violation of the law; it had a legitimate dispute with the Tax Assessor and hired Prins to negotiate a settlement.  [Finding of Facts Nos. 2–3].

effect, filing a lis pendens against the Property with knowledge of the existence of the automatic stay, and only suing certain recipients of the funds traceable to the Proceeds.  [Adv. Doc. No. 219 at 8–11 of 16].

There is no question that the $300,000.00 Prins gave to Industry Drive on November 4, 2016, from the BBVA Operating Account is directly traceable to the Proceeds.  [*See* Finding of Fact Nos. 40, 57].  To be successful on its claim for money had and received, Elbar must show that the $300,000.00 Prins gave to Industry Drive, in equity and good conscience, belongs to Elbar.  *Plains Expl. & Prod. Co.*, 473 S.W.3d at 302 n.4.  The Court first considers the "good conscience" element.  When considering this element, "courts have concluded that, 'one who receives money which has been illegally obtained by a third party in due course of business, in good faith, and for valuable consideration, can keep it without liability to him from whom it was stolen.'"  *GE Capital Commercial, Inc.*, 2011 WL 124237, at *6 (quoting *Sinclair Houston Fed. Credit Union*, 268 S.W.2d at 295).  When determining whether Elbar has shown that Industry Drive holds money that in "good conscience" belongs to Elbar, this Court will examine (just as it has done with the claim against TransWorld) each of the three considerations identified by the court in *GE Capital Commercial, Inc.*—"due course of business," "in good faith," and "for valuable consideration."

### (1) *"Good Conscience" Considerations*

### a)  Good Conscience:  Due Course of Business

Elbar argues that there was no evidence that the $300,000.00 Prins gave to Industry Drive on November 4, 2016, was received in the due course of Industry Drive's business of managing real estate.  [*See* Adv. Doc. No. 217 at 17–19 of 35, ¶ 41; Adv. Doc. No. 228 at 11 of 19, ¶ 28].

Industry Drive argues that it is "any business's 'due course of business' to receive a refund of wrongfully-taken funds."[119]  [Adv. Doc. No. 226 at 4 of 12].

The Court finds that receiving a refund of wrongfully-taken funds is not in the due or ordinary course of Industry Drive's business.  Industry Drive is a privately-held entity that owns G5's corporate office.  [Finding of Fact No. 18].  Industry Drive collects money from the G5 property and maintains the property.  [Finding of Fact No. 18].  Transactions not directly related to a business's purpose are not conducted in "due course of business."  *Compare Shelby Eng'g Co., Inc.*, 707 N.E.2d at 1028 (finding that defendant Shelby Engineering was not selling a crane in the due course of business, but rather was "attempting to find a buyer for an item of equipment it no longer desired"), *with Ohio Cas. Ins. Co.*, 297 F.2d at 266–67 (finding that defendant who sold home goods merchandise door to door and who received payment from plaintiff for such certain home goods received the money from plaintiff in "the due course of her business dealings").  As Industry Drive did not receive the $300,000.00 from Prins as a result of Industry Drive's core business dealings—maintaining the G5 property—the $300,000.00 was not received in the "due course of business."

### b)  Good Conscience:  In Good Faith

Elbar asserts that TransWorld offered no evidence that TransWorld was acting in good faith when it received the $300,000.00 from Prins.  [Adv. Doc. No. 217 at 17–19 of 35, ¶ 41].  Moreover, Elbar argues that Industry Drive had notice about Prins' poor financial condition because Industry Drive had been made aware (1) that Prins had filed for Chapter 7 bankruptcy;

---

[119] The Court notes that Industry Drive makes this argument in the "conversion" section of its post-trial brief, [Adv. Doc. No. 226, at 4 of 12]; the Court, however, will consider it as part of Industry Drive's rebuttal to Elbar's claim for money had and received, since it is a defense to a claim for money had and received as well.

and (2) of the Ozer Adversary that accused Prins of wrongdoing.  [Adv. Doc. No. 217 at 19 of 35, ¶ 42].

For its part, Industry Drive argues that it received the $300,000.00 in good faith, and that there was no evidence at trial that Industry Drive knew of Elbar's existence or knew that the $300,000.00 it received was traceable to misappropriated funds.  [Adv. Doc. No. 219 at 12 of 16; Adv. Doc. No. 226 at 5 of 12].

The Court finds that Industry Drive received the $300,000.00 in good faith.  Industry Drive did not know anything about Elbar or even about Elbar's existence when Prins transferred the $300,000.00 to Industry Drive on November 4, 2016.  [Finding of Fact No. 57; Adv. Doc. No. 221, Feb. 7, 2018, Trial. Tr. 149:7-11, 149:21-23].  Thus, Industry Drive had no reason to believe that the $300,000.00 that Prins transferred into the Industry Drive account was not the "original" $300,000.00 that was withdrawn by Pfirrmann and placed into Prins' IOLTA.  From the moment Gabriel learned that Pfirrmann had taken $300,000.00 out of the Industry Drive account and given it to Prins to place in his IOLTA, she, as well as other members of the Gabriel Family, were singular in their efforts to have the money returned, including imploring Pfirrmann to return the money, [Finding of Fact No. 22; Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 123:23–124:7]; indeed, they even went so far as to file a lawsuit against Pfirrmann for return of the money, [Finding of Fact No. 23; Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 115:19-25].  In the year long period the $300,000.00 was missing from the Industry Drive account, Prins never indicated to Gabriel or to Pfirrmann that the money was no longer in his IOLTA.  [Finding of Fact No. 24; TransWorld's Ex. HH, Prins Dep. 33:7-12].  In fact, Pfirrmann assured Gabriel that Prins was holding the money and that it was safe.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 117:19-20].  When Prins eventually returned the $300,000.00 to Industry Drive in November of

148

2016, the Court finds that Industry Drive genuinely believed that it was getting back the $300,000.00 Pfirrmann had taken in October 2015 and placed into Prins' IOLTA.  [*See* Adv. Doc. No. 221, Feb. 7, 2018, Hrg. 146:16-20, 149:7-11, 149:21-23; *see* Finding of Fact No. 57].

Elbar asserts that prior to the $300,000.00 being returned to Industry Drive on November 4, 2017, Industry Drive had notice about the Prins' Bankruptcy and about the adversary proceeding filed by the Ozers in the Prins' Bankruptcy, which alleged that Prins committed fraud.  As discussed previously, the Court has already found that the Prins' Bankruptcy was not discussed at the meeting among Gabriel, the Gabriel Family, and Pfirrmann on October 4, 2016, [Finding of Fact No. 24].  Further, there was no evidence adduced at trial indicating that Gabriel, the Gabriel Family, or Industry Drive were aware of the Ozer adversary in the Prins' Bankruptcy.[120]  Thus, Elbar's argument that Industry Drive was on notice about Prins' poor financial condition fails.  Only when the receiver of the money has actual knowledge that the money was stolen will the receiver of the money be found not to be in "good faith":  "[M]ere ground of suspicion of defect of title, or knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker, will not defeat title.  **Bad faith alone will defeat the right of the taker without knowledge**."  *See Merchants' Loan & Trust Co.*, 90 Ill. App. at 21 (emphasis added) (finding that individuals who received stolen money were "not shown to have had knowledge of the theft by which the moneys in question were obtained.  At most it can only be said that there were grounds of suspicion, or that they were guilty of some degree of negligence.  No bad faith upon the part of appellees can

---

[120] Gabriel testified that she could not remember the name of the individual and/or entity that Prins had "issues" with.  [*See supra* footnote 34].  At his deposition, Prins testified that once Gabriel learned about the Ozer adversary, she no longer wanted Prins holding the $300,000.00.  [TransWorld's Ex. HH, Prins Dep. 29:7-12].  The Court does not give any weight to Prins' account, as Prins does not have personal knowledge of what Gabriel knew or did not know.  Further, the actual identity of the individual(s) or entity that Prins had an "issue" with and that Gabriel was sent information about does not matter, as Gabriel did not read the document that was sent to her; instead, she depended on the advice of the attorney at the Pulman Law Firm that she should be concerned about Prins, without reading the attached document.  [*See supra* footnote 34].

be predicated upon these facts."); *see also Am. Surety Co. of N.Y.*, 82 S.W.2d at 182–83; *Ohio Cas. Ins. Co.*, 297 F.2d at 266–67 (citing *Merchants' Loan & Trust Co.*, 90 Ill. App. at 19–21); *First Nat'l Bank of Birmingham, Ala.*, 49 So. at 596.   Considering all of the facts and circumstances described above, the Court finds that Industry Drive received the $300,000.00 from Prins in good faith.

### c)  Good Conscience:  For Valuable Consideration

Citing Texas Business and Commerce Code §§ 24.004 and 3.303, Industry Drive argues that the return of the $300,000.00 satisfied an antecedent debt, which constitutes valuable consideration.[121]  [Adv. Doc. No. 219 at 12 of 16].   In its briefs, however, Industry Drive does not identify exactly what antecedent debt the return of the $300,000.00 satisfied.  During closing argument, counsel for Industry Drive merely argued that "[t]he evidence did show that the return of the funds satisfied an antecedent debt because Mr. Pfirrmann had taken the $300,000 out and given it to Mr. Prins, who was allegedly holding it . . . ."  [Adv. Doc. No. 222, Feb. 8, 2018, Trial Tr. 173:1-4].  Elbar argues that antecedent debt does not constitute present value or a valuable consideration for bona fide purchaser status, and that 11 U.S.C. § 548 and Chapter 24 of the Texas Business and Commerce Code do not apply to this action.  [Adv. Doc. No. 228 at 9 of 19, ¶ 24].

Even if Industry Drive is correct regarding the general proposition that satisfaction of an antecedent debt constitutes valuable consideration under Texas law, here, there was no antecedent debt that was satisfied when Prins gave Industry Drive the $300,000.00 because (1) Pfirrmann did not owe a debt to Industry Drive; nor (2) did Prins owe a debt to Industry Drive.

---

[121] The Court again notes that Industry Drive makes this argument in the "conversion" section of its post-trial brief [*see* Adv. Doc. No. 219 at 13 of 16]; the Court, however, will consider it as part of Industry Drive's rebuttal to Elbar's claim for money had and received, since it is a defense to a claim for money had and received as well.

First, Industry Drive has not identified any debt that Pfirrmann owed to Industry Drive. At least one Texas court has defined "debt" as "a contract by which one party agrees to let another party have the use of a specific sum of money for a definite period with the stipulation that the borrower repay it with or without interest." *Trevino v. Trevino*, 555 S.W.2d 792, 802 (Tex. Civ. App.—Corpus Christi 1977, no writ); *see also Debt*, Black's Law Dictionary (10th ed. 2014) (defining "debt" as "[l]iability on a claim").[122]  Here, Pfirrmann and Industry Drive never entered into any type of agreement or contract for Pfirrmann to take the $300,000.00; he simply took it.  This unilateral and surreptitious taking by Pfirrmann is more akin to a theft done out of spite, than a debt which arises in a contracts context.  In fact, in Industry Drive's own pleadings in the Pfirrmann Lawsuit, Industry Drive brought claims for judicial dissolution under the Texas Business Organization Code, breach of fiduciary duty, conversion, and breach of partnership agreement.  [Finding of Fact No. 23].  None of these claims are based in contract, and conversion is akin to a theft claim.  Indeed, in response to the Court's question of why did Pfirrmann take the $300,000.00 and give it to Prins, Gabriel testified:

> Well, because my brother-in-law was used to controlling everything and I -- unfortunately when you want to sort of divorce someone, they don't take it very well when you say you don't want to be their partner anymore and, of course, this was all his in-laws and we were really his only family because he didn't really have one.  He's not from Texas.
>
> And so I just think emotionally it was more of a control issue for him and so he didn't want me to distribute it to the Partners.  He liked to do all the distributions and control everything.  And earlier on, we had a transaction where I actually did the distribution, not him and so he just wanted to control it.  And so he gave it to his attorney, which was Mr. Prins.

[Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 122:11-24].

---

[122] 11 U.S.C. § 101(12) contains the same definition of "debt" as in Black's Law Dictionary.

Second, there is absolutely nothing in the record indicating that Prins himself owed any kind of debt to Industry Drive.  The Court therefore rejects Industry Drive's argument that the return of the $300,000.00 was valuable consideration because it satisfied an antecedent debt.

Thus, in determining whether Elbar has shown that Industry Drive holds money which "in good conscience" belongs to Elbar, of the three considerations identified by the court in *GE Capital Commercial, Inc.*, one weighs in favor of Industry Drive and the other two weigh in favor of Elbar.  Specifically, Industry Drive received the $300,000.00 from Prins in good faith. However, Industry Drive did not receive the $300,000.00 from Prins in "due course of business," nor did Industry Drive give valuable consideration for the $300,000.00.  Under these circumstances, Elbar has satisfied the first element of its claim against Industry Drive for money had and received.

The second element the Court must consider is whether the equities of the case "in view of the totality of the circumstances," *Murray*, 257 S.W.3d at 300, show that Industry Drive holds money that belongs to Elbar.  As already discussed in this Court's evaluation of Elbar's money had and received claim against TransWorld, when balancing these equities, a court may consider, but is not limited to, the following:  (1) any detrimental reliance suffered by the defendant;[123] (2) a plaintiff's unclean hands;[124] and (3) "what the parties knew and intended."[125]

---

[123] *Bank of Saipan*, 380 F.3d at 843; *First Am. Title, Ins. Co.*, 2015 WL 1220733, at *12; *Chesapeake Operating, Inc.*, 2011 WL 3813174, at *8.

[124] *Bank of Saipan*, 380 F.3d at 840 n.1 (quoting *Tex. Bank & Trust Co. of Dallas v. Custom Leasing, Inc.*, 498 S.W.2d 243, (Tex. Civ. App.—Tyler 1973)); *Sirus Computer Sols., Inc.*, 138 F. Supp. 3d at 838.

[125] *In re Hwang*, 452 B.R. at 194 (citing *Murray*, 257 S.W.3d at 300).

*(2) "Balancing the Equities" Considerations*

### a)  Balancing the Equities:  Detrimental Reliance

Industry Drive asserts that it has "materially changed" its position in reliance on the $300,000.00 payment it received from Mr. Prins.  [Adv. Doc. No. 219 at 4–5 of 16].  At trial, in response to the question of whether it would be a hardship to Industry Drive if it had to return the $300,000.00, Gabriel simply replied:  "Yes, because then it'll be $300,000 plus whatever the litigation costs have been, so we will be more in the negative than how we even started out." [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 151:3-7].  Gabriel also testified that Industry Drive does not have much cash on hand.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 151:8-10]. Gabriel further testified that after receiving the $300,000.00 from Prins in November 2016, the $300,000.00 went back into Industry Drive's account and that Industry Drive paid its bills and other normal course of business expenses out of that account.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 133:24–134:5].  Industry Drive continued to do that until the other members of the Gabriel Family associated with Industry Drive bought out Pfirrmann and Eleanor's interests in the business in approximately September 2017.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 132:25–133:6, 136:6-8].  According to Gabriel, after Industry Drive "closed on the repurchase of Jim [**Pfirrmann**] and Eleanor's interests . . . their portion of everything was distributed out to them including their portion of the $300,000."  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 132:25–133:6].  Gabriel also testified that attorneys' fees were being paid out of the account that held the $300,000.[126]  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 133:8-11, 136:13–137:15].

---

[126] It is not clear whether the attorneys' fees that were being paid out of the Industry Drive account holding the $300,000.00 were related to the Pfirrmann Lawsuit, to the instant adversary proceeding, to legal work totally unrelated to either the Pfirrmann Lawsuit or the instant adversary proceeding, or some combination of the three. [*See* Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 133:8-11, 136:13–137:15].

Here, Industry Drive did not meet its burden in demonstrating that it materially changed its position in reliance on the $300,000.00 it received.  *See First Am. Title, Ins. Co.*, 2015 WL 1220733, at *9, *12.  Gabriel did not testify that Industry Drive changed positions or assumed liabilities or obligations that Industry Drive would not otherwise have assumed if it had not received the $300,000.00.  *See Pickett*, 619 S.W.2d at 400.  The agreement the Gabriel Family and Eleanor and Pfirrmann reached when mediating the Pfirrmann Lawsuit was not a liability or obligation Industry Drive assumed as a result of receiving the $300,000.00; Gabriel testified that since at least 2015, the Gabriel Family had wanted to end the business relationship between themselves and Pfirrmann.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 113:14–114:3].  Further, litigation costs cannot be the basis for a detrimental reliance defense.  *See News Am. Mktg. In-Store, LLC v. Emmel*, No. 1:07-CV-791-TCB, 2009 WL 10675288, at *9 (N.D. Ga. Mar. 13, 2009) ("The costs of litigation are not sufficient to constitute the damages necessary to support a promissory estoppel claim; if that were the law, detrimental reliance would be proven in every promissory estoppel case."), *vacated in part and remanded in part on other grounds*, 429 F. App'x 851 (11th Cir. 2011).  Thus, Gabriel's testimony that Industry Drive has spent $44,000.00 defending itself in this lawsuit, [*see* Finding of Fact No. 109], is of no moment.  Finally, Gabriel specifically testified that Industry Drive would pay normal business expenses out of the account that the $300,000.00 was deposited into on November 4, 2016; these normal business expenses are obviously not liabilities or obligations that Industry Drive assumed or incurred as a result of receiving the $300,000.00.  Thus, any detrimental reliance allegedly suffered by Industry Drive does not come into play as the Court weighs the equities in regards to Elbar's claim of money had and received against Industry Drive.

### b) Balancing the Equities:  Unclean Hands

As discussed *supra* in Section IV.D.5 regarding equitable subrogation, in the Fifth Circuit, "[t]he alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct." *Mitchell Bros. Film Grp.*, 604 F.2d at 863; *see also SA Bay LLC*, 849 F. Supp. 2d at 773.  Here, Industry Drive, like TransWorld, is unable to show that it has been personally injured by Elbar's conduct.  At this point in time, Industry Drive has suffered no injury; after receiving the $300,000.00 from Prins on November 4, 2016, Industry Drive used these funds in the ordinary course of its business to pay expenses and make distributions to partners.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 133:24–134:5].  Further, even if this Court were to find that Industry Drive was liable for at least some percentage of Elbar's claim for money had and received, the source of Industry Drive's injury (i.e., having to pay Elbar all or some portion of the $300,000.00) is due to Prins' misconduct of stealing the $2.4 million, not any misconduct of Elbar.  Thus, the unclean hands doctrine does not come into play as the Court weighs the equities in regards to Elbar's claim of money had and received against Industry Drive.

### c) Balancing the Equities:  What the Parties Knew and Intended

"What the parties knew and intended are all relevant factors in balancing the equities . . . ."  *In re Hwang*, 452 B.R. at 194 (citing *Murray*, 257 S.W.3d at 300).  This factor weighs heavily in favor of Industry Drive.

What Elbar "knew and intended" demonstrates that Elbar has little respect for the Bankruptcy Code and has acted solely in its perceived best interests.  Elbar violated the automatic stay on October 4, 2016, when it was the highest bidder at the foreclosure sale.  [Finding of Fact No. 29 – 35]; *see In re Jackson*, 392 B.R. at 671 (holding that "the foreclosure

sale, conducted the day after the filing of the Bankruptcy Petition, constituted an act 'to obtain possession of property of the estate' in violation of § 362") (quoting 11 U.S.C. § 362(a)(3)); *Smith v. London*, 224 B.R. at 46 (finding that foreclosure sale was void because it violated the automatic stay and the fact that the mortgage company who conducted the foreclosure sale was not given notice of the debtor's bankruptcy filing was irrelevant in determining whether the stay was violated).   It does not matter that Elbar did not know that the Debtor had filed for bankruptcy at the time of the foreclosure sale; a technical stay violation occurred.

If this had been the only violation of the automatic stay, the Court would perhaps have sympathy for Elbar.   However, two days later, on October 6, 2016, Elbar **willfully** violated the automatic stay when it wire transferred the $2.4 million into the IOLTA.   [Finding of Fact No. 37–41]; *see In re Benson*, 293 B.R. at 240 ("[P]ayment of the bid price must be regarded as an 'act to obtain possession of property of the estate.'"); *In re Allen*, 75 B.R. at 574 (finding that post-petition action taken by purchaser to perfect a pre-petition sale of debtor's real property "was an attempt to affect and exercise control over the bankruptcy estate's interest in the [d]ebtor's real property, contrary to 11 U.S.C. § 362(a)(3)"); *In re Ford*, 296 B.R. at 543 (finding that postpetition foreclosure sale, where foreclosing creditor received notice of bankruptcy filing, violated the automatic stay of § 362(a)).   In Bustamante's own words:   "We paid the money knowing about the bankruptcy.   It doesn't get more complicated than that."   [TransWorld's Ex. II, Bustamante Dep. 228:17-20]

There is even more.   Elbar knowingly violated the automatic stay for a **second** time when it filed a lis pendens against the Property on January 3, 2017, and Elbar took this action completely aware that the stay was in effect.   [Finding of Fact No. 89].   As discussed more fully *supra* in Section IV.C, Elbar's two willful violations of the automatic stay—especially when

Elbar is a sophisticated purchaser who has been involved in hundreds of foreclosure sales where the debtor was in bankruptcy—lead this Court to find Elbar's stay violations egregious and in bad faith, and this finding weighs heavily against Elbar as the Court weighs the equity of what "the parties knew and intended." Elbar intended to preserve its ability to complete the purchase of the Property, [Adv. Doc. No. 220, Feb. 6, 2018, Trial Tr. 133:13–134:10], and Elbar's two willful stay violations show the extreme lengths Elbar was willing to go to meet that goal. Elbar is not an innocent party here;[127] it is a sophisticated entity who knowingly violated the automatic stay twice with the ultimate goal of reaping a large profit.[128] Industry Drive, on the other hand— without knowledge of Prins' dishonest dealings or knowledge of Elbar's existence—was simply trying to recover money that was taken from its coffers by an in-law of the family (i.e., Pfirrmann), thus trying to balance delicate family relations with reaching a satisfactory business conclusion.

Another fact that Elbar knew was that its chosen line of work—purchasing foreclosed properties in nonjudicial foreclosure sales, [Finding of Fact No. 30]—is a risky business. The amount of risk Elbar is willing to undertake is measured against the profit it expects to make on any given foreclosed property. Here, Elbar hoped to make a substantial profit in its purchase of the Property. [Finding of Fact No. 34]. This Court can consider the type of work Elbar engages in when weighing the equities, and the fact that Elbar is engaged in a line of business that has inherent monetary risks that Elbar has freely chosen to take on and build into its business model

---

[127] The Court notes that there are prior published opinions involving Elbar and/or Bustamante holding that foreclosure sales in these particular cases were void because they were held in violation of the stay. *See In re Cueva*, 371 F.3d at 237–38; *In re Pierce*, 91 F. App'x at 929–30; *In re Cueva*, 200 F. App'x at 334 ("Once again, Vincent Bustamante comes before this court demanding a return of money he lost in foreclosure speculation. And, once again, we must deny him."). Thus, not only is Elbar very sophisticated, but its business plan has already resulted in adverse rulings in prior litigation.

[128] As discussed *supra* in footnote 19, based on the proof of claim Elbar filed in the Debtor's Main Chapter 7 Case which set forth that Elbar believed the Property was worth $3.5 million, the Purchasers stood to make a $1.1 million profit on their investment in the Property, or 45.8% return on their investment.

works against Elbar when weighing the equities. *See Mid-Continent Office Distributs., L.P.*, 252 S.W.3d at 840 n.10 (affirming trial court's judgment that plaintiff take nothing in a claim for money had and received when, in balancing the equities, the trial court found that "[t]he transaction between [the parties] was a high-risk transaction through which [the plaintiff] hoped to make a significant profit").

In regards to what Industry Drive "knew and intended," Industry Drive did not know anything about Elbar or even about Elbar's existence when Prins transferred the $300,000.00 back to Industry Drive on November 4, 2016, [Adv. Doc. No. 221, Feb. 7, 2018, Trial. Tr. 149:7-11, 149:21-23], and thus Industry Drive had no reason to believe that the $300,000.00 that Prins transferred into the Industry Drive account was not the "original" $300,000.00 that was withdrawn by Pfirrmann and placed into Prins' IOLTA.  From the moment Gabriel learned that Pfirrmann had taken $300,000.00 out of the Industry Drive account and given it to Prins to place in his IOLTA, she, as well as other members of the Gabriel Family, were singular in their efforts to have the money returned, including imploring Pfirrmann to return the money, [Finding of Fact No. 22; Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 123:23–124:7]; indeed, they even went so far as to file a lawsuit against Pfirrmann for return of the money, [Finding of Fact No. 23; Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 115:19-25; Pl.'s Ex. 47; Industry Drive's Ex. 1].  In the year long period the $300,000.00 was missing from the Industry Drive account, Prins never indicated to Gabriel or to Pfirrmann that the money was no longer in his IOLTA.  [Finding of Fact No. 24; TransWorld's Ex. HH, Prins Dep. 33:7-12].  In fact, Pfirrmann assured Gabriel that Prins was holding the money and that it was safe.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 117:19-20]. When Prins eventually returned the $300,000.00 to Industry Drive in November of 2016, Industry Drive believed that it was simply getting back the $300,000.00 that Pfirrmann had taken

158

in October 2015 and placed into Prins' IOLTA. [*See* Adv. Doc. No. 221, Feb. 7, 2018, Hrg.

146:16-20, 149:7-11, 149:21-23].

Additionally, Industry Drive did not have any business dealings, or any relationship at all,

with Prins.  [Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 115:10-18].  The only "connection"

Industry Drive had to Prins was that a co-managing partner of Industry Drive (i.e., Pfirrmann)

used Prins as his personal attorney.  [Finding of Fact Nos. 19–20].  Further, as soon as Gabriel

learned that there was an "issue" with Prins,[129] she immediately contacted Pfirrmann to get the

$300,000.00 from the IOLTA and return it to the Industry Drive account.  [Finding of Fact No.

22].  At trial, Gabriel aptly summed up Industry Drive's relation to Prins as follows:

> I'm just here trying to talk about my $300,000 and what role we had with Mr.
> Prins, which he was not our attorney.  I was not making an investment with him.
> I was not trying to give – make some kind of return.  I simply wanted to get out of
> real estate relationship with a brother-in-law who's still currently my brother-in-
> law and go down the road and not be in this court today.

[Adv. Doc. No. 221, Feb. 7, 2018, Trial Tr. 155:17-23].

Elbar argues that prior to the $300,000.00 being returned to Industry Drive on November

4, 2017, Industry Drive had notice about the Prins' Bankruptcy and about the adversary

proceeding filed by the Ozers in the Prins' Bankruptcy, which alleged that Prins committed

fraud.  As discussed above, this Court has already found that the Prins' Bankruptcy was not

discussed at the mediation among Gabriel, the Gabriel Family, and Pfirrmann on October 4,

2016.  [Finding of Fact No. 24].  Further, there was no evidence adduced at trial indicating that

Gabriel, the Gabriel Family, or Industry Drive was aware of the Ozer adversary proceeding in

---

[129] Prins' "issue" is discussed more in depth *supra* at footnote 34.

the Prins' Bankruptcy.[130]   Thus, Elbar's argument that Industry Drive was on notice about Prins'

poor financial condition fails.

Another factor the Court considers is that if Industry Drive is ordered to return the

$300,000.00 to Elbar, Industry Drive will have no recourse to try and recover its $300,000.00

from Prins.  Industry Drive was not listed as a creditor in the Prins' Bankruptcy or as a victim in

the Prins' Criminal Case because Industry Drive had suffered no loss at that point.  [Adv. Doc.

No. 221, Feb. 7, 2018, Trial Tr. 147:25–148:8, 149:24–150:12].  Elbar, on the other hand, in

addition to requesting relief from this Court, has had two other sources to look to for collecting

its $2.4 million:  the Prins' Criminal Case and the Prins' Bankruptcy.  And, in fact, Elbar has so

far been very successful in obtaining money from these two sources.  In the Prins' Bankruptcy,

Elbar has received $82,373.28, and in the Prins' Crinimal Case it has received $1,601,542.14.

[Finding of Fact Nos. 110, 113–114].

In sum, when weighing the equities, detrimental reliance and unclean hands do not factor

into the Court's analysis of Elbar's claim for money had and received; however, what the parties

knew and intended weigh in Industry Drive's favor.  When weighing the equities, the Court is

given much leeway and is permitted to give certain factors more weight than other factors.  *See*

*Mid-Continent Office Distribs., L.P.*, 252 S.W.3d at 836 (stating that "a trial court exercises

broad discretion in balancing the equities involved in a case seeking equitable relief");

*Dominguez*, 2009 WL 10692958, at *6 n.5 (citing *Mid-Continent Office Distribs., L.P.* for the

proposition that a trial court has broad discretion in balancing the equities).

---

[130] As previously discussed *supra* at footnote 34, Gabriel testified that she could not remember the name of the individual and/or entity that had Prins had "issues" with.  At his deposition, Prins testified that once Gabriel learned about the Ozer adversary, she no longer wanted Prins holding the $300,000.00.  [TransWorld's Ex. HH, Prins Dep. 29:7-12].  The Court does not give any weight to Prins' account, as Prins does not have personal knowledge of what Gabriel knew or did not know.  Further, the actual identity of the individual(s) or entity that Prins had an "issue" with and that Gabriel was sent information about does not matter, as Gabriel did not read the document that was sent to her; instead, she depended on the advice of the attorney at the Pulman Law Firm that she should be concerned about Prins, without reading the attached document.  [*See supra* footnote 34].

160

This Court gives most weight to the factor of what the parties knew and intended.  The Purchasers are sophisticated businessmen—two of them trained and seasoned attorneys with experience in bankruptcy law—who went into the foreclosure sale of the Debtor's Property hoping to make a large return on their investment.  [Finding of Fact Nos. 30–34, 41].  It is Elbar's entire business model to purchase distressed properties at foreclosure sales in order to make a profit.  [Finding of Fact No. 30].  Yet, the Purchasers—including Elbar—**willfully violated the automatic stay twice** in pursuit of receiving the deed to the Property.  Bustamante did not hesitate to make the decision to wire transfer the $2.4 million after the Purchasers learned of the automatic stay because, according to Bustamante, the Purchasers would either receive the deed to the Property if the automatic stay was eventually annulled or they would get their money back if the automatic stay was not annulled.  [Finding of Fact No. 40; Adv. Doc. No. 220, Feb. 6, 2018, Trial. Tr. 96:25–97:4, 133:13-25, 135:2-6; TransWorld's Ex. II, Bustamante Dep. 190:6-17, 194:13-19].  Prins stealing the Proceeds was an unforeseeable consequence of wire transferring the Proceeds, but the Purchasers would not be in the position that they are if they had not violated the automatic stay in the first place by wire transferring the Proceeds.  Industry Drive, on the other hand, had no business dealings with Prins; it was merely trying to recover the money a co-managing partner and brother-in-law unilaterally and surreptitiously took from Industry Drive's bank account.  [Finding of Fact Nos. 21–24].  As some courts have noted when considering claims for money had and received:  "[O]ther courts have held that as between two innocent parties, the party that must suffer the loss is the one that mistakenly created the situation and was in the best position to have avoided it."  *First Am. Title, Ins. Co.*, 2015 WL 1220733, at *4.

Here, in the Court's view, Elbar and Industry Drive are not equally innocent parties. Both are innocent in the sense that both are victims of Prins' bad acts, but Elbar is less innocent than Industry Drive because Elbar twice willfully violated the automatic stay. Because of this stark fact, Elbar must suffer the loss on its claim for money had and received because it *purposefully* created the situation—by wire transferring the Proceeds in violation of the stay—and it was in the best position to have avoided it. Thus, when balancing all the equities, the Court holds that Elbar does not prevail on its claim for money had and received against Industry Drive.

    2.  <u>Unjust Enrichment</u>

        *a.  Applicable Law*

Texas law is not completely clear on whether unjust enrichment is recognized as an independent cause of action or is merely recognized as a quasi-contractual theory of recovery. *See Perales v. Bank of Am., N.A.*, No. H-14-1791, 2014 WL 3907793, at *3 (S.D. Tex. Aug. 11, 2014) (noting uncertainty in Texas law). Even within the Southern District of Texas, which this Court believes it is bound to follow,[131] there is disagreement about whether unjust enrichment is an independent cause of action, a theory of recovery, or both. *Compare Banion v. Geovera Specialty Ins. Co.*, No. CV H-15-1595, 2016 WL 7242536, at *3 (S.D. Tex. Dec. 15, 2016) (J. Rosenthal) ("Texas courts recognize unjust enrichment as an independent cause of action), *and Nueces Cty., Tex. v. MERSCORP Holdings, Inc.*, No. 2:12-CV-00131, 2013 WL 3353948, at *19 (S.D. Tex. July 3, 2013) (J. Ramos) ("Unjust enrichment may be both an equitable right asserted as its own cause of action, or a theory of recovery."), *and Mora v. Koy*, No. CIV. A. H-12-3211, 2013 WL 2289887, at *5 (S.D. Tex. May 23, 2013) (J. Miller) ("Although unjust enrichment is usually characterized as a basis for quantum meruit recovery, it can be an independent cause of

---

[131] *See In re Ritz*, 459 B.R. at 634 n.8.

action."), *with GE Betz Inc. v. Moffitt-Johnson*, No. H-13-0459, 2014 WL 12596523, at *17

(S.D. Tex. June 6, 2014) (J. Gilmore) ("Unjust enrichment is not a distinct independent cause of

action, but a theory of recovery.") (citation omitted), *and Baisden v. I'm Ready Prods., Inc.*, No.

H-08-0451, 2008 WL 2118170, at *10 (S.D. Tex. May 16, 2008) (J. Lake) ("Unjust enrichment

is a not cause of action recognized by Texas law.").

> Other courts in the Southern District of Texas recognize that:

> Despite the lack of unanimity among Texas courts, one thing remains clear:  even
> in the cases [suggesting unjust enrichment is not an independent cause of action,]
> the courts have still allowed plaintiffs to recover based on the theory of unjust
> enrichment so long as a person has obtained a benefit from another by fraud,
> duress, or the taking of undue advantage.

*Yosemite Auto (Shanghai) Co., Ltd. v. JRS Metals, Inc.*, No. 4:15-CV-1641, 2016 WL 4441543,

at *7 n.7 (S.D. Tex. Aug. 23, 2016) (J. Harmon) (quoting *BP Expl. & Prod. V. Cashman Equip.*

*Corp.*, 132 F. Supp. 3d 876, 889–90 (S.D. Tex. 2015)); *see also Galvotec Alloys, Inc. v. Gaus*

*Anodes Int'l, LLC*, No. 7:13-CV-664, 2014 WL 6805458, at *10 (S.D. Tex. Dec. 2, 2014) (J.

Crane) (same); *First Am. Title, Ins. Co.*, 2015 WL 1220733, at *3 (J. Rosenthal) (same);

*Maxwell v. Neri N. Am.*, No. 4:13-CV-269, 2014 WL 2441200, at *5 n.3 (S.D. Tex. May 30,

2014) (J. Ellison) ("There is considerable confusion as to whether unjust enrichment can stand as

an independent cause of action under Texas law.  Despite the confusion, Texas courts seem

willing to award recovery based on unjust enrichment, even if it is nothing more than a theory.")

(citations and quotations omitted).

This Court agrees with those district courts in the Southern District of Texas that have

found that whether characterized as an independent cause of action or as a theory of recovery, a

plaintiff can nonetheless recover when "one person has obtained a benefit from another by fraud,

duress, or the taking of an undue advantage." *Heldenfels Bros. v. City of Corpus Christi*, 832

S.W.2d 39, 41 (Tex. 1992).[132]   Accordinly, this Court now addresses Elbar's claim that TransWorld and Industry Drive have been unjustly enriched by $164,807.29 and $300,000.00, respectively, and that they should be required to remit these sums to Elbar.

Turning to Texas law regarding unjust enrichment, "[u]njust enrichment is an implied-contract basis for requiring restitution when it would be unjust to retain benefits received." *Perales*, 2014 WL 3907793, at *3.  As described by District Judge Kathleen Cordone, Texas law recognizes two "forms" of unjust enrichment—"active" and "passive":

> One of the elements of an unjust enrichment claim is some underlying contact or nexus between the plaintiff seeking the recovery and the defendant from whom the recovery is sought.  [*Burlington N. R.R. v. Sw. Elec. Power*, 925 S.W.2d 92, 96–97 (Tex. Ct. App. 1996)].  Texas law also demands that, in some way, those dealings must have been inequitable, in favor of the defendant and at the expense of the plaintiff, for an unjust enrichment claim to hold.  *See Dudley Constr.* [*v. Dawson*], 258 S.W.3d [694,] 703 [(Tex. Ct. App. 2008)] (including "fraud, duress or taking of undue advantage"); *see also Burlington N. R.R.*, 925 S.W.2d at 98 n. 6 ("Appellee does not aver fraud, accident, mistake, duress or bad faith on the part of the appellant [therefore making unjust enrichment unavailable].").  This can be viewed as an "active" form of unjust enrichment.
>
> Texas law also reveals that unjust enrichment can touch "passively received" benefits, where the nexus is some related third party's acts against the plaintiff, when it would be "unconscionable for the receiving party to retain" them.  *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. Ct. App. 2002).  It is not available "merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall."  *Id.* at 679–80 (citing *Heldenfels Bros. v. Corpus Christi,* 832 S.W.2d 39, 40 (Tex. 1992)).  Rather, it requires a specific justification, such as unconscionability.  *Id.*

---

[132] As aptly noted by District Judge David C. Godbey in the Northern District of Texas:

> Given this varied authority [on whether unjust enrichment is an independent cause of action under Texas law], some Texas courts have read claims for "unjust enrichment" as pleading an equitable common law claim for money had and received.  Indeed, the two claims are extremely similar.  The Court thus refuses to dismiss [the party]'s unjust enrichment claim solely on the basis that some courts hold that it is not an independent cause of action.  Under this varied history, the Court here chooses to analyze [the party]'s claims under both the substantive unjust enrichment and money had and received standards.

*David O. Kemp, P.C. v. Nationwide Agribusiness Ins. Co.*, No 3:11-cv-1745-N, 2012 WL 13019688, at *2 (N.D. Tex. June 12, 2012) (internal citations omitted).

164

*Cty. of El Paso, Tex. v. Jones*, No. EP-09-00119-KC, 2009 WL 4730343, at *12 (W.D. Tex. Dec. 4, 2009); *see also Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 462 (5th Cir. 2017) ("Unjust enrichment occurs when a person has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain.  A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.") (quotations omitted); *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 667 (S.D. Tex. 2016) ("Unjust enrichment occurs when the 'person sought to be charged [has] wrongfully secured a benefit or [has] passively received one which it would [be] unconscionable to retain.'") (quoting *City of Corpus Christi v. S.S. Smith & Sons Masonry, Inc.*, 736 S.W.2d 247, 250 (Tex. App.—Corpus Christi 1987, writ denied)).

Further, "[t]o recover under an unjust enrichment theory, the benefits to the other party must be actually unjust under the principles of equity."  *Smith v. Jimenez (In re IFS Fin. Corp.)*, No. 02-39553, 2007 WL  4244115, at *7 (Bankr. S.D. Tex. Nov. 30, 2007) (quoting *Argyle Indep. Sch. Dist. v. Wolf*, 234 S.W.3d 229, 247 (Tex. App.—Fort Worth 2007, no pet.)).  "The decision whether to grant relief for unjust enrichment depends on the particular facts and equities of the case, and on what constitutes good public policy."  *Helm*, 1995 WL 319014, at *6 (citing *San Benito Bank & Trust Co. v. Rio Grande Music Co.*, 686 S.W.2d 635, 639 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.)).

### b.  Application of the Law of Unjust Enrichment to the Facts at Bar

Elbar argues that both TransWorld and Industry Drive were unjustly enriched because they obtained a benefit by the taking of an undue advantage.[133]  [*See* Adv. Doc. No. 222, Feb. 8,

---

[133] Elbar admits that it cannot show that TransWorld or Industry Drive received a benefit through any fraud or duress on their part.  [*See* Adv. Doc. No. 222, Feb. 8, 2018, Trial Tr. 147:7-15; Adv. Doc. No. 228 at 6 of 19, ¶ 13;

2018, Trial Tr. 147:7-15; Adv. Doc. No. 228 at 6–9 of 19, ¶¶ 13–23; Adv. Doc. No. 230 at 3 of 19, ¶ 6].  Stated differently, even though it does not use the term "active form," Elbar essentially asserts that TransWorld and Industry Drive fit within the "active form" of unjust enrichment. Elbar does not address the "passive" form of unjust enrichment—that is, when a defendant passively receives a benefit which would be unconscionable to retain.  Even though Elbar did not argue for this type of unjust enrichment, the Court will examine both types of unjust enrichment—as they apply to both TransWorld and Industry Drive—below.

### i.   <u>TransWorld</u>

Elbar argues that TransWorld has obtained a benefit by the taking of an undue advantage by obtaining possession of, and continuing to retain possession of, the $164,807.20.  [Adv. Doc. No. 230 at 3–4 of 19, ¶ 6].  TransWorld argues that (1) unjust enrichment is not a separate cause of action and therefore Elbar's claim should be dismissed;[134] or, alternatively, (2) there is no evidence that TransWorld committed fraud, duress, or took undue advantage of Elbar.  [Adv. Doc. No. 216 at 12 of 43].

To succeed on a claim for "active" unjust enrichment, there must be a "nexus of exchange between the parties":

> Unjust enrichment includes both a material gain by the defendant and a material loss by the plaintiff.  Moreover, the loss and gain do not come together by random chance.  They are two sides of the same coin—that coin being a transfer of wealth from plaintiff to defendant.  There is a nexus of exchange between the parties.

*Davis v. Wells Fargo Bank, N.A.*, No. 6:11-CV-00047, 2014 WL 585403, at *3 (S.D. Tex. Feb. 14, 2014) (quoting Lionel Smith, *Restitution: The Heart of Corrective Justice*, 79 Tex. L. Rev.

---

Adv. Doc. No. 230 at 3 of 19, ¶ 6].  Hence, Elbar restricts its argument that they obtained a benefit by the taking of an undue advantage.

[134] As already discussed above, the Court rejects TransWorld's first argument and will substantively analyze Elbar's claim for unjust enrichment.

2115, 2141 (2001)); *see also Banion*, 2016 WL 7242536, at *3 ("Unjust enrichment includes a transfer to the defendant by the plaintiff, resulting in a material gain to the defendant and material loss by the plaintiff."); *Mitsuba Tex., Inc. v. Brownsville Indep. Sch. Dist.*, No. 05-97-01271-CV, 2000 WL 122348, at *4 (Tex. App.—Dallas Feb. 2, 2000, no pet.) ("To sustain an action for unjust enrichment, there must be some basis for the court to infer a promise on the part of the defendant to the plaintiff to pay for the benefit . . . ."); *Cty. of El Paso, Tex.*, 2009 WL 4730343, at *12 ("One of the elements of an unjust enrichment claim is some underlying contact or nexus between the plaintiff seeking the recovery and the defendant from whom the recovery is sought.").

Here, there is no nexus between Elbar and TransWorld sufficient enough to sustain a claim for "active" unjust enrichment.  Elbar's loss (the Proceeds being stolen by Prins) and TransWorld's gain (Prins giving TransWorld $164,807.29 after TransWorld gave Prins $169,807.29 to hold as good faith money) came together by random chance:  but for Prins stealing the Proceeds, Prins could not have used the money Elbar wire transferred to the IOLTA to remit the $164,807.29 to TransWorld.  [*See* Finding of Fact No. 50]. There was no money transferred directly from Elbar to TransWorld; further, TransWorld did not make any promises to Elbar to pay for any type of benefit.  Thus, there are no circumstances here for "active" unjust enrichment to apply.

Elbar has also failed to show that "passive" unjust enrichment occurred.  To be successful on a theory of "passive" unjust enrichment, Elbar would need to show that it would be unconscionable for TransWorld to retain the money ($164,807.29) given to it by Prins when the $164,807.29 can be traced to the Proceeds that Prins pilfered.  Elbar has not met this standard.[135]

---

[135] The Court notes that most of the Texas courts and federal courts applying Texas law that analyze the term "unconscionable" do so either under the Texas Deceptive Trade Practices Consumer Protection Act (of which

TransWorld and Elbar have both been harmed by Prins' actions and both have lost money due to Prins' actions.[136]  However, as discussed at length previously, Elbar is the ultimate source of its own misfortune:  Elbar broke the law when it willfully violated the automatic stay and wire transferred $2.4 million to the IOLTA.  [*See* Finding of Fact Nos. 37–41].   That the $164,807.29 Prins gave to TransWorld—which, again, TransWorld believed was Prins returning TransWorld's own money to it, minus $5,000.00 for settlement with the Tax Assessor—is traceable to the Proceeds does not in any way equate to TransWorld breaking the law; at worst, it amounts to a windfall to TransWorld.  *See Cty. of El Paso, Tex.*, 2009 WL 4730343, at *12 ("[Unjust enrichment] [i]s not available merely because . . . the benefits to the person sought to be charged amount to a windfall.") (citation omitted).  Moreover, it is difficult to understand how a party receives a windfall which would be unconscionable to retain when that party genuinely believed it was receiving back its own funds, as TransWorld genuinely believed it was.  *See, e.g.*,

---

"unconscionable" is statutorily defined) or as to whether the terms of a particular contract are unconscionable as that term has been discussed in case law.  Although the court in *Wernecke v. W-Bar Ranches, Ltd.*, was discussing the term "unconscionable" as it relates to contracts, this Court finds the *Wernecke* court's comments helpful in its analysis in the suit at bar:

> "Unconscionable" is generally defined as "shockingly unfair or unjust."  MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1286 (10th ed. 1996).  However, Texas courts have held that the term carries no precise legal definition.  *Besteman v. Pitcock*, 272 S.W.3d 777, 787 (Tex. App.—Texarkana 2008, no pet.); *Arthur's Garage, Inc. v. Racal–Chubb Sec. Sys.*, 997 S.W.2d 803, 815 (Tex. App.—Dallas 1999, no pet.).  "Unconscionability is to be determined in light of a variety of factors, which aim to prevent oppression and unfair surprise . . . ." *In re Poly–America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008) (orig. proceeding).

No. 13-12-00782-CV, 2013 WL 5522673, at *4 (Tex. App.—Corpus Christi-Edinburg Oct. 3, 2013, no pet.).

[136] It must be remembered that TransWorld has been harmed, at a minimum, in the amount of $5,000.00, which is the difference between the $169,708.29 it gave to Prins and the $164,807.29 he returned to TransWorld.  There is no question that Prins told TransWorld that the $5,000.00 difference represented the amount he paid to the Tax Assessor to settle the tax issues that TransWorld had.  However, this Court has already found that there was no such settlement and that Prins' representation to TransWorld was a bald-faced lie.  [Finding of Fact No. 50].  Therefore, he unquestionably harmed TransWorld by $5,000.00.  Moreover, it is quite likely that TransWorld has suffered substantially more than $5,000.00 because it is presently in a dispute with the same Tax Assessor, who alleges that TransWorld owes past due taxes totaling half a million dollars.  It worth emphasizing that TransWorld not only gave Prins $169,807.29 in May of 2016, but also $230,853.66 in February of 2008, and Prins never accounted for this latter sum—leading this Court to believe that Prins stole all or some of the $230,853.66 and therefore further damaged TransWorld in that its tax liability increased substantially as penalties and interest accrued.

*Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900–01 (Tex. App.—Dallas 2006, no pet.) (affirming trial court's conclusion that defendants were not unjustly enriched when they believed the money they received from a third-party fraudster was a return on legitimate businesses investments and plaintiff and defendants both lost money due to business dealings with third-party fraudster); *Cote v. Texcan Ventures II*, 271 S.W.3d 450, 453–54 (Tex. App.—Dallas 2008, no pet.) (affirming trial court's conclusion that defendants were not unjustly enriched when they believed the money they received from a third-party fraudster—which in reality was traceable to plaintiffs' money—was a return on legitimate businesses investments and both defendants and plaintiffs were monetarily damaged due to business deals with fraudster).

Further, this Court keeps in mind that "[t]he decision whether to grant relief for unjust enrichment depends on the particular facts and equities of the case, and on what constitutes good public policy." *Helm*, 1995 WL 319014, at *6 (citing *San Benito Bank & Trust Co. v. Rio Grande Music Co.*, 686 S.W.2d 635, 639 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.)). The particular facts and equities of this adversary proceeding have been discussed at length, *see supra* Section IV.E.1.b.i discussing balancing the equities, and this Court finds that equity favors, *in this particular instance*, TransWorld keeping the $164,807.29. The Court's consideration of what constitutes good public policy also favors Elbar being unable to recover on its claim for unjust enrichment against TransWorld. Public policy is best served when individuals and entities abide by the law; individuals and entities—such as Elbar—who willfully violate the law should not be able to recover from innocent parties. Elbar and the Purchasers are sophisticated and Elbar's continued snubbing of the automatic stay must stop. [*See* Finding of Fact Nos. 30–34, 41]. Indeed, the Fifth Circuit has already ruled against them not once, but twice, where they were involved in purchasing properties at foreclosure sales held in violation of

the stay.  *See In re Pierce*, 91 F. App'x at 929–30; *In re Cueva*, 371 F.3d at 239.  Here, the facts are even worse than in *In re Pierce* and *In re Cueva* because there is no question that Elbar was aware of the existence of the Debtor's bankruptcy and her claim to the Property when it wired the Proceeds to Prins and filed the lis pendens.  Thus, this Court finds that Elbar cannot prevail on a claim of unjust enrichment against TransWorld.

## ii.   __Industry Drive__

Elbar asserts that Industry Drive "obtaining and retaining possession" of the $300,000.00 when Industry Drive had notice that there were "problems with Prins" before obtaining possession of the $300,000.00 amounts to the taking of an undue advantage.  [Adv. Doc. No. 228 at 6–9 of 19, ¶¶ 13–23].  Industry Drive argues that Elbar presented no evidence that Industry Drive obtained a benefit from Elbar by fraud, duress, or by the taking of an undue advantage. [Adv. Doc. No. 219 at 6 of 16].

Just like its unsuccessful claim for unjust enrichment against TransWorld, there is also no nexus between Elbar and Industry Drive sufficient enough to sustain a claim for "active" unjust enrichment against Industry Drive.  Elbar's loss (the Proceeds being stolen by Prins) and Industry World's gain (Prins giving Industry Drive $300,000.00 after Pfirrmann took $300,000.00 from the Industry Drive account) came together by random chance:  but for Prins stealing the Proceeds, Prins could not have used the money Elbar wire transferred to the IOLTA to return to Industry Drive.  There was no money transferred directly from Elbar to Industry Drive; further, Industry Drive did not make any promises to Elbar to pay for any type of benefit. Thus, there are no circumstances here for "active" unjust enrichment to apply.

Elbar has also failed to show that "passive" unjust enrichment occurred.  To be successful on a theory of "passive" unjust enrichment, Elbar would need to show that it would be

unconscionable for Industry Drive to retain the money ($300,000.00) given to it by Prins when

the $300,000.00 can be traced to the Proceeds that Prins pilfered.  Elbar has not met this

standard.  There is no question that Elbar has been harmed by Prins' actions due to his theft of

the Proceeds; whereas, Industry Drive (unlike Elbar and TransWorld) has not been harmed by

Prins' actions in that it has recovered all of the $300,000.00 that Pfirrmann initially withdrew

from Industry Drive's account and gave to Prins.  All that can be said of Industry Drive is that it

has had to pay $44,000.00 in attorneys' fees to defend itself in this suit, [Finding of Fact No.

109], although such expenditures do not constitute harm as a matter of law.  *See News Am. Mktg.*

*In-Store, LLC*, 2009 WL 10675288, at *9 ("The costs of litigation are not sufficient to constitute

the damages necessary to support a promissory estoppel claim; if that were the law, detrimental

reliance would be proven in every promissory estoppel case."), *vacated in part and remanded in*

*part on other grounds*, 429 F. App'x 851 (11th Cir. 2011).

      However, as discussed at length previously, Elbar is the ultimate source of its own

misfortune:  Elbar broke the law when it willfully violated the automatic stay and wire

transferred $2.4 million to the IOLTA.  [Finding of Fact Nos. 37–41].  That the $300,000.00

Prins gave to Industry Drive (which, again, Industry Drive believed was Prins returning Industry

Drive's own money, which had previously been taken from Industry Drive's bank account

without permission by Pfirrmann) is traceable to the Proceeds does not in any way equate to

Industry Drive breaking the law—at worst, it amounts to a windfall to Industry Drive.  *See Cty.*

*of El Paso, Tex.*, 2009 WL 4730343, at *12 ("[Unjust enrichment] [i]s not available merely

because . . . the benefits to the person sought to be charged amount to a windfall.") (citation

omitted).  Moreover, it is difficult to understand how a party receives a windfall which would be

unconscionable to retain when that party genuinely believed it was receiving back its own funds,

as Industry Drive believed it was. *See, e.g.*, *Walker*, 181 S.W.3d at 900–01 (affirming trial court's findings that defendants were not unjustly enriched when they believed the money they received from a third-party fraudster was a return on legitimate businesses investments and plaintiff and defendants both lost money due to business dealings with third-party fraudster); *Cote*, 271 S.W.3d at 453–54 (affirming trial court's findings that defendants were not unjustly enriched when they believed the money they received from a third-party fraudster—which in reality was traceable to plaintiffs' money—was a return on legitimate businesses investments and both defendants and plaintiffs were monetarily damaged due to business deals with fraudster).

Further, this Court keeps in mind that "[t]he decision whether to grant relief for unjust enrichment depends on the particular facts and equities of the case, and on what constitutes good public policy." *Helm*, 1995 WL 319014, at *6 (citing *San Benito Bank & Trust Co. v. Rio Grande Music Co.*, 686 S.W.2d 635, 639 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.)). The particular facts and equities of this suit have been discussed at length, *see supra* Section IV.E.1.b.ii discussing balancing the equities, and this Court finds that equity favors, *in this particular instance*, Industry Drive keeping the $300,000.00. The Court's consideration of what constitutes good public policy also favors Elbar being unable to recover on its claim for unjust enrichment against Industry Drive. Public policy is best served when individuals and entities abide by the law; individuals and entities—such as Elbar—who willfully violate the law should not be able to recover from innocent parties. The Court emphasizes that not only did Elbar willfully violate the stay when it wire transferred $2.4 million to the IOLTA, but it also willfully violated the automatic stay when it filed the lis pendens on the Property. [Finding of Fact Nos. 40, 89]. Elbar and the Purchasers are sophisticated and Elbar's continued snubbing of the automatic stay must stop. [*See* Finding of Fact Nos. 30–34, 41]. Indeed, the Fifth Circuit has

already ruled against them not once, but twice, where they were involved purchasing properties at foreclosure sales held in violation of the stay. *See In re Pierce*, 91 F. App'x at 929–30; *In re Cueva*, 371 F.3d at 239. Here, the facts are even worse than in *In re Pierce* and *In re Cueva* because there is no question that Elbar was aware of the existence of the Debtor's bankruptcy and her claim to the Property when it wired the Proceeds to Prins and filed the lis pendens. Thus, this Court finds that Elbar cannot prevail on a claim of unjust enrichment against Industry Drive.

### 3. Conversion

#### a. Applicable Law

"Under Texas law, conversion is the wrongful exercise of dominion and control over another's property in violation of the property owner's rights." *ITT Commercial Fin. Corp. v. Bank of the W.*, 166 F.3d 295, 305 (5th Cir. 1999); *see also Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997) ("Conversion is defined as the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights.").

When the plaintiff alleges that the specific chattel converted was money, as is the case here, then the plaintiff must show "the money (1) was delivered **to the defendant** for safekeeping, (2) was intended to be kept segregated, (3) was substantially in the form in which it was received or intact, and (4) was not the subject of a title claim by the defendant." *Club Escapade 2000, Inc. v. Ticketmaster, L.L.C.*, No. EP-11-CV-166-KC, 2012 WL 1078012, at *6 (W.D. Tex. Mar. 30, 2012) (emphasis added); *see also Engenium Sols., Inc. v. Symphonic Techs., Inc.*, 924 F. Supp. 2d 757, 797 (S.D. Tex. 2013) (citation omitted); *Edge Petroleum Operating Co., Inc. v. GPR Holdings, L.L.C. (In re TXNB Internal Case)*, 483 F.3d 292, 308 (5th Cir.

2007).  Further, to be successful on a conversion of money claim under Texas law, a plaintiff

must be able to trace the exact funds claimed to be converted:

> Despite recognizing the existence of a claim for the conversion of money, Texas courts have cautioned that because the title to money passes with delivery by its nature, a cause of action for conversion fails when the plaintiff cannot trace the exact funds claimed to be converted, making it impossible to identify the specific monies in dispute.  In other words, money can be the subject of a conversion claim only if it can be identified as a specific chattel.[137]  Moreover, when an indebtedness can be discharged by the payment of money, a conversion action is inappropriate.

*Ellis*, 2014 WL 12596473, at \*5 (internal citations and quotations omitted) (footnote added); *see*

*also United States v. Boardwalk Motor Sports, Ltd.*, 692 F.3d 378, 381 (5th Cir. 2012) ("An

action will lie for conversion of money when its identification is possible and there is an

obligation to deliver the specific money in question or otherwise particularly treat specific

money." (quoting *Hous. Nat'l Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. App.—Houston [14th

Dist.] 1981, writ ref'd n.r.e.)).

### b.  Application of the Law of Conversion to the Facts at Bar

Here, Elbar fails to prove its conversion of money claim as to both TransWorld and

Industry Drive.  Elbar has failed to show the first element in a claim for conversion of money—

that is, Elbar had to prove that money was delivered to the defendant for safekeeping.  Here,

Elbar did <u>not</u> deliver <u>any</u> money to TransWorld or Industry Drive for safekeeping; to the

contrary, Elbar delivered the $2.4 million to Prins for safekeeping.  Alas, Elbar did not bring a

conversion of money claim against Prins—even though Elbar brought a number of other claims

against him—and thus Elbar's conversion of money claim fails.  Further, even if the first element

of the conversion of money claim could be construed as the portion of the Purchasers' money

that Prins delivered to TransWorld and Industry Drive, this too would fail as Prins did not deliver

---

[137] Examples of specific chattel would include certain coins or a certificate of deposit.  *Jaffer v. Aviel*, No. 3:13-CV-1674-G, 2014 WL 301041, at \*6 (N.D. Tex. Jan. 28, 2014).

the $164,807.29 and $300,000.00 to TransWorld and Industry Drive, respectively, for any kind of "safekeeping"; the opposite, in fact, occurred: Prins gave those respective sums to TransWorld and Industry Drive as a "return" of those parties' own money, which TransWorld and Industry Drive could then dispose of as they saw fit. [*See* Finding of Fact Nos. 50, 57]. Thus, because no money was delivered to TransWorld or Industry Drive for safekeeping, Elbar's claim for conversion of money must fail. *See Cannon v. Cannon*, No. SA-13-CA-710-HJB, 2014 WL 12488581, at *6–7 (W.D. Tex. Aug. 5, 2014) (granting summary judgment in favor of defendants on plaintiff's claim for conversion of money because plaintiff presented no evidence that cash or financial accounts were delivered to defendants for safekeeping).

## V.   CONCLUSION

Elbar has brought numerous claims against Prins, United Sentry, TransWorld, and Industry Drive. For the reasons set forth herein, the Court finds that all of Elbar's claims must fail with one exception: Elbar has proven the elements of its TTLA claim against Prins. Accordingly, Elbar is entitled to judgment against Prins for $716,084.58, representing the difference between the $2.4 million that Prins stole and the $1,683,915.42 that Elbar has recovered through the Prins' Criminal Case and the Prins' Bankruptcy Case. [*See* Finding of Fact Nos. 110, 113–114]. Additionally, because Elbar has prevailed under its TTLA claim, Elbar is entitled to recover the reasonable attorneys' fees and costs it has expended in prosecuting this particular claim.

Conversely, because Elbar is not the prevailing party in its TTLA claims against MacKenzie and United Sentry, Elbar is liable to these two defendants for their respective reasonable attorneys' fees and costs in defending themselves against Elbar.

Counsel for MacKenzie and United Sentry has seven (7) days to provide to counsel for Elbar all invoices that his two clients believe represent the reasonable fees and costs incurred in defending themselves against Elbar's TTLA claim.  If counsel for MacKenzie and United Sentry fails to deliver these invoices within the seven (7) day deadline, then the fees and costs will be deemed waived.  If they are timely delivered, then counsel for Elbar has seven (7) days to file a certificate setting forth that Elbar either does object or does not object to the reasonableness of the requested fees and expenses.[138]  If Elbar's counsel files a certificate that Elbar does not object to the reasonableness, then no further hearings will be held and the Court will enter a judgment consistent with these findings of fact and conclusions of law.  Elbar's certification that it does not object to reasonableness will **not** constitute a waiver of Elbar's right to appeal any of this Court's rulings, including that Elbar is liable to MacKenzie and United Sentry for their reasonable fees and costs as the prevailing parties in Elbar's TTLA claim against them.

If Elbar's counsel certifies that Elbar does object to the reasonableness of the requested fees and costs of MacKenzie and United Sentry, then this Court will hold a hearing on solely this issue, and thereafter will render a ruling on reasonableness and then enter a judgment consistent with these findings of fact and conclusions of law.

Finally, with respect to Elbar's fees and costs for prosecuting its TTLA claim against Prins, Elbar's counsel has seven (7) days to submit to this Court all invoices that Elbar believes represent its reasonable fees and expenses.  The Court will review these invoices *in camera* and

---

[138] On September 12, 2018, this Court orally announced on the record its ruling regarding the adversary proceeding, and informed the parties that it would subsequently be entering this Memorandum Opinion on the docket to explain its ruling in detail.  In issuing its oral ruling, the Court set forth deadlines for counsel to deliver invoices representing the reasonable fees and costs.  In fact, counsel for MacKenzie and United Sentry timely delivered its invoices to counsel for Elbar and, in the aggregate, seeks to recover fees and costs of $60,725.00 and $1,851.45, respectively. [*See* Adv. Doc. No. 249].

then issue a ruling on the amount it finds to be reasonable.  As with the fees and costs of MacKenzie and United Sentry, Elbar's fees and costs will be incorporated into the judgment.[139]

Signed on this 28th day of September, 2018.

_____

Jeff Bohm
United States Bankruptcy Judge

---

[139] After this Court issued its oral ruling on September 12, 2018, Elbar's counsel subsequently filed a certificate expressly setting forth that Elbar waives its attorneys' fees and expenses for prosecuting its TTLA claim against Prins.  [*See* Adv. Doc. No. 250].  Hence, the judgment will set forth that Elbar shall recover only $716,084.58 from Prins.